UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAY KRAVITZ and MICHAEL STODDARD,

                                    Plaintiffs,

                                                            9:12-CV-01011
v.
                                                            (LEK/TWD)
BRIAN FISCHER, et al.,

                                    Defendants.
_____

APPEARANCES:                          OF COUNSEL:

JAY KRAVITZ
Plaintiff *pro se*
08-A-6613
Downstate Correctional Facility
Box F
Fishkill, NY 12524

MICHAEL STODDARD
Plaintiff *pro se*
P.O. Box 374
35 West Main Street, Upper
Leroy, NY 14482

HON. ERIC T. SCHNEIDERMAN              CATHY Y. SHEEHAN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

        *Pro se* Plaintiffs Jay Kravitz and Michael Stoddard (referred to individually herein as

"Kravitz" and "Stoddard" and collectively as "Plaintiffs") have commenced this action pursuant

to 42 U.S.C. § 1983, alleging the deprivation of their rights under the First, Eighth, and

Fourteenth Amendments to the Constitution while confined in the Riverview Correctional Facility ("Riverview") in 2011 and 2012. Plaintiffs claim they were: (1) not allowed to hold pre-meal blessings on various Jewish holidays; (2) not allowed Chanukah candles on at least one occasion; (3) verbally harassed, threatened and ridiculed by corrections officers because of their Jewish faith on a number of occasions; (4) denied the opportunity to attend a service held for Shavuot because the corrections officers claimed there was no facilitator available, when the inmate Jewish community facilitator was available; and (5) denied requests to form a Jewish organization to raise funds for the purchase of religious books and articles for Riverview inmates. (Dkt. No. 1.)

Plaintiffs have sued Defendants Brian Fischer ("Fischer"), Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Calvin Rabsatt, incorrectly sued as Calvin Rabassat ("Rabsatt"), Superintendent of Riverview; Corrections Officers Perry, Osgood, Gravlin, Beldock, and Bell; John Does #I and #II; and DOCCS. *Id.* at ¶ 2. Defendants Fischer, Rabsatt, Perry, Osgood, Gravlin, Beldock, and Bell have been sued in their individual and official capacities.[1] *Id.* at 1. The named defendants, with the exception of Defendant Bell, who has not been served, have moved for summary judgment dismissing Plaintiffs' Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] (Dkt. Nos. 53; 53-5 at ¶ 2.) Kravitz has filed papers in opposition to the motion. (Dkt. No. 70.) Stoddard

---

[1] Although the caption to Plaintiffs' Complaint does not include Defendants John Doe #1 and John Doe #2 among the corrections officers sued in both their individual and official capacities, the Court will assume that since the Doe defendants are also corrections officers the omission was an oversight on Plaintiff's part.

[2] The Defendants' motion has been referred to me for Report and Recommendation by the Hon. Lawrence E. Kahn, D.J., pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

has not.

For the reasons set forth below, the Court recommends that the moving Defendants' motion for summary judgment (Dkt. No. 53) be granted. The Court also recommends that the Complaint be *sua sponte* dismissed with prejudice against non-movants Bell and John Does #1 and #2 pursuant to 28 U.S.C. § 1915A.[3]

## I.    BACKGROUND

During the time period relevant to their claims, Plaintiffs were inmates confined at Riverview.[4] (Dkt. No. 1 at ¶ 4.) Kravitz has been a life-long member of the Jewish faith. (Dkt. Nos. 53-5 at 29;70 at ¶ 5.) According to Kravitz, Stoddard, who may have been "partially Jewish" and maintained a Kosher diet, was a student of the Jewish faith with a great desire to learn more about Judaism. (Dkt. No. 53-5 at 32-33.)

### A.    Restrictions on Prayer

On September 25, 2011, Riverview Corrections Officer Beldock ordered Plaintiffs not to say a pre-meal blessing at a Rosh Hashanah holiday meal in the mess hall. (Dkt. No. 1 at ¶ 5.) On September 27, 2011, during Yom Kippur, Beldock again refused to allow Plaintiffs to say a

---

[3]    28 U.S.C. § 1915A provides that, "[o]n review, the court shall . . . dismiss [the prisoner's] complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief can be granted . . . ." 28 U.S.C. § 1915A(b).

[4]    This action was commenced on June 21, 2012. (Dkt. No. 1.) Original Plaintiffs Juarez F. Barreto, Anthony Sidle and Michael Orthodox have been dismissed from the action. (*See* Dkt. Nos. 10 and 43.) Kravitz and Stoddard were both released on parole during the pendency of the lawsuit. (*See* Dkt. Entry 01-16-2013; Dkt. No. 34.) Kravitz has since been returned from parole into DOCCS custody. (Dkt. No. 71.)

pre-meal blessing in the mess hall.[5]  *Id*. at ¶ 6.  When Plaintiffs complained, Beldock replied, "I run the mess hall you Jews are here to eat not pray, just fuckin eat and ge[t] the fuck out, I have had [i]t with you fucking Jews."  *Id*.  On September, 29, 2011, when Beldock was once again hostile to Plaintiffs in the mess hall, Corrections Officer Jones stepped in and apologized for Beldock's behavior, and Plaintiffs were allowed to have a normal holiday in accordance with DOCCS rules.  *Id.* at ¶ 8.

The evening of October 12, 2011, during the Jewish holiday of Sukkot, when the Jewish inmates attempted to pray together at the Holiday Booth provided each year by Riverview for the pre-meal group prayer and blessing, they were barred from praying as a group by Beldock and only allowed to go into the booth one at a time.  *Id*. at ¶ 9.  When Beldock attempted to bar the group prayer again on the last day of Sukkot, another corrections officer apologized and allowed the inmates to pray as a group.  *Id.*  ¶ 10.

In support of their motion for summary judgment, Defendants have submitted the Declaration of DOCCS employee, Kristina Monnet ("Monnet"), supervisor of the Riverview Inmate Grievance Program ("IGP").  Monnet searched grievance records for Kravitz and Stoddard and found no grievances filed by them with respect to being prohibited from praying in the mess hall between April 2011, and May 2012.  (Dkt. No. 53-3 at 1-2.)  Jeffrey Hale ("Hale"),

_____

    [5]  The Jewish calendar for 2011 indicates that Rosh Hashana began on the evening of September 28, 2011, and ended September 30, 2011, and Yom Kippur began at sundown on October 7, 2011, and continued through October 8, 2011.  *See* http://www.hebcal.com/ hebcal/?year=2011&month=x&yt=G&v=on&nx=on&mf=on&ss= on&s=on&i=on&lg -a&vis=on&d=on&c =on&geo=city-Jerusalem&m=72&.cgifields-nx&.cgifields- nh&.cgifields=+ss&.s=  Preview+Calendar (Jewish Calendar').  The Court will assume for purposes of this motion that the two incidents involving Beldock's refusal to allow the Jewish inmates to recite a pre-meal blessing occurred during Rosh Hashana and Yom Kippur, and that Plaintiff has inadvertently alleged incorrect dates.

DOCCS Assistant Director of the IGP, searched records of appeals made to CORC during the same time period and found no appeal by Plaintiffs regarding being prohibited from praying in the mess hall.  (Dkt. No. 53-4 at 1-2.)

Kravitz claims that Juarez Barreto ("Barreto") filed a grievance regarding not being allowed to pray in the mess hall on behalf of the Jewish community at Riverview as a whole, and that Kravitz's name was attached to the grievance.  (Dkt. No. 70 at 2, 6.)

### B.      Chanukah Candles

On December 27, 2011, per the instructions of Rabbi T. Snyder, Kravitz asked Defendant Corrections Officer Osgood for the Chanukah candles for the traditional holiday lighting.  *Id.* at ¶ 12.  Osgood responded, "[t]here are no Fuckin candles, get you[r] Jewish Ass out of here, I don't have any Jew Candles, and y[o]u Jews are a pain in the ass."  *Id.*

### C.      Shavuot Service

Rabbi Snyder sent a memo to the Riverview administration requesting a 1:30 call-out for a Shavuot service on May 27, 2012.  *Id.* at ¶ 16.  Kravitz went to the activities building for the service and was told by a corrections officer that there was no memo.  *Id.*  Barreto asked two sergeants about the call-out not being made and was told that there was no call-out because there was no facilitator, even though almost every corrections officer knew that Barreto was the Jewish community facilitator.[6]  *Id.*

---

[6]  Plaintiffs have not implicated any of the defendant corrections officers in their Shavuot service call-out claim.  Therefore, it will be addressed by the Court in its analysis of Plaintiffs' general supervisory claim against Defendants Fischer and Rabsatt.

**D.    Verbal Harassment and Threats and Derogatory Comments**

Plaintiffs allege a pattern of verbal harassment and derogatory comments about Judaism and adherents of the Jewish faith by defendant corrections officers and acceptance by supervisory defendants of an unofficial policy of antisemitic behavior towards Jewish inmates.  According to Plaintiff, on April 23, 2012, Corrections Officer Gravlin ("Gravlin") commented to John Doe #1: "Here it is we just received another radical pain in the Ass fuckin, just what we need another fuckin Jew." *Id*. at ¶ 14.  On May 27, 2012, as inmates Barreto, Anthony Sidle ("Sidle"), and Michael Orthodox ("Orthodox") were leaving the mess hall with their Shavuot holiday meal, John Doe # 2 said to Corrections Officer Perry, "[h]ey look at this shit, special diets and fuckin Jews." *Id*. at ¶ 15.  Perry laughed out loud at the remark.  *Id*.

On June 18, 2012, while Kravitz was in the recreation yard, Corrections Officer Bell commented to him, "Kravitz you Fuckin Pain in the ass Jew, I am going to get your Jew ass one way or the another."  *Id*. at  ¶ 18.  On June 22, 2011, in the Riverview mess hall, Bell told Plaintiff to "[j]ust eat and get out fuckin Jew."  *Id*. at ¶ 19.

**E.    Denial of Permission for a Jewish Fund Raising Organization**

In 2011, Jewish inmates applied for permission to create a Jewish organization at Riverview to raise funds for the purpose of buying religious books and articles for study by Jewish inmates.  (Dkt. No. 1 at ¶ 21.)  The request was denied by supervisory officials at both Riverview and DOCCS.  *Id*.  According to Plaintiffs, Riverview has Christian, Latino, African American, Rastafarian, and Native American organizations for the purpose of raising funds for their community festivals and religious purposes.  *Id*.

On June 7, 2011, a month and a half after receiving an April 26, 2011, denial from

Catherine Jacobsen ("Jacobsen"), then Acting Deputy Commissioner of Programs for DOCCS,

Kravitz requested a written explanation for the denial. *Id.* at 13. In a June 13, 2011,

memorandum to Plaintiff, Jacobsen explained that the request for a fund raising group was

denied because the Jewish inmates' desire for books and materials to study Judaism could be

easily accommodated by a coordinated effort of the DSP (Deputy Superintendent of Program

Services), Coordinating Chaplain, and the facility Rabbi, and did not require a formal

organization. *Id.* at 14.

Kravitz filed a grievance from the denial on July 12, 2011, claiming that without being

able to do fund raising, there would be no money to purchase the necessary materials to learn

Hebrew and study the Torah, Talmud, Kaballah, and Zohar. (Dkt. No. 53-5 at 10-11.) Kravitz

noted in the grievance that other groups at Riverview were allowed to have fund raising

organizations. *Id.* The Inmate Grievance Resolution Committee ("IGRC") denied the grievance,

recommending that Kravitz address his grievance – establishing an organization for fund raising

for books and supplies – to the Rabbi and Riverview administration because a Jewish fund

raising organization might not be necessary to acquire whatever was needed. *Id.* at 8.

Defendant Rabsatt affirmed the IGRC denial, noting Jacobsen's rationale for the denial

and indicating that the Rabbi at Riverview was in the process of establishing a study group for

Jewish inmates where they would have access to learning materials to further advance knowledge

of their religion and religious practices. *Id.* at 9. The materials for the study group were to be

provided by the Rabbi and with facility funds. *Id.* CORC upheld Rabsatt's affirmance of the

IGRC determination. *Id.* at 9.

At his deposition, Kravitz testified that DOCCS Deputy of Programs, Paul Frank ("Frank") (Dkt. No. 53-5 at 34), who is alleged in Plaintiffs' Complaint to have acted in the interest of the Jewish inmates on a number of occasions (*see, e.g.*, Dkt. No. 1 at ¶¶ 7, 12), stepped in and allotted considerable funds for the purchase of books for study.[7] (Dkt. No. 53-5 at 49.) According to Kravitz, they were able to purchase numerous excellent books so that they could meet and try to interpret the work of God. *Id.* The Riverview administration suddenly became very kind-hearted towards the Jewish inmates, and the Jewish inmates studied Judaism for almost a year prior to the time Kravitz was paroled. *Id.* at. 30. The inmates who were not well educated in Judaism, and some who were, all enjoyed the last year Kravitz was at Riverview when the Jewish inmates were allowed to meet on the Sabbath. *Id.* at 31.

## F.      Passover Food and Grape Juice

At his deposition in this case, Kravitz claimed, for the first time, that in 2011 corrections officers drank the grape juice meant for Passover while they were playing cards. (Dkt. No. 53-4 at 40.) Kravitz did not identify the person or persons responsible for taking the food and grape juice. He did identify Beldock and Bell as two of the officers he observed drinking the grape juice and Osgood as having been present. Plaintiff testified at his deposition that he filed grievances for all of the incidents about which he complained. In his unsworn Argument in

---

[7] In his deposition, Plaintiff testified that Frank, with 100 percent sincerity, tried very hard to intervene on behalf of the Jewish inmates, and that when he was around the corrections officers spoke kindly to the inmates, but behind his back were derogatory and condescending towards them. (Dkt. No. 53-5 at 34-35, 44.) Plaintiff also testified at his deposition that Frank intervened during one Passover when corrections officers mistreated and pillaged from the Jewish inmates so that the celebration of Passover could go forward. *Id*. at 51. In the middle of another Jewish holiday, Frank removed the corrections officers who were in the dining area, including defendant corrections officers, because they were intent on harassing Plaintiffs. *Id*. at 51-52.

Response to Defendants' Summary Judgment Motion, Kravitz made a cursory reference to his deposition testimony that the "officer[s] were eating [their] food and drinking [Plaintiffs'] juice while playing cards." (Dkt. No. 70 at 4.) However, he has submitted no evidence supporting his assertions regarding the Passover food and grape juice.[8] (Dkt. No. 70.)

## II. PROCEDURAL HISTORY

This action was filed by Plaintiffs Kravitz and Stoddard, along with Barreto, Orthodox, and Sidle on June 21, 2012. (Dkt. No. 1.) Plaintiffs filed joint motions to proceed *in forma pauperis* (Dkt. No. 2) and for appointment of counsel. (Dkt. No. 3.) The Court thereafter issued an Order advising Plaintiffs that for the action to proceed, they would have to comply with the filing fee requirements by either paying the filing fee or submitting a current inmate authorization form within thirty days of the Order. (Dkt. No. 3.) Plaintiffs Kravitz, Stoddard, and Orthodox filed authorization forms. (Dkt. Nos. 5, 6, and 9.)

On October 24, 2013, Judge Kahn issued a Decision and Order: (1) denying Barreto's motion to proceed *in forma pauperis* and ordering that Barreto be dismissed from the action without prejudice if he did not pay the filing fee and notify the Court of his current address within thirty days of the filing of the Decision and Order; (2) denying Kravitz's motion to

---

[8] "Although a complaint need not correctly plead every legal theory supporting the claim . . ., at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense." *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000). Plaintiff did not move to amend his Complaint to include the claim regarding the Seder food and grape juice prior to the filing of Defendants' summary judgment motion, nor has he sought leave to amend in his opposition to the motion. "A plaintiff may not amend his complaint by making new allegations in his deposition, or in response to a motion for summary judgment. " *Edwards v. Bezio*, No. 9:08-CV-256 (LEK/RFT), 2010 WL 681369, at *3 n.4, 2010 U.S. Dist. LEXIS 16527, at *7 n.4 (N.D.N.Y. Feb. 5, 2010). Therefore, as in *Edwards*, the Court has not considered Plaintiff's new claim regarding the Passover food and wine in its summary judgment analysis. *Id*.

proceed *in forma pauperis* without prejudice to renew upon the submission of a proper application within thirty days, and ordering that Kravitz be dismissed from the action without prejudice if he did not pay the filing fee or file a proper *in forma pauperis* application within thirty days of the filing of the Decision and Order; (3) dismissing Sidle from the action without prejudice for failure to comply with the Court's prior order, and denying his *in forma pauperis* application as moot; (4) granting Stoddard and Orthodox's *in forma pauperis* applications; (5) directing service; and (6) denying the motion for appointment of counsel.[9]  (Dkt. No. 10.)

Kravitz paid the filing fee on June 3, 2013.  (Dkt. Entry 06/03/2013.)  Barreto did not comply with Judge Kahn's Decision and Order of October 24, 2013, and was dismissed from the action without prejudice by the terms of the thereof.  Orthodox was dismissed from the action without prejudice as a result of failure to comply with Judge Kahn's Decision and Order of September 23, 2013 ordering that he would be dismissed from the action if he failed to notify the Clerk of his current address within thirty days, leaving Kravitz and Stoddard as the only plaintiffs.  (Dkt. No. 43.)

The Summons and Complaint were served on each of the named defendants except for Defendant Bell.  (Dkt. Nos. 12-15, 17-18, 20-21.)  Named Defendants, with the exception of Bell, filed their Answer on June 22, 2013 (Dkt. No. 38), and moved for summary judgment on February 12, 2014.[10]  (Dkt. No. 52.)

_____

[9]  A subsequent motion for appointment of counsel by Kravitz (Dkt. No. 45) was also denied without prejudice.  (Dkt. No. 48.)

[10]  Defendants' motion was made pursuant to Rule 56 but was described by the movants as a "motion to dismiss plaintiff's complaint" and originally docketed as a motion to dismiss rather than one for summary judgment.  (Dkt. No. 53 at 1.)  In a March 3, 2014, Text Order (Dkt. No. 54), the Court concluded that based upon the submission by Defendants of a Local Rule 7.1

## III.    APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

---

Statement and two affidavits, it appeared that Defendants intended to move for summary judgment.  In the Text Order, the Court informed the parties that unless Defendants notified it within ten days that they wanted the motion to remain docketed as a motion to dismiss, the Court would convert it to a motion for summary judgment.  *Id*.  Defendants thereafter confirmed that they intended to move for summary judgment, and the Court direct the Clerk to reflect that the motion was one for summary judgment.  (Dkt. Nos. 55 and 56.)

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.[11]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro se*,  the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[12] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

[11]  Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746.  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).  In addition, under oath in his deposition, Kravitz adopted the Complaint as his own and testified that everything in the Complaint was true and there was nothing he wished to modify.  (Dkt. No. 53-5 33-34.)

[12]  Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

## IV. ANALYSIS

### A. Plaintiffs' Official Capacity Claims For Money Damages Against Defendants

Plaintiffs have asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the individual defendants as well as claims against DOCCS. (Dkt. No. 1 at ¶ 8.) The moving Defendants seek summary judgment dismissing those claims on Eleventh Amendment grounds.[13] (Dkt. No. 23-4 at 3-4.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state. (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006). Since DOCCS is a state agency for purposes of the Eleventh Amendment, claims for money damages against DOCCS are barred under the Eleventh Amendment. *See Rother v. NYS Dept. of Corrections and Community Supervision*, 970 F. Supp. 2d 78, 89-90 (N.D.N.Y. 2013). The Eleventh Amendment also bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against all

---

[13] Although only the moving Defendants seek dismissal of Plaintiffs official capacity claims for money damages, the District Court is empowered to *sua sponte* dismiss those official capacity claims as against Defendants John Doe #1 and #2 and unserved Defendant Bell. *See Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) (Eleventh Amendment may be raised *sua sponte* because it affects the court's subject matter jurisdiction); s*ee also Saxon v. Attica Medical Dept.*, 468 F. Supp. 2d 480, 484 (W.D.N.Y. 2007) (recognizing that 28 U.S.C. § 1915A directs district courts *sua sponte* to dismiss prisoner claims barred by the Eleventh Amendment).

individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity).

Therefore, I recommend that the moving Defendants be granted summary judgment dismissing Plaintiffs' § 1983 claims for money damages against DOCCS and the individual Defendants in their official capacities, and that the claim for money damages against Bell and John Does #1 and #2 in their official capacities be *sua sponte* dismissed with prejudice on Eleventh Amendment grounds pursuant to 28 U.S.C. § 1915A.

### B.     Beldock's Refusal to Allow Pre-Meal Blessings in the Mess Hall

Plaintiffs claim that Corrections Officer Beldock prohibited Jewish inmates, including Kravitz, from saying a pre-meal blessing in the mess hall at a Rosh Hashanah meal and a meal on Yom Kippur in September of 2011, in violation of Plaintiffs' First Amendment right to the free exercise of their religious beliefs.  (Dkt. No. 1 at ¶¶ 5-6.)  Defendants have submitted no evidence disputing Plaintiffs' claim regarding Beldock's actions.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."[14]  *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  Alleged infringements of an inmate's free exercise rights are judged by whether the restriction is "reasonable."  *Ford*, 352 F.2d 588.  Prison officials may not "substantially burden an inmate's First Amendment right to religious exercise without some justification . . . ."  *Salahuddin,* 467 F.3d at 275-76.  A prison regulation that impinges on an inmate's right to freely exercise his

_____

[14]  Plaintiff has also asserted a free exercise of religion claim under N.Y. Const., art. 1, § 3. (Dkt. No. 15 at ¶ 55.)

religion is valid "if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). Individualized decisions to deny an inmate the ability to engage in a religious exercise, as is alleged with regard to Defendant Beldock, are analyzed under the same standard as DOCCS policies. *See Salahuddin*, 467 F.3d at 274, n.4.

Defendants seek summary judgment dismissing Plaintiffs' claim for the violation of their right to free exercise of their religious belief with regard to pre-meal blessings in the mess hall during Rosh Hashanah and Yom Kippur solely on the ground that Plaintiffs failed to exhaust their administrative remedies. (Dkt. No. 53-3 and 53-4.) The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996) imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, and expressly requires that no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. tit. 7, Part 701. (2013).

The first step requires an inmate to file a grievance complaint with the facility's IGP

clerk. *Id*. at § 701.5(a). If there is no informal resolution, the IGRC holds a hearing. *Id*. at § 701.5(b)(2). If the grievance is denied by written decision of the IGRC, *id*. at § 701.5(b)(3), the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at 701.5(c)(1). The appeal of a grievance involving an institutional issue is decided by the superintendent of the facility. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

The third step is an appeal to CORC, *id*. at 701.5(d)(1)(i), which issues a written decision. *Id*. at 701.5(d)(3)(ii). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6, 2012 U.S. Dist. LEXIS 185178, at *14-15 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

Defendants submitted declarations from Monnet and Hale establishing that a review of grievances filed at Riverview from April of 2011 to May of 2012, and a review of the appeals filed with CORC during that same time period, did not uncover any grievances filed by either Plaintiff regarding being prohibited from praying in the mess hall. (Dkt. Nos. 53-3 and 53-4.)

If, as in this case, defendants meet the burden of establishing plaintiffs' failure to exhaust,

the exhaustion review does not end. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff. The DOCCS IGP is well established, and Kravitz has acknowledged filing grievances while at Riverview, including one with regard to denial of permission to for a Jewish fund raising organization, showing that he was well aware of the administrative remedies available to him. (Dkt. Nos. 53-5 at 5-12; 44-47.)

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.'" *Hemphill*, 380 F.3d at 688 (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004)). Plaintiffs have asserted no such claim, nor have they provided evidence that they were prevented from filing grievances with regard to the prayer prohibition. In fact, Kravitz claims that prohibiting the pre-meal blessings was grieved by Barreto on behalf of all of the Jewish inmates. (Dkt. No. 70 at 2, 6.) There is no claim by Stoddard, who has not opposed Defendants' motion, or evidence establishing that he exhausted his administrative remedies.

Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the

defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified.[15]  *Hemphill*, 380 F.3d at 686.  "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats.  *See, e.g., Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

The IGP cannot be reasonably interpreted to allow an inmate to file a grievance on behalf of a class of inmates.  The IGP specifically provides that "[a]ll grievances must be filed in an individual capacity."  § 701.3(b); *see also Shariff v. Coombe*, 655 F. Supp. 2d 274, 286 (S.D.N.Y. 2009) (relying on § 701.3(b) in rejecting plaintiff's argument that where there are issues affecting a class of inmates, the issues should be grievable as a class action); *Jamison v. Franko*, No. 12 C 0242, 2013 WL 5166626, at *2, 2013 U.S. Dist. LEXIS 35915, at *9-10 (N.D. Ill. Sept. 13, 2013) (finding failure to exhaust where plaintiff attempted to rely on a grievance filed by another inmate, and the applicable IGP did not authorize one inmate to file on behalf of another); *Douglas v. Marvin,* Civil No. 12-2070, 2013 WL 2631875, at *3, 2013 U.S. Dist.

---

[15]  Subsequent to *Hemphill*, the Supreme Court decided *Woodford v. Ngo*, 548 U.S. 81 (2006).  The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id*. at 83-84.  The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" – "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id*. at 90 (citation omitted).  Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford*, the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases*. See, e.g., Amador v. Andrews*, 655 F.3d 89, 102-03 (2d Cir. 2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

LEXIS 82582, at *8 (W.D. Ark. June 12, 2013) (finding failure to exhaust where plaintiff failed to submit a grievance and attempted to rely on grievance of another inmate); *Torres v. Cormier*, Civ. Action No. 5:12-CV-63, 2012 WL 5330980, at *3 n.3, 2012 U.S. Dist. LEXIS 155410, at *11 n.3 (D. Vt. Sept. 19, 2012) (a plaintiff cannot rely on the fact that another inmate filed a grievance "as evidence that he has in any way initiated (let alone exhausted) the administrative grievance procedure himself").

Given Plaintiffs' failure to exhaust their administrative remedies under the IGP with respect to Beldock's refusal to allow Jewish inmates to recite a pre-meal blessing in the mess hall on two occasions during Rosh Hashana and Yom Kippur, the Court recommends that Defendant Beldock be granted summary judgment dismissing Plaintiffs' claims arising out of that refusal on failure to exhaust grounds.

### C. Beldock's Refusal to Allow Group Prayer by Jewish Inmates During Sukkot

Plaintiffs claim that during Sukkot, Riverview officials provided a Holiday Booth for a pre-meal group prayer and blessing for Jewish inmates. (Dkt. No. 1 at ¶ 9.) On October 12, 2011, when Plaintiffs attempted to pray as a group in the Holiday Booth, Beldock refused to allow it and required them to go in one at a time. *Id*. When on the last day of Sukkot, Beldock again refused to allow group prayer, another officer apologized for Beldock and allowed the group prayer. *Id*. at ¶ 10. According to Plaintiff, group prayer was allowed during Sukkot with the exception of October 12, 2011. *Id*.

Defendants' evidence of failure to exhaust covered only the refusal to allow prayer in the mess hall. (See Dkt. Nos. 53-3 at ¶¶ 5-6; 53-4 at ¶ 9.) Neither Plaintiff's Complaint nor Defendants' Answer or motion papers identifies the location of the Holiday Booth, leaving some

question as to whether Plaintiffs' Holiday Booth claim falls within the failure to exhaust defense relied upon by Defendants that is limited to the mess hall.[16] That question may be answered by Plaintiff's Affidavit in opposition, in which he states that Plaintiffs were stopped from prayer in the mess hall during Rosh Hashana, Yom Kippur, and Sukkot, suggesting that the Holiday Booth was located in the mess hall. (Dkt. 70 at ¶ 9.)

If the Holiday Booth was in the mess hall, Plaintiffs' free exercise claims related to Beldock's refusal to allow group prayer on October 12, 2011, fall within Defendants' failure to exhaust argument, and Defendant Beldock is entitled to summary judgment dismissing claims arising out of the incident for failure to exhaust administrative remedies. Beldock is entitled to summary judgment even if the Holiday Booth was located outside of the mess hall.

As discussed above, in order to succeed on a free exercise clause claim, a plaintiff must show at the threshold that defendants' conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 274-75.) The substantial burden requirement is not met by a *de minimis* imposition on the free exercise of religion. *See Leach v. New York City*, No. 12 Civ. 3809 (PAC)(JCF), 2013 WL 3984996, at *5, 2013 U.S. Dist. LEXIS 110658, at *10 (S.D.N.Y. Aug. 2, 2013).

By Plaintiffs' own admission, Beldock was successful in preventing the group prayer on only one occasion during Sukkot, and having to recite their pre-meal blessing alone rather than as a group on a single occasion, was *de minimis* and did not constitute a substantial burden on their

---

[16] Defendants' failure to identify the specific claims they intend to include in their failure to exhaust argument on summary judgment and further failure to present any legal argument at all in support of the exhaustion defense, has left the Court unable to determine the scope of the exhaustion defense with certainty.

free exercise rights.  *See, e.g., Halloum v. Ryan*, No. CV 11-0097 (PHX-RCB), 2014 WL 1047144, at *17, 2014 U.S. Dist. LEXIS 35077, at *55-56 (D. Ariz. Mar. 18, 2014) (preventing Muslim inmates from bringing their prayer rugs into the dining room on two occasions during Ramadan, thereby prohibiting them from praying, did not constitute a substantial burden warranting summary judgment for defendants on the free exercise claim); *Robinson v. Jimminez*, No. 08-CV-902 (NGG)(LB), 2012 WL 1038917, at *6, 2012 U.S. Dist. LEXIS 43097, at *21-23 (E.D.N.Y. Mar. 6, 2012) (one-time interruption of a service celebrating Rosh Hashana, even if a violation of plaintiff's free exercise rights, was *de minimis*); *Smith v. Graziano*, No. 9:08-CV-469 (GLS/RFT), 2010 WL 1330019, at *9, 2010 U.S. Dist. LEXIS 33811, at *30 (N.D.N.Y. Mar. 16, 2010) (cancellation of two religious services, which appeared to have been isolated occurrences rather than a systemic problem or policy of denying religious services, constituted a *de minimis* burden on plaintiff's ability to freely exercise his religion).

In light of the foregoing, the Court recommends that Defendant Beldock be granted summary judgment dismissing Plaintiffs' claims arising out of his refusal to allow Plaintiffs to pray as a group in the Holiday Booth during Sukkot.

### D. Chanukah Candles

Kravitz claims that on one occasion, when he asked Defendant Corrections Officer Osgood for the Chanukah candles for the traditional lighting, Osgood responded that there were "no Fuckin candles," and told Kravitz to get his "Jewish Ass" out of there, that he had no "Jew Candle," and that the Jews were "a pain in the ass."  (Dkt. No. 1 at ¶ 12.)  Defendants have submitted no evidence refuting Plaintiffs' claim or providing an explanation or a penological justification for the denial.  Moreover, Defendants have not submitted any legal argument

supporting summary judgment dismissing Plaintiffs' First Amendment claim for violation of

their right to the free exercise of their religious beliefs with regard to the Chanukah candles.

Plaintiff, for his part, has submitted no evidence showing that the denial of Chanukah candles by

Osgood was a matter of policy, or that Chanukah candles were available and intentionally

withheld by Osgood.

Despite the parties' mutual failure to address the claim on summary judgment, a Court

can search the record and award judgment to any party entitled to it as a matter of law as long as

there are no genuine issues of material fact. *4Kids Entertainment, Inc. v. Upper Deck Co.*, 797 F.

Supp. 2d 236, 241 (S.D.N.Y. 2011) (on a motion for summary judgment the court may search the

record and grant judgment to either party whose claim has been proved or disproved). Searching

the record, the Court finds that Defendant Osgood is entitled to summary judgment dismissing

Plaintiffs' First Amendment claim regarding the Chanukah candles on the grounds that denying

Plaintiffs Chanukah candles on a single occasion was *de minimis* and did not substantially burden

their sincerely held religious beliefs. *See Leach*, 2013 WL 3984996, at *5 (substantial burden

requirement not met by a *de minimis* imposition on the free exercise of religion).

### E. Verbal Harassment and Threats and Derogatory Comments

Plaintiffs contend that Defendant Corrections Officers Beldock, Osgood, Perry, Gravlin,

Bell, and John Does #1 and #2 verbally harassed, threatened, and made derogatory comments

regarding members of the Jewish faith in violation of Plaintiffs' First and Eighth Amendment

rights. None of the moving Defendants have denied Plaintiffs' contentions in their summary

judgment papers.

The harassing and derogatory comments by Beldock and Osgood are noted above. Plaintiff contends that Gravlin referred to a new Jewish inmate as a "pain in the Ass . . . fuckin Jew." (Dkt. No. 1 at ¶ 14.) Perry laughed when John Doe #2 made reference to "special diets and fuckin Jews." *Id*. Bell called Kravitz a "Fuckin pain in the ass Jew," and told him he was going to "get [his] Jew ass one way or the other."

Verbal threats, name-calling, intimidation, and harassment alone, even when they pertain to race and religion, do not give rise to a First or Eighth Amendment claim. *See Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) (explaining that verbal harassments including racial epithets, derogatory comments about Muslims, and mocking plaintiff about wearing an adult diaper, absent physical injury, are not constitutional violations cognizable under § 1983); *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (name-calling without appreciable injury did not violate inmate's constitutional rights); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under . . . § 1983.").

Plaintiffs have not established any physical or other appreciable injury as a result of Defendants' verbal harassment and threats. Therefore, despite the unprofessional, reprehensible, and totally unacceptable nature of the comments made about members of the Jewish faith and the threats against Jewish inmates by defendant corrections officers, the Court is compelled to recommend summary judgment in Defendant Beldock, Osgood, Gravlin, and Perry's favor with regard to Plaintiffs' claims, and also to recommend dismissal of the claims with prejudice against Defendants Bell and John Does #1 and #2 under 28 U.S.C. ¶ 1915A.

**F.      Denial of Request for a Jewish Fund Raising Organization at Riverview**

Plaintiffs claim that their rights to free expression under the First Amendment and to equal protection under the Fourteenth Amendment were violated by the denial at the facility and State levels of DOCCS of their request for permission to form a Jewish fund-raising group at Riverview to raise funds to buy religious books and materials.  (Dkt. No. 1 at ¶ 21.)  Plaintiff claims, and Defendants have submitted no evidence to the contrary, that Riverview has authorized Latino, Muslim, Christian, African American, Native American, and Rastafarian community organizations. (Dkt. No. 1 at ¶ 22.)

Since the only two administrators named as defendants are DOCCS Commissioner Fischer and Riverview Superintendent Rabsatt, the claim is presumably meant to be asserted against one or both of them.  The facts in the summary judgment record, however, do not support Plaintiffs' claims against Fischer or Rabsatt, or any of the Defendants, with regard to denial of permission to form a Jewish fund-raising group.

1.      Supervisory Liability

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").  "Holding a position in a hierarchical chain of command, without more,

is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.

The evidence shows that Acting Deputy Commissioner of Programs Jacobsen, who is not named as a defendant in this action, made the decision to deny Plaintiffs' request. *Id*. at 8, 14. Jacobsen denied the request based upon the belief that the goal of the fund-raising group, *i.e.*, funds for the purchase of religious books and materials for study by Jewish inmates, *id*. at 10, "could be easily accommodated by a coordinated effort of the DSP, Coordinating Chaplain, and facility Rabbi." *Id*. at 14. There is no evidence of any personal involvement by Fischer under the *Colon* categories, and the only personal involvement by Rabsatt revealed in the summary

judgment record is Rabsatt's affirmance of the IGRC denial of Kravitz's grievance. (Dkt. No. 53-5 at 8-12.)

Although there is some dispute among district courts in the Second Circuit, a superintendent's mere affirmance of an IGRC denial of a grievance has generally been found insufficient to show personal involvement for purposes of liability under § 1983.[17] *Keitt v. Schun*, No. 11-CV-438, 2014 WL 347053, at *8, 2014 U.S. Dist. LEXIS 184557, at *23-24 (W.D.N.Y. Jan. 30, 2014) (affirmance of denial of plaintiff's grievance is insufficient to establish personal involvement under § 1983); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 503 (S.D.N.Y. 2012); ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights."); *White v. Sears*, No. 9:10-CV-0721 (MAD/GHL), 2011 WL 2728443, at *8, 2011 U.S. Dist. LEXIS 74689, at *21 (N.D.N.Y. June 20, 2011) (merely denying a plaintiff's grievance is insufficient to establish personal involvement); *Henry v. Lempke*, 680 F. Supp. 2d 461, 464 (W.D.N.Y. 2010) (affirmance of denial of an inmate's grievances alone is insufficient to establish personal involvement).

2.     First Amendment Free Exercise Claim

The evidence in the record establishes that Plaintiffs' First Amendment right to the free exercise of their religious beliefs was not substantially burdened by the denial of the request for a

---

[17]  *See, e.g., Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) (finding that where the grievance involves an ongoing violation that can be directly remedied by the supervisory official affirming denial of the grievance, personal involvement can be found for purposes of § 1983). Even if affirming the denial of Kravitz's grievance was sufficient to establish personal liability on Rabsatt, as discussed below, the evidence does not support a determination that Plaintiffs' constitutional rights were violated by denial of the request for a Jewish fund-raising group.

Jewish inmate fund-raising group. Kravitz has acknowledged that the purpose for the fund-raising group was to buy books and other materials for the purpose of learning Hebrew and studying the Torah, Talmud, Kaballah, and Zohar. (Dkt. No. 53-5 at 10-11.) Kravitz has admitted that after the request for a fund raising group was denied by Jacobsen, who believed that the desire for books and materials to study Judaism could be easily accommodated without a fund-raising group, considerable DOCCS funds were allotted for the purchase of books for study, allowing the purchase of "numerous excellent books." *Id.* at 49. According to Kravitz, the Jewish inmates enjoyed studying Judaism during the last year of his incarceration. *Id*. at 30.

Thus, rather than burden Plaintiffs' free exercise of their religious beliefs, the Riverview and DOCCS state administration facilitated Jewish inmates' exercise of their religious beliefs. Therefore, the Court recommends that Defendant Fischer and Rabsatt's motion for summary judgment dismissing Plaintiffs' claim for violation of their First Amendment right to free expression be granted.

### 3. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To prove a violation of this clause, a plaintiff must prove "purposeful discrimination . . . directed at an identifiable or suspect class." *Giano*, 54 F.3d at 1057 (citation omitted).

Plaintiffs are very clear that the reason for requesting permission to establish a Jewish fund-raising group was to raise money for books and materials for the study of Judaism. The only evidence in the record with regard to the purpose for which the community organizations

identified by Plaintiff in his Complaint were approved is Plaintiffs' assertion that they all had the purpose of "raising funds for their community purposes and religious festivals." (Dkt. No. 1 at ¶ 21.) There is no evidence in the record that establishes the denial of the request for a Jewish community fund-raising group was purposefully discriminatory. Rather, because the Riverview and DOCCS administrators actually followed through on providing the Jewish inmates with the requested study materials, the only rational conclusion that can be reached from the evidence is that the request for a fund-raising group was denied for the precise reason given to Kravitz by Jacobsen and not as the result of purposeful discrimination. Therefore, the Court recommends that Defendants Fischer and Rabsatt's motion for summary judgment on Plaintiffs' equal protection claim be granted.

### G. Claim against Defendants Fischer and Rabsatt for Accepting the Unofficial Policy of Anti-Semitism at Riverview and for Failure to Properly Supervise and Train DOCCS Employees

#### 1. Acceptance of Unofficial Policy of Anti-Semitism

The only evidence directly connecting either Fischer or Rabsatt to any of Plaintiffs' claims suggesting anti-Semitism is Rabsatt's affirmance of the denial of Kravitz's grievance regarding denial of the request for a Jewish fund-raising organization.[18] There is no evidence that either Fischer or Rabsatt was aware of an unofficial policy of anti-Semitism at Riverview or in the DOCCS system. Without the requisite personal involvement, liability cannot be established against Fischer or Rabsatt under any of the categories identified in *Colon*. *See Bass*, 790 F.2d at 263 (tangible connection needed between defendant's actions and plaintiff's damages).

---

[18] As previously noted, mere affirmance of the denial of a grievance is insufficient to support a § 1983 claim again Rabsatt. *See Keitt*, 2014 WL 347053, at *8.

Moreover, the evidence in the record does not support the existence of an unofficial policy of anti-Semitism at Riverview. Granted, the individually named corrections officers have not disputed Plaintiffs' allegations regarding their shameful comments regarding members of the Jewish faith, Beldock's refusal to allow pre-meal blessings or group prayer, or Osgood's denial of Chanukah candles on one occasion. However, Plaintiff concedes that when Beldock attempted to prevent a pre-meal blessing for a second time during Yom Kippur, another corrections officer apologized for Beldock's unacceptable behavior and allowed the blessing. (Dkt. No. 1 at ¶ 8.) The failure to have a call-out for a Shavuot service as requested by the Rabbi on a single occasion because there was no facilitator present does not support the existence of an unofficial policy of anti-Semitism. *Id*. at ¶ 16.

The evidence shows that Riverview officials provided Jewish inmates with a Holiday Booth for group prayer during Sukkot. *Id*. at ¶ 9. When Beldock attempted to prevent a group prayer in the Holiday Booth for the second time during Sukkot, another corrections officer present apologized for Beldock and allowed the group prayer. *Id.* In fact, according to Plaintiff, the only time group prayer was not allowed was when Beldock was present. *Id*. Plaintiff acknowledges that Deputy of Programs Frank worked very hard to intervene in the verbal harassment, threats, and anti-Semitic comments made by the handful of corrections officer defendants named in the action, but that when Frank wasn't around the officers resumed their unacceptable conduct. (Dkt. No. 53-5 at 34-35.) In addition, funding was provided for a number of excellent books so that the Jewish inmates could study Judaism, and Plaintiff himself concedes that "the Riverview administration suddenly became very kind-hearted towards the Jewish inmates." *Id*. at 30.

29

## 2.    Failure to Supervise and Train Employees

Plaintiffs claim a failure to properly train and supervise employees by Defendants Fischer and Rabsatt.  "The mere fact of supervisory authority . . . is insufficient to demonstrate liability, based on a failure to supervise, under § 1983."  *Colon*, 58 F.3d at 874.  *See also Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011); *White v. Fischer*, No. 9:09-CV-240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb. 18, 2010) ("Vague and conclusory allegations that a supervisor failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) (vague and conclusory allegations that a supervisor has failed to properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement and support a finding of liability); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (dismissal of a § 1983 claim is proper where plaintiff does no more than allege defendant was in charge of the prison).

## 4.    Recommendation

There is no evidence of personal involvement of Rabsatt and Fischer in the acts complained of by Plaintiffs.  There is no evidence of an unofficial policy of anti-Semitism at Riverview or DOCCS administration and considerable evidence to the contrary.  Furthermore, there is no evidence causally connecting the alleged wrongful actions of the corrections officer defendants and a failure by Defendants Rabsatt and Fischer to properly train and supervise them. Therefore, the Court recommends that Defendants Fischer and Rabsatt's motion for summary judgment dismissing Plaintiffs' claims against them be granted.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that the moving Defendants' motion for summary judgment be (Dkt. No. 53) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiffs' Complaint **BE DISMISSED WITH PREJUDICE** against Defendants Bell, John Doe #1 and John Doe #2 pursuant to 28 U.S.C. 1915A; and it is further

**ORDERED** that the Clerk provide Plaintiffs with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: June 18, 2014
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge



Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
Oct. 4, 2012.

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[FN1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

> FN1. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[FN2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

> FN2. The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____."

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[FN3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

> FN3. According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint.[FN4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances.[FN5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

> FN4. Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

> FN5. Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for com-

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

mencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor.[FN6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

> FN6. Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was

required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No."[FN7] *Id.*

> FN7. During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Of-

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

ficer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties.[FN8],[FN9]

FN8. The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

FN9. Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

III. *DISCUSSION*

A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at *4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the

plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements.[FN10,FN11] *Id.*

> FN10. In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantively exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

FN11. In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for exam-

ple—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

C. *Application of Governing Legal Principles*

1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

2. *Presentation of Defense/Estoppel*

*7 The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at *3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at *5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at *4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and co-operate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at * 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at *6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS RE-PORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2012.
Bailey v. Fortier
Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green Haven
Correctional Facility, R. Pflueger, A. Glemmon, Sgt.
Stevens, Lt. Haubert, Capt. W.M. Watford, Capt. T.
Healey, and John Doe # 1–5, all as individuals, De-
fendants.

No. 93 Civ. 5981(WHP) JCF.
Oct. 28, 1999.

Mr. Craig Cole, Bare Hill Correctional Facility,
Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, New York, for Defendant.

*MEMORANDUM & ORDER*
PAULEY, J.

**\*1** The remaining defendant in this action, Cor-
rection Officer Richard Pflueger, having moved for an
order, pursuant to Fed.R.Civ.P. 56, granting him
summary judgment and dismissing the amended
complaint, and United States Magistrate Judge James
C. Francis IV having issued a report and recommen-
dation, dated August 20, 1999, recommending that the
motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff
does "not contest the dismissal of this action", it is

ORDERED that the attached report and recom-
mendation of United States Magistrate Judge James C.

Francis IV, dated August 20, 1999, is adopted in its
entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*
FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green
Haven Correctional Facility, brings this action pur-
suant to 42 U.S.C. § 1983. Mr. Cole alleges that the
defendant Richard Pflueger, a corrections officer,
violated his First Amendment rights by refusing to
allow him to attend religious services. The defendant
now moves for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the de-
fendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at
the Green Haven Correctional Facility. (First
Amended Complaint ("Am.Compl.") ¶ 3). From June
21, 1993 to July 15, 1993, the plaintiff was in keeplock
because of an altercation with prison guards.
(Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony An-
nucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS
policy, inmates in keeplock must apply for written
permission to attend regularly scheduled religious
services. (Reply Affidavit of George Schneider in
Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.")

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Or-

der dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

## B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[FN1]

FN1. In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that

the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

S.D.N.Y.,1999.
Cole v. Artuz
Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 2631875 (W.D.Ark.)
**(Cite as: 2013 WL 2631875 (W.D.Ark.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Arkansas,
Fort Smith Division.
Ryan Michael DOUGLAS, Plaintiff.
v.
Captain Jeff MARVIN, Crawford County Detention
Center, Defendant.

Civil No. 12–2070.
June 12, 2013.

Ryan Michael Douglas, Calico Rock, AR, pro se.

Nicholas Rudolph Windle, C. Burt Newell, The Law
Office of C. Burt Newell, Hot Springs, AR, for Defendant.

### MEMORANDUM OPINION

JAMES R. MARSCHEWSKI, United States Chief
Magistrate Judge.

   **\*1** This is a civil rights action filed pursuant to 42
U.S.C. § 1983. The Plaintiff, Ryan M. Douglas, proceeds *pro se* and *in forma pauperis*. The case is before
me on the consent of the parties (Doc. 12).

   Before me for decision is the Defendant's motion
for summary judgment (Docs.15–17). Plaintiff filed a
response (Doc. 24) to the motion. The motion is ready
for decision.

### *1. Background*

   Plaintiff is now incarcerated in the Arkansas
Department of Correction, North Central Unit. At all
times relevant to this complaint, he was incarcerated
in the Crawford County Detention Center (CCDC).

   On or about February 8, 2012, Douglas and another inmate, Jesse Darnell, were placed in lock-down.
*Plaintiff's Response* (hereinafter *Plff's Resp.)* at ¶ 2.
On the day in question, guards were passing out
commissary. *Plff's Resp.* at ¶ 2. Deputy Stevens responded to a commotion coming from cell 4. *Defendant's Exhibit* (hereinafter *Deft's Ex.)* A. Stevens'
incident report states that he saw inmate Douglas
grabbing Mark Thornsberry's commissary and "tossing it all over the room." *Id.* A search of Douglas and
Inmate Darnell revealed that they were in possession
of Thornberry's missing commissary items. *Id.* The
incident was reported to Captain Marvin; he informed
Stevens and Deputy Ridenour to place both inmates on
lock down in cell 2C for 5 days for theft of property.
*Id.* According to Stevens, he informed the inmates of
their right to a lock down hearing. *Id.*

   Douglas does not deny he was involved in the
commotion or that he had another inmate's commissary items. Instead, he merely asserts that Stevens saw
him kicking another inmate's commissary not tossing
it around. *Plff's Resp.* at ¶ 6.

   With respect to the lock down cell, Douglas alleges there was no light in the cell and no hot water.
*Plff's Resp.* at ¶ 1. He had access to cold water but says
the toilet was turned off. *Id.* at ¶ 4(a). He asserts that
he was unable to sterilize his hands without hot water.
*Id.* As a result of these conditions, Douglas asserts that
he "got a little cold." *Id.*

   He was provided three meals a day. *Plff's Resp.* at
¶ 4(b). He had a mattress to sleep on. *Id.*

   Because there was no light, he asserts that he
could not write his attorney. *Plff's Resp.* at ¶ 3. He
maintains his criminal case was adversely affected
because his attorney failed to inform him of the witnesses who would testify against him and he was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 2631875 (W.D.Ark.)
**(Cite as: 2013 WL 2631875 (W.D.Ark.))**

unable to write his attorney to obtain this information. *Id.* at ¶ 3(a).

Douglas maintains he was locked down for approximately two weeks. *Plff's Resp.* at ¶ 1. He did not file a grievance about being on lock down. *Id.* at ¶ 5. He states he asked for a grievance form on two occasions but was not provided one. *Id.* Towards the end of his lock down, Douglas maintains Inmate Teas wrote a grievance for him. *Id.* Douglas also maintains that neither he nor Darnell were told they had a right to a lock down hearing. *Plff's Resp.* at ¶¶ 9–11.

**\*2** On February 17th, Douglas submitted a grievance requesting that twenty-one cents (21¢) be placed back on his books. *Plff's Resp.* at ¶ 12; *Deft's Ex.* B. The grievance makes no mention of the lock down or the conditions of the cell. Additionally, the grievance form indicates Douglas was off lock down and in cell block 2B. *Plff's Resp.* at ¶¶ 13–14.

Douglas believes Marvin violated his constitutional rights but putting him on lock down in "harmful, non-healthy, conditions." *Plff's Resp.* at ¶ 15. Douglas believes Marvin was aware of the conditions in the cell. *Id.* Douglas asserts that after he was released from lock down Marvin had the lights repaired. *Id.* Douglas maintains that he should not have to ask to have the hot water fixed or the lights repaired. *Id.* at ¶ 17. He asserts that all detention center staff were aware of the problem. *Id.*

## *2. Applicable Standard*

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the

burden rests with the nonmoving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.,* 165 F.3d 602, 607 (8th Cir.1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank,* 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing, *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985)).

## *3. Discussion*

Marvin has moved for summary judgment on a variety of arguments. First, he notes that Douglas was aware of the CCDC grievance procedure but never filed any grievances relating to the subject matter of this lawsuit. Second, Marvin contends that no claim has been stated against him. Third, Marvin argues that Douglas was notified of his right to a lock down hearing and chose not to take advantage of the right. Finally, even assuming Douglas was housed in a dark cell with no hot water for two weeks, Marvin maintains that given the short duration of the confinement it is not sufficiently serious to amount to a constitutional violation.

I will address the exhaustion issue first as a finding in favor of the Defendant on the exhaustion issue is fatal to Douglas' claims. Marvin maintains that Douglas' claims must be dismissed because Plaintiff did not exhaust his available administrative remedies as required by the Prison Litigation Reform Act (PLRA) prior to filing this lawsuit.

**\*3** The PLRA, 42 U.S.C. § 1997e(a), mandates exhaustion of available administrative remedies be-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 2631875 (W.D.Ark.)
**(Cite as: 2013 WL 2631875 (W.D.Ark.))**

fore an inmate files suit. Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Supreme Court has held that the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 534 (2002). In Booth v. Churner, 532 U.S. 731, 738–39 (2001), the Court held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." Walker v. Maschner, 270 F.3d 573, 577 (8th Cir.2001). "If an inmate fails to exhaust one or more discrete claims raised in a § 1983 complaint, the PLRA requires only that the unexhausted claim or claims be dismissed—it does not require that the complaint be dismissed it its entirety." Id.

In this case, Douglas has sworn under penalty of perjury that he requested grievance forms and was denied those forms while he was on lock down. When detention center officials deny an inmate access to grievance forms, they cannot rely on the defense that the inmate failed to exhaust his remedies. See e.g., Miller v. Norris, 247 F.3d 736, 740 (8th Cir.2001)(prisoner's allegations that prison officials denied his requests for grievance forms could raise inference that he was prevented from utilizing prison's administrative remedies; remedy that prison officials prevent prisoner from utilizing is not "available" under § 1997e(a)). The evidence in this case establishes that by no later than February 17th, Douglas had access to those forms.

In this case, there is no question that a grievance procedure existed; Douglas was aware of it; and he failed to submit grievances regarding the claims at

issue in this case. Douglas cannot rely on a grievance filed by another inmate to comply with the exhaustion requirement. See e.g., Roberson v. Martens, 2010 WL 3779544 (W.D.Mich. August 25, 2010)(Grievance filed by another inmate "did not exhaust plaintiff's administrative remedies, because it was not plaintiff's grievance"); Cf Shariff v. Coombe, 655 F.Supp.2d. 274, 288 (S.D.N.Y.2009)("Plaintiffs' related argument that a grievance filed by one inmate that receives a favorable determination should suffice for all inmates is ... unavailing.").

### 4. Conclusion

For the reasons stated, Defendant's motion for summary judgment (Docs.15–17) will be granted. A separate order in accordance with this opinion will be entered.

W.D.Ark.,2013.
Douglas v. Marvin
Slip Copy, 2013 WL 2631875 (W.D.Ark.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 681369 (N.D.N.Y.)

**(Cite as: 2010 WL 681369 (N.D.N.Y.))**

**C**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Mark EDWARDS, Plaintiff,
v.
Sgt. BEZIO, C.O. Lapage, C.O. LaFey, C.O. Carrons, C.O. Reif, all individually and in their official capacities, Defendants.

No. 9:08-CV-256 (LEK/RFT).
Feb. 24, 2010.

Mark Edwards, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Michael G. McCartin, Esq., Assistant Attorney General, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on February 5, 2010 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 45). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Mark Edwards, which were filed on February 19, 2010. Objections (Dkt. No. 46).

It is the duty of this Court to "make a de novo determination of those portions of the report or speci-

fied proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 45) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 36) is **GRANTED** and Plaintiff's claims against LaPage and Bezio are **DISMISSED;** and it is further

**ORDERED,** that the Plaintiff's claims against LaFey are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Mark Edwards filed this civil rights action, pursuant to 42 U.S.C. § 1983, alleging several violations of his constitutional rights, including retaliation, excessive force, deliberate indifference, and failure to protect. Dkt. No. 1, Compl. Defendants Sergeant (Sgt.) Bezio and Corrections Of-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 681369 (N.D.N.Y.)
**(Cite as: 2010 WL 681369 (N.D.N.Y.))**

ficer (C.O.) LaPage [FN1] now move for Summary Judgment pursuant to Fed.R.Civ.P. 56(c). Dkt. No. 36. Plaintiff opposes the Motion. Dkt. No. 39. For the reasons that follow, it is recommended that the Motion be **GRANTED.**

> FN1. Defendants C.O.'s Carrons and Reif have not joined this Summary Judgment Motion. Also, Defendant C.O. LaFey has not yet been served with process. *See* Dkt. No. 10.

## I. BACKGROUND

In order provide a background for assessing Defendants' Motion, we summarize the allegations raised in the Complaint as follows: [FN2] On December 28, 2005, Plaintiff, upon his arrival at Upstate Correctional Facility ("Upstate") after being transferred from another prison, was assigned to cell 19 and was not allowed to retrieve any of his personal property until January 2, 2006. Compl. at ¶ 13. On that date, while Plaintiff was retrieving his property, Defendant C.O. LaFey noticed his legal papers and told Plaintiff, "[w]e don't like writers [at Upstate]." *Id.* Then, C.O. LaPage, who was also present, said "if he complains up here, we'll teach 'em [sic]." At some point, either or perhaps both LaPage and LaFey warned Plaintiff, "if you write us up, we'll teach you a hard lesson." *Id.* at ¶ 27. While still at the property area, LaFey asked Plaintiff if he had any stamps and, after Plaintiff indicated that his stamps were in his Bible, LaFey pocketed them. *Id.* at ¶ 13. After Plaintiff asked for his stamps back, LaPage became angry and threatened to throw Plaintiff down the stairs. *Id.* Without his stamps, Plaintiff was unable to send his correspondences.[FN3] *Id.*

> FN2. We omit Plaintiff's claims against C.O.'s Carrons and Reif, the non-moving Defendants. *See* Compl. at ¶ 15. We also omit Plaintiff's claims against C.O. Bogardrus, who is not a named defendant in this action. *See* Compl. at ¶ 14. For a complete

statement of Plaintiff's allegations, reference is made to the Complaint.

> FN3. Plaintiff does not specifically identify to whom he intended to send correspondences.

**\*2** Plaintiff also claims that after he refused to double bunk with another inmate, Defendants LaPage and Bezio threatened him, stating, "we're going to teach you a lesson." *Id.* at ¶ 28. Finally, Plaintiff alleges that "LaPage, LaFey, and Bezio colluded to retaliate against the Plaintiff for filing a claim against people they knew personally, or related to as prison guards." *Id.* at ¶ 30.

## II. DISCUSSION
### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is] a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts sub-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 681369 (N.D.N.Y.)
**(Cite as: 2010 WL 681369 (N.D.N.Y.))**

mitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## B. Retaliation

**\*3** Plaintiff alleges that Defendants LaFey, LaPage, and Bezio retaliated against him because of "past and present complaints" he filed, including both grievances and civil rights actions. Compl. at ¶ 31.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

Here, Plaintiff alleges that Defendants LaFey, LaPage, and Bezio took adverse actions against him when they allegedly threatened him.[FN4] First, Plaintiff alleges LaFey and LaPage told him that "if you write us up, we'll teach you a hard lesson." Compl. at ¶ 27. Second, Plaintiff alleges that LaPage and Bezio told him they were "going to teach [him] a lesson" after Plaintiff refused to double bunk with another inmate. *Id.* at ¶ 28.

> FN4. In his deposition, Plaintiff also speculated that Defendant LaPage arranged for another inmate to assault Plaintiff as retaliation. Dkt. No. 36-3, Pl.'s Dep. Tr., dated Feb. 10, 2009, at p. 45. However, Plaintiff makes no such allegation in his Complaint. In fact,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 681369 (N.D.N.Y.)
**(Cite as: 2010 WL 681369 (N.D.N.Y.))**

Plaintiff asserts that C.O. Bogardrus (not a named defendant in this action), not LaPage, set him up by placing a dangerous inmate in his cell. Compl. at ¶ 14. A plaintiff may not amend his complaint by making new allegations in his deposition, or in response to a motion for summary judgment. *See Aretakis v. Durivage,* 2009 WL 249781, at *26 (N.D.N.Y. Feb. 3, 2009) (citing cases for the proposition that "opposition papers are not the proper vehicle to instill new causes of action"). Therefore, we do not consider that accusation in our discussion.

The above threats were allegedly motivated by grievances and lawsuits Plaintiff filed. *Id.* at ¶ 30. Although Plaintiff alleges that he was retaliated against for "past and present" grievances and lawsuits, he does not specifically identify any grievance or lawsuit he filed that became the motivation for the alleged threats. While the filing of grievances and lawsuits is constitutionally protected activity, *see Colon v. Coughlin,* 58 F .3d 865, 872 (2d Cir.1995), Plaintiff's general references to grievances and lawsuits he allegedly filed are not sufficient to establish that he was engaged in protected conduct, *see Flaherty v.. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone."); *see also Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 468 (S.D.N.Y.1998) (citing *Flaherty* for the proposition that "[b]road and unsubstantiated allegations of retaliation ... will not defeat a motion for summary judgment").

Indeed, by Plaintiff's own admission, one of LaPage's and/or Bezio's alleged threats was prompted by his refusal to bunk with another inmate, not by his engagement in constitutionally protected conduct. Moreover, Plaintiff admitted in his deposition that most inmates in Upstate are housed in double cells. Dkt. No. 36-3, Pl.'s Dep. Tr., dated Feb. 10, 2009, at p. 49; *see also* Dkt. No. 36-4, Donald LaPage, Aff., dated June 15, 2009, at ¶¶ 7-8 (stating that "placing an inmate in double-cell status is the norm"). Thus, that claim must fail because Plaintiff has failed to show a causal connection between his protected conduct and the alleged threats made.

**\*4** For the above reasons, we recommend that Plaintiff's retaliation claims against LaPage and Bezio be **dismissed.**

### C. Threats

Plaintiff alleges Defendants LaPage and Bezio violated his Eighth Amendment rights when they threatened him. In addition to the threats mentioned in Part II.B, *supra,* Plaintiff alleges that LaPage threatened to throw him down the stairs after he challenged Defendant LaFey's theft of his stamps on January 2, 2006.[FN5] Compl. at ¶ 13.

FN5. Plaintiff makes clear in his Complaint that LaPage made this threat "because he was angered that the Plaintiff asked for his stamps," not because of any constitutionally protected conduct he was engaged in. Thus, Plaintiff has not asserted a retaliation claim with respect to this alleged threat.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996); *Petway v. City of New York,* 2005 WL 2137805, at *3 (E.D.N.Y. Sept. 2, 2005); *Larocco v. New York City Dep't of Corr.,* 2001 WL 1029044, at *5 (S.D.N.Y. Aug. 31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz*

Not Reported in F.Supp.2d, 2010 WL 681369 (N.D.N.Y.)
**(Cite as: 2010 WL 681369 (N.D.N.Y.))**

*v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)).

For the above reasons, it is recommended that Plaintiff's Eighth Amendment claims based on the Defendants' alleged threats be **dismissed.**

### D. Failure to Serve

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [FN6] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

> FN6. Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

In this case, there is no indication that the Defendant C.O. LaFey has been properly served. *See* Dkt. No. 10, Unexecuted Summons. Although the courts must afford plaintiffs notice before they may dismiss a claim for failure to serve a defendant, FED. R. CIV. P. 4(m), in this case, because Plaintiff's claims lack merit, granting Plaintiff the opportunity to properly serve LaFey would be futile.

Plaintiff's claims that on January 2, 2006, LaFey, upon noticing Plaintiff's legal papers, stated "we don't like writers up here [in Upstate]," and "if you write us up, we'll teach you a hard lesson." Compl. at ¶¶ 13 & 27. As mentioned above in Part II.C, receipt of such a threat (to the extent it can be classified as such) is not a valid basis for a § 1983 claim. To the extent Plaintiff

alleges that LaFey's threat was retaliatory in nature, that claim should be dismissed for the same reasons as his claims against LaPage and Bezio, namely, Plaintiff has failed to establish he was engaged in constitutionally protected conduct.

**\*5** Plaintiff also accuses LaFey of stealing stamps from his Bible in retaliation and in order to prevent Plaintiff from sending letters and otherwise corresponding. [FN7] Compl. at ¶¶ 13 & 29. LaFey's alleged theft of Plaintiff's stamps, even assuming the truth of such accusation, does not rise to the level of a due process violation. The lynchpin of a due process claim based on a state actor's unauthorized deprivation of private property is the availability of post-deprivation remedies provided by the state, not the deprivation itself. *See Hudson v. Palmer,* 468 U.S. 517, 533 (1984) (holding that the destruction of a prisoner's property did not violate due process when the state provided a meaningful post-deprivation remedy) (cited in *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994) (denying prisoner's § 1983 claim that his property was stolen or lost because he failed to allege that he was denied an adequate post-deprivation remedy)). Plaintiff does not allege that New York State has failed to provide a meaningful post-deprivation remedy and, in fact, New York provides a venue for challenging such appropriations in the New York Court of Claims. N.Y. CT. CL. ACT § 9 (McKinney's 1989) (cited in *Reyes v. Koehler,* 815 F.Supp. 109, 114-15 (S.D.N.Y.1993)). Thus, Plaintiff's due process claim against LaFey is without merit.

> FN7. In contradiction to the allegations raised in his Complaint, Plaintiff stated in his deposition that Defendant LaPage stole his stamps, not LaFey. Pl.'s Dep. at pp. 28-29. However, Plaintiff makes clear in his Response to Defendants' Motion that the deposition transcript is incorrect and he intended to bring this claim against LaFey, not LaPage. Dkt. No. 39, Pl.'s Resp. at pp. 4 & 7.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 681369 (N.D.N.Y.)
**(Cite as: 2010 WL 681369 (N.D.N.Y.))**

Finally, Plaintiff's claim that LaFey stole his stamps in retaliation fails because, like his other retaliation claims, it is alleged in wholly conclusory terms. Plaintiff does not identify the protected conduct that was the motivation for the alleged theft, nor does he attempt to link LaFey to such conduct in order to create a causal connection.

Therefore, it is recommended that Plaintiff's claims against LaFey be **dismissed** as futile pursuant to 28 U.S.C. § 1915. *See, e.g., Zimmerman v. Burge,* 2008 WL 850677, at *7 (N.D.N.Y. Mar. 28, 2008) (noting that "even where a defendant has not requested dismissal based on the failure of the plaintiff to state a claim upon which relief may be granted, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim [.]") (citing 28 U.S.C. § 1915(e)(2)(B)(ii)).

### III. CONCLUSION
For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion for Partial Summary Judgment (Dkt. No. 36) be **GRANTED** and Plaintiff's claims against LaPage and Bezio be **DISMISSED;** and it is further

**RECOMMENDED,** that the Plaintiff's claims against C.O. LaFey be **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); [FN8] and it is further

FN8. In the interest of clarity, we note that should the District Court adopt this Report-Recommendation, only Plaintiff's claims against Defendants Carrons and Reif shall remain. *See* Compl. at ¶¶ 15 & 21-25.

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2010.
Edwards v. Bezio
Not Reported in F.Supp.2d, 2010 WL 681369 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Kenneth Carl GROVES, Sr., Plaintiff,
v.
Brett DAVIS, Secure Care Treatment Aid; David W.
Sill, Secure Care Treatment Aid; Thomas Nicolette,
RN, Ward Nurse; Charmaine Bill, Treatment Team
Leader; Jill E. Carver, Social Worker, Primary Ther-
apist; Edwin Debroize, Psychologist Assist; Jeff
Nowicki, Chief of Mental Health Treatment Serv.;
Terri Maxymillian, Ph.D., Dir. of Mental Health
Serv.; Sgt. Sweet, Security Services, CNYPC; Mi-
chael Hogan, Comm'r, Dep't of Mental Health, De-
fendants.

No. 9:11–CV–1317 (GTS/RFT).
Feb. 28, 2012.

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

### MEMORANDUM DECISION and ORDER
Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil
rights action filed by Kenneth Carl Groves, Sr.
("Plaintiff"), against numerous employees of New
York State or the Central New York Psychiatric
Center ("Defendants"), are Plaintiff's motion to pro-
ceed *in forma pauperis,* his motion for a temporary
restraining order and preliminary injunction, and his
motion for appointment of counsel. (Dkt.Nos.2, 3, 4.)
[FN1] For the reasons set forth below, Plaintiff's motion
to proceed *in forma pauperis* is granted; his motion for
a preliminary injunction is denied; his motion for
appointment of counsel is denied; Plaintiff's claims of
deliberate indifference to his mental health needs

against Defendants Bill, Carver and DeBroize are *sua
sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault
are *sua sponte* dismissed without prejudice and with leave
to amend in this action in accordance with
Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed
without prejudice as a Defendant in this action; the
Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on
Defendants Davis, Sill, and Nicolette.

> FN1. This is the fourth civil rights action
> filed by Plaintiff in this District. Generally,
> two of these actions arose out of Plaintiff's
> refusal to consent to a strip search and the
> subsequent actions taken against Plaintiff
> as a result of his refusal. *See Groves v. New
> York,* 09–CV–0406, Decision and Order
> (N.D.N.Y. filed May 11, 2009) (Hurd, J.)
> (*sua sponte* dismissing complaint pursuant to
> 28 U.S.C. § 1915[e][2][B] ); *Groves v. The
> State of New York,* 9:09–CV–0412, Decision
> and Order (N.D.N.Y. filed Mar. 26, 2010)
> (Sharpe, J.) (granting defendants' motion to
> dismiss the complaint pursuant to
> Fed.R.Civ.P. 12[b][6] ). The third action al-
> leged numerous violations of Plaintiff's con-
> stitutional rights during the period July 23,
> 2009, and August 26, 2009, and was dis-
> missed without prejudice upon Plaintiff's
> request in October, 2010. *See Groves v.
> Maxymillian,* 9:09–CV–1002, Decision and
> Order (N.D.N.Y. filed Oct. 8, 2010)
> (Suddaby, J.). As a result, it does not appear
> that the current action is barred because of res
> judicata, collateral estoppel, and/or the rule
> against duplicative litigation.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

## I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.) [FN2] Liberally construed, Plaintiff's Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and De-Broize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, De-Broize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

> FN2. At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any

time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[FN3]

> FN3. The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for

failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[FN4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[FN6]

FN4. *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN5. *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN6. It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under

Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
(Cite as: 2012 WL 651919 (N.D.N.Y.))

victed criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg, 457 U.S. at 315–16.* As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [FN7]

> FN7. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize**

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[FN8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[FN9]

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

FN8. Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

FN9. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.FN10 Rather, this claim is hereby dismissed with prejudice.

FN10. The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1994). *John Hancock Mut. Life Ins. Co., 22 F.3d at 462.* The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993); see Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir.2000)* ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977).* Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN11]

> FN11. *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)* (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith, 781 F.2d 319, 323–324 (2d Cir.1986)* (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon, 568 F.2d at 934.* Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas, 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008)* (quoting *Bass v. Jackson, 790 F.2d 260, 263* [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis, 964 F.Supp. 127, 130 (S.D.N.Y.1997).*[FN12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally, 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011).*[FN13]

> FN12. *See also Gillard v. Rosati, 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011)* (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin, 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995)* ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin, 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993)* ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

> FN13. *See also Bernstein v. N.Y., 591 F.Supp.2d 448, 460 (S.D.N.Y.2008)* ("Courts within the Second Circuit have determined

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its*

*entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

**IV. MOTION FOR INJUNCTIVE RELIEF**

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defend-

ants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations


that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

### V. MOTION FOR APPOINTMENT OF COUNSEL

***9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[FN14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

> FN14. For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, “this factor alone is not determinative of a motion for appointment of counsel,” *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**\*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;**[FN15] and it is further

> FN15. Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and De-Broize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

N.D.N.Y.,2012.
Groves v. Davis
Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**



Only the Westlaw citation is currently available.

United States District Court,
D. Arizona.
Ammar Dean HALLOUM, Plaintiff,
v.
Charles RYAN, et al., Defendants.

No. CV 11–0097–PHX–RCB.
Filed March 18, 2014.

**ORDER**

ROBERT C. BROOMFIELD, Senior District Judge.

**\*1** In January 2011, Plaintiff Ammar Dean Halloum filed this civil rights action under 42 U.S.C. § 1983 against various Arizona Department of Corrections (ADC) employees (Doc. 1). In 2012, the parties filed and briefed cross-motions for summary judgment (Docs.52, 55). On November 28, 2012, before ruling on the motions, the Court dismissed the action without prejudice under Federal Rule of Civil Procedure 41(b) due to Plaintiff's failure to pay the civil filing fee after his release from custody and failure to respond to an Order to Show Cause directing him explain why he was unable to pay (Doc. 74).[FN1] Accordingly, the summary judgment motions were denied as moot (id.).

> FN1. The Court had granted Plaintiff *in forma pauperis* status, and he was required to pay the unpaid balance of the filing fee within 120 days of his release (Doc. 5). Plaintiff was released from custody in April 2011 (Doc. 16).

Two months later, in January 2013, Plaintiff filed motions indicating that he did not have notice of the Order to Show Cause or the Order dismissing the action (Docs.76–77). On April 25, 2013, the Court vacated the judgment entered on November 28, 2012 and the Order entered that same date (Doc. 81 at 8). The April 25, 2013 Order stated that the parties' summary judgment motions will once again be pending (id.). Thereafter, Plaintiff paid the filing fee in full (Doc. 83).

Pursuant to the Court's April 25, 2013 Order, the parties' cross-motions for summary judgment are again before the Court (Docs.52, 55).

Defendants' motion will be granted in part and denied in part, and Plaintiff's motion will be denied.

**I. Background**

From December 2009 to July 8, 2010, Plaintiff was confined at the Arizona State Prison Complex (ASPC)-Florence North Unit, and thereafter he was confined at ASPCTucson, Whetstone Unit (Doc. 1 at 3, 5B). In his Complaint, Plaintiff named the following Defendants: (1) librarian Kerry Hernandez; (2) WIPP Coordinator Denise Huggins;[FN2] (3) Correctional Officer (CO) III Tara Turner; (4) Master Chaplain Bruce Brier; and (5) Lieutenant Debra Riharb (id. at 2A).[FN3]

> FN2. WIPP refers to the Work Incentive Pay Plan.

> FN3. On screening, the Court dismissed the ADC, Ryan, Clark, Canteen Inc., Coleman, Sauceda and Jackson as Defendants (Docs.5, 31). The Court subsequently dismissed Itenberg as a Defendant (Doc. 40).

Plaintiff alleges numerous First Amendment violations, some of which relate to his status as a Muslim of Syrian origin (id. at 3). In Count I, Plaintiff set

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

forth retaliation claims against Hernandez, Huggins, and Turner (*id.* at 3). In Count III, Plaintiff alleged that Brier denied Plaintiff a religious shaving waiver in violation of Plaintiff's right to free exercise and to equal protection (*id.* at 5). Count IV alleged that Brier refused to distribute copies of the Quran, also in violation of Plaintiff's right to free exercise and to equal protection (*id.* at 5A). Finally, in Count VI, Plaintiff alleged that Riharb, in violation of Plaintiff's freeexercise rights, prohibited Plaintiff and other Muslim inmates from holding communal prayer when she refused to let them bring in their prayers rugs for pre-breakfast prayers during Ramadan (*id.* at 5C).[FN4] Plaintiff sued for money damages (*id.* at 6).

> FN4. The Court dismissed Counts II and VIII as barred by *Heck v. Humphrey,* 512 U.S. 477 (1994) (Doc. 5). The Court later dismissed Counts V and VII on Defendants' Motion to Dismiss (Doc. 36).

Defendants move for summary judgment on the grounds that (1) there is no evidence of retaliation by Hernandez, Huggins, or Turner; (2) Brier properly handled Plaintiff's shaving waiver request and Plaintiff's religious practice was not burdened; (3) the return of copies of the Quran was facilitated by an official other than Brier and was pursuant to ADC policy; (4) there is no evidence that Brier acted intentionally to discriminate against Plaintiff; (5) Riharb did not burden Plaintiff's religious practice; and (6) Defendants are entitled to qualified immunity (Doc. 52).[FN5]

> FN5. Defendants also argue for summary judgment as to any monetary claims against Defendants in their official-capacity (Doc. 52 at 22); however, Plaintiff did not assert any official-capacity claims against Defendants.

**\*2** Plaintiff opposes Defendants' motion and cross-moves for summary judgment, arguing that (1) Hernandez, Huggins, and Turner's actions constitute

unlawful retaliation; (2) Brier denied Plaintiff and other Muslims shaving waivers but permitted inmates of other religions to keep beards; (3) Brier customarily accepted boxes of language books and Bibles but refused copies of the Quran; (4) Riharb denied Muslims the ability to pray when she refused to let them use prayer rugs; and (5) Defendants are not entitled to qualified immunity (Doc. 55).[FN6]

> FN6. Before he filed his response, the Court issued an Order with the Notice required under *Rand v. Rowland,* 154 F.3d 952, 962 (9th Cir.1988) (en banc), which informed Plaintiff of the requirements of Federal Rule of Civil Procedure 56 and the Local Rules of Procedure governing summary judgment (Doc. 51).

**II. Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.,* 210 F.3d 1099, 1102–03 (9th Cir.2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v.*

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

*Square D. Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for al." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed.R.Civ.P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence, and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed.R.Civ.P. 56(c)(3).

### III. Count I–Retaliation

### A. Governing Standard

Prisoners have a First Amendment right to file grievances and pursue civil rights actions. *Rhodes v. Robinson,* 408 F.3d 559, 567 (9th Cir.2005) (quoting *Bruce v. Ylst,* 351 F.3d 1283, 1288 (9th Cir.2003), and *Schroeder v. McDonald,* 55 F.3d 454, 461 (9th Cir.1995)); *see also Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir.1995) (prisoners have a constitutional right to meaningful access to the courts, and prison authorities may not penalize or retaliate against an inmate for exercising that right), *overruled on other grounds* by *Shaw v. Murphy,* 532 U.S. 223 (2001). Thus, allegations of retaliation against an inmate's First Amendment rights to speech or to petition the government may support a civil rights claim. *See Rizzo v. Dawson,* 778 F.2d 527, 531–32 (9th Cir.1985); *Valandingham v. Bojorquez,* 866 F.2d 1135, 1138 (9th Cir.1989); *see also Pratt v. Rowland,* 65 F.3d 802, 806 & n. 4, 807 (9th Cir.1995) (retalia-

tion claims "fall within the 'other protection[s] from arbitrary state action' ... because they are based upon protection of the prisoner's First Amendment rights, and not their Due Process rights").

**\*3** "[A] viable claim of First Amendment retaliation entails five basic elements: (1)[a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes,* 408 F.3d at 567–68. A prisoner "must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." *Barnett v. Centoni,* 31 F.3d 813, 815–16 (9th Cir.1994) (per curiam). A variety of conduct can be actionable as retaliatory if undertaken for an improper purpose. *See, e.g., Rizzo,* 778 F.2d at 531–32. And the resulting injury need not be tangible to support the claim. *Hines v. Gomez,* 108 F.3d 265, 267, 269 (9th Cir.1997) (an injury asserted to be the chilling effect of an officer's false accusation on the prisoner's First Amendment right to file prison grievances is sufficient to support a retaliation claim).

Retaliation claims must be evaluated in light of the concerns of excessive judicial involvement in day-to-day prison management, and courts must therefore "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *Pratt,* 65 F.3d at 807.

### B. Facts

In support of their motion, Defendants submit a separate Statement of Facts (DSOF), which is supported by Defendants' and other prison officials' declarations, various attachments, and an excerpt from Plaintiff's deposition (Doc. 53, Exs.A–M). Plaintiff supports his motion/response with his own declara-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

tion, sworn statements from numerous other individuals incarcerated at the same time as Plaintiff, and exhibits (Doc. 55, Exs.1–11).[FN7]

> FN7. Defendants object to Plaintiff's separate Statement of Facts on the ground that it is just an index of his exhibits and does not set out factual assertions as required under Local Rule of Civil Procedure 56.1 (Doc. 71 at 1–2). The Court finds that Plaintiff's motion/response memorandum, declaration, and verified Complaint set out Plaintiff's factual assertions and establish disputes with DSOF. *See Jones v. Blanas,* 393 F.3d 918, 923 (9th Cir.2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment). In light of Plaintiff's *pro se* status and the requirement to construe his pleadings liberally and afford him the benefit of any doubt, the Court will overrule Defendants' objection. *See Thomas v. Ponder,* 611 F.3d 1144, 1150 (9th Cir.2010) (cautioning district courts to "construe liberally motions papers and pleadings filed by pro se inmates and ... avoid applying summary judgment rules strictly"); *Karim–Panahi v. L.A. Police Dep't,* 839 F.2d 621, 623 (9th Cir.1988).

The parties set forth the following relevant disputed and undisputed facts:

On March 12, 2001, Plaintiff brought an affidavit to Hernandez for notarization, but she refused to notarize it (Doc. 1 at 3; DSOF ¶ 17). Defendants state that she would not notarize it because the notary statement on the document was worded improperly, so Hernandez instructed Plaintiff to correct the wording (DSOF ¶ 17). Plaintiff states that Hernandez read the affidavit, made racist comments to him, and refused to notarize the document (Doc. 1 at 3; Doc. 55, Ex. 1, Pl. Decl. ¶ 5 (Doc. 55 at 21)[FN8]). Defendants state that at no time did Hernandez make racists comments to

Plaintiff (DSOF ¶ 25). Plaintiff states that he complained to the Sergeant on duty about Hernandez's conduct (Doc. 1 at 3). Plaintiff states that the Sergeant reviewed the affidavit and exonerated Plaintiff (*id.*).

> FN8. Defendants object to ¶ 5 of Plaintiff's declaration on the grounds that it lacks foundation and is not supported by admissible evidence (Doc. 71 at 8). The objection is overruled. Foundation goes towards the admissibility of evidence, and Plaintiff has personal knowledge to testify as to what Hernandez said to him. *See Fed.R.Civ.P.* 56(c)(4); *Latman v. Burdette,* 366 F.3d 774, 787 (9th Cir.2004) (personal knowledge means that the witness actually perceived or observed what he testifies to). To the extent that Defendants' objection goes to form, the Court finds that Plaintiff's declaratory statement is proper and admissible; regardless, Plaintiff is not required to present evidence in a form that would be admissible at trial, as long as he meets the requirement of Rule 56. *Block v. City of L.A.,* 253 F.3d 410, 419 (9th Cir.2001).

Defendants state that when presented with the affidavit containing improper wording, Hernandez asked Plaintiff if he printed it on the computers in the Education Classroom where he worked because she thought it looked recently printed and did not appear to have been in an envelope (DSOF ¶ 18). Plaintiff states that the affidavit was mailed to him by a paralegal agency (Doc. 55, Ex. 1, Pl.Decl.¶ 9 [FN9]). Defendants state that Hernandez then checked with James Ard, the Program Teacher, who confirmed that Plaintiff had access to a computer and printer (DSOF ¶ 19). Defendants state that Ard suspected Plaintiff had printed the document in the classroom (*id.*). Defendants state that Hernandez spoke with a Security Sergeant (DSOF ¶ 20).[FN10]

> FN9. Defendants' objection to ¶ 9 of Plain-

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

tiff's declaration is overruled (Doc. 71 at 9). Plaintiff has personal knowledge of the fact that he testifies to, and Defendants also assert that Plaintiff informed Hernandez that he received the affidavit from California (*see* DSOF ¶ 18). Fed.R.Civ.P. 56(c)(4); *see* n. 8.

> FN10. Neither Plaintiff nor Hernandez identify the Security Sergeant involved (Doc. 1 at 3; Doc. 53, Ex. B, Hernandez Decl. ¶ 9).

**\*4** Plaintiff states that in retaliation for his complaint to the Sergeant, Hernandez attempted to get him terminated from his Teaching Aid job by going to Plaintiff's supervisor, Ard, but Ard confirmed that Plaintiff did not have access to the printer (Doc. 1 at 3).

Defendants state that Hernandez then advised Huggins that she believed Plaintiff used the education computers for personal legal work (DSOF ¶ 22). Defendants state that Huggins spoke with Ard, who advised her that he believed Plaintiff used the education computers for personal legal work (*id.*¶ 23). Defendants further state that Ard requested that Plaintiff be reassigned from his position as a Teaching Aid (*id.*). Plaintiff states that Ard sought to keep Plaintiff in his position as a Teaching Aid (Doc. 1 at 3A).

On March 16, 2010, Huggins terminated Plaintiff from his Teaching Aid position on the ground that he used the education computers for personal work (DSOF ¶ 26). Plaintiff states Huggins terminated him based on Hernandez's false accusation (Doc. 1 at 3A). Plaintiff states that Huggins thereafter assigned Plaintiff to manual labor jobs, despite Plaintiff's disability, for the purpose of degrading Plaintiff and deterring him from complaining (*id.*). Defendants state that Huggins spoke with medical staff and was told that Plaintiff had no physical restrictions, so, in April 2010, Plaintiff was reassigned to a kitchenhelper position (DSOF ¶¶ 31–32). Plaintiff states that on the

second day of his kitchen job, he was injured as a result of his disability, and he was released from the kitchen job (Doc. 55, Ex. 1, Pl.Decl.¶ 15 <sup>FN11</sup>).

> FN11. Defendants' objection to ¶ 15 of Plaintiff's declaration is overruled. *See* n. 8.

Plaintiff states that in early May 2010, he complained to CO IV Perry about Huggins' vindictiveness towards him (Doc. 55, Ex. 1, Pl.Decl.¶ 17 <sup>FN12</sup>). Plaintiff states that he also complained to Turner about the unfair treatment from Huggins, but Turner refused to assist him (Doc. 1 at 3A). Plaintiff states that he filed grievances, but Turner threatened to move Plaintiff off the yard (*id.*). Plaintiff states that on May 19, Turner told another inmate that she knew Plaintiff had made a complaint against her and she went to Huggins to ask that Plaintiff be moved off the yard, so he would be moved to Yard 2 that afternoon (Doc. 55, Ex. 2, Saifullah Shahid Decl. ¶ 19 (Doc. 55 at 31) <sup>FN13</sup>).

> FN12. Defendants' objection to ¶ 17 of Plaintiff's declaration is overruled. *See* n. 8.

> FN13. Defendants object to ¶ 19 of Shahid's declaration on the ground that it contains hearsay (Doc. 71 at 4). The objection is overruled. Turner's statement to Shahid constitutes an admission by a party-opponent and therefore falls outside the hearsay definition. Fed.R.Evid. 801(d)(2).

Defendants state that on May 13, 2010, Plaintiff was reassigned to a groundskeeper position and moved from North Unit Yard 1 to Yard 2 (DSOF ¶ 34). They also state that while Turner was Plaintiff's counselor, he went into her office daily to complain about issues, so it was agreed that Plaintiff would have to address his issues through inmate letters and could go to Turner's office only twice a week (*id.* ¶ 36).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

Plaintiff states that there was no agreement for him go to Turner's office twice a week (Doc. 55, Ex. 1, Pl.Decl.¶ 24 [FN14]). Plaintiff states that on one occasion, Turner allowed other inmates in before seeing Plaintiff, and when she finally saw Plaintiff, she screamed at him and told him she didn't want to see him and kicked Plaintiff out (*id.*¶ 22). Plaintiff states that he then went to the Administrative office and filed a complaint about Turner's behavior (*id.*¶ 23 [FN15]).

> **FN14.** Defendants object to ¶ 24 of Plaintiff's declaration on the ground that it is unsupported and consists solely of argument (Doc. 71 at 10). The objection is overruled. Plaintiff has personal knowledge to testify that he was unaware of a twice-a-week visit agreement; thus, his statement is not solely argument.

> **FN15.** Defendants' objections to ¶¶ 22 and 24 of Plaintiff's declaration are overruled (Doc. 71 at 10). Plaintiff has personal knowledge to testify as to what Turner told him, the actions of Turner that he observed, and what he did. *See Latman,* 366 F.3d at 787.

**\*5** Defendants state that after a couple more job changes and a move back to Yard 1, Plaintiff was transferred to the Florence East Unit on July 8, 2010 (DSOF ¶¶ 41–43). Plaintiff states this was a retaliatory transfer because Florence East houses aggressive and dangerous inmates (Doc. 1 at 3B). Plaintiff states that when he arrived at Florence East, he was hired to work again as a Teaching Aid after Supervisor Skelly verified with Ard that the earlier accusation about Plaintiff was false (*id.*). Plaintiff states that two weeks later, Huggins called another WIPP Coordinator, Emilio Sauceda, and had Plaintiff terminated from his Teaching Aid job at Florence East (*id.*). Defendants state that in July 2010, Huggins contacted WIPP coordinator Sauceda at Florence East and advised him to review Plaintiff's AIMS for comments about Plaintiff's job assignments (DSOF ¶ 46). Defendants state

that Huggins did not advise Sauceda to terminate Plaintiff (*id.* ¶ 48).

On July 26, 2010, Plaintiff was removed from his Teaching Aid position because AIMS revealed that in March 2010 he was removed from the same position for use of education computers for personal work (*id.*¶ 47).

On August 8, 2010, Plaintiff was transferred to the Tucson Complex, where he immediately began a job as a Teaching Aide, which he kept for eight months until his release in April 2011 (Doc. 55, Pl.Decl.¶ 39 [FN16]).

> **FN16.** Defendants object to ¶ 39 of Plaintiff's declaration on the grounds that it lacks foundation, is not supported by evidence, and is not relevant (Doc. 71 at 12). The objection is overruled. Plaintiff has personal knowledge as to his transfer and the job he held, and the Court finds that it may be relevant that Plaintiff was given a job for eight months which Defendants claim Plaintiff was not previously eligible to hold.

**C. Analysis**

**1. Hernandez**

Plaintiff must first show that he exercised protected conduct. *Rhodes,* 408 F.3d at 567. He states that he complained to the Sergeant about Hernandez's racist comment and the Sergeant took the issue seriously, which in turn began a series of retaliatory actions that, according to Plaintiff, were designed to deter him from filing grievances (Doc. 55 at 10). Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff's verbal complaint to a Sergeant about Hernandez's conduct constitutes a protected action under the First Amendment *Rizzo,* 778 F.2d at 531–32; *Valandingham,* 866 F.2d at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

1138.

Next, Plaintiff must demonstrate that Hernandez took an adverse action against him. *Rhodes,* 408 F.3d at 567–68; *see Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir.1988) (the plaintiff must identify specific facts as to each individual defendant's acts or omissions that allegedly caused the deprivation). The alleged adverse action by Hernandez is her attempt to get Plaintiff fired by making a false accusation—that he improperly used the school's printer-to Plaintiff's work supervisor and the WIPP Coordinator (see Doc. 1 at 3; Doc. 55 at 2). The Court finds that Plaintiff has sufficiently alleged an adverse action to support his retaliation claim. *See Austin v. Terhune,* 367 F.3d 1167, 1171 (9th Cir.2004) (the defendant filed false report that resulted in inmate's placement in segregation in retaliation for filing grievances).

Under the third element of the *Rhodes* analysis, Plaintiff must show that his protected conduct was "the substantial or motivating factor" behind Hernandez's action. *Brodheim v.* Cry, 584 F.3d 1262, 1271 (9th Cir.2009) (citing *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314 (9th Cir.1989)). To make this showing, Plaintiff must demonstrate that Hernandez knew of the protected conduct and that either (1) there was proximity in time between the protected conduct and the allegedly retaliatory action, (2) that Hernandez expressed opposition to the speech, or (3) Hernandez's proffered reason for the adverse action was pretextual. *Corales v. Bennett,* 567 F.3d 554, 568 (9th Cir.2009) (citation and emphasis omitted); *see Pratt,* 65 F.3d at 808 (timing can be considered as circumstantial evidence of retaliatory event).

**\*6** Plaintiff asserts that after he complained to the Sergeant, the Sergeant privately spoke to Hernandez (Doc. 55 at 10). In her declaration, Hernandez confirms that she spoke with a Security Sergeant (Doc. 53, Ex. B, Hernandez Decl. ¶ 9). Although Hernandez's declaration statements suggest that her contact with the Sergeant occurred after she went to Plaintiff's

work supervisor, the order of events is not clear, and, regardless, the Court must take as true Plaintiff's allegation that Hernandez's actions followed Plaintiff's complaint about her to the Sergeant. Thus, there is a material question of fact whether Hernandez knew of Plaintiff's protected conduct after the Sergeant spoke with her.

Ard avers that Hernandez came to speak with him on or about March 12, 2010 (Doc. 53, Ex. G, Ard Decl. ¶ 5), and Huggins states that Hernandez spoke to her just prior to March 16, 2010 (*id.,* Ex. C, Huggins Decl. ¶ 8). This evidence supports that there was proximity in time between Plaintiff's protected conduct and the allegedly retaliatory action. With a material factual dispute as to Hernandez's knowledge of Plaintiff's complaint and the timing of the adverse action, Plaintiff has satisfied the third prong of the analysis.

Defendants argue that there is no evidence that Hernandez's actions chilled Plaintiff's exercise of his First Amendment rights (Doc. 52 at 8); however, Plaintiff need not demonstrate a total chilling of his rights to support his retaliation claim. *Rhodes,* 408 F.3d at 568–69. That Plaintiff's First Amendment rights were chilled, though not necessarily silenced, is enough. *Id.* at 569. Plaintiff avers that he believed that Hernandez retaliated against him, and he consequently lost his job due to his complaint to the Sergeant (Doc. 55, Ex. 1, Pl.Decl.¶¶ 5–6). This is sufficient to show a chilling effect on Plaintiff's First Amendment rights.

Lastly, Plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains. *Pratt,* 65 F.3d at 806 (citations omitted). Plaintiff must show that Hernandez did not have a legitimate correctional purpose in bringing her accusation against Plaintiff to his supervisor and the WIPP Coordinator. *Rhodes,* 408 F.3d at 568. As mentioned, the Court must " 'afford appropriate deference and flexibility' to prison offi-

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

cials in the evaluation of proffered legitimate peno-logical reasons for conduct alleged to be retaliatory ." *Pratt,* 65 F.3d at 807 (quotation omitted).

Defendants argue that under Department Order (DO) 501.02, which governs employee professional-ism, ethics, and conduct, Hernandez is required to take corrective action in response to all inmate rule viola-tions to ensure impartiality and fairness with all in-mates (Doc. 53, Ex. B, Ex. 5, DO 502.02 § 1.1.5). Hernandez asserts her belief that Plaintiff had im-properly used the printer; therefore, given her obliga-tion to take corrective action, she brought her suspi-cions about Plaintiff's use of the school printer to his supervisor (*id.,* Ex. B, Hernandez Decl. ¶ 7). In his declaration, Ard, Plaintiff's supervisor, states that he also suspected that Plaintiff had used the computer and printer for personal work and that he requested to the WIPP Coordinator that Plaintiff be reassigned from his position (Doc. 53, Ex. G, Ard.Decl.¶ 6). After Ard relayed his suspicions to the WIPP Coordinator, Plaintiff was terminated from his position (*id.,* Ex. C, Huggins Decl. ¶¶ 9–10). This evidence shows that in going to the work supervisor and WIPP Coordinator, Hernandez was acting pursuant to policy and that her charge that Plaintiff violated computer-usage rules was supported; thus, her actions served a legitimate penological purpose.

**\*7** Plaintiff's only response to this evidence is his claims that Ard assured Huggins that Plaintiff did not have access to computers and that Ard tried to rein-state Plaintiff to his Teaching Aide position (Doc. 55, Ex. 1, Pl.Decl.¶¶ 10–11). But Plaintiff's claims are unsupported by personal knowledge or other evidence and they are contrary to Ard's own sworn statement. As such, Plaintiff's claims are insufficient to create a material factual dispute. *See Leer,* 844 F.2d at 634.

In short, Plaintiff fails to establish that there was not a legitimate penological purpose for Hernandez's conduct when she went to Plaintiff's work supervisor and the WIPP coordinator. For this reason, summary

judgment will be granted to Hernandez on the retalia-tion claim in Count I, and Plaintiff's request for summary judgment on this claim will be denied.

**2. Huggins**

The Court already determined that Plaintiff's complaint to the Sergeant about Hernandez consti-tuted protected conduct. Plaintiff also avers that after Huggins terminated him from his Teaching Aide po-sition and reassigned him to inappropriate jobs, he complained about Huggins to CO IV Perry (Doc. 55, Ex. 1, Pl.Decl.¶¶ 13, 15, 17). Plaintiff's additional oral complaints about Huggins also amount to protected conduct.

Plaintiff asserts that Huggins terminated him from his Teaching Aide job, assigned him to menial jobs that were inappropriate given Plaintiff's disabil-ity, and—after Plaintiff's transfer—worked to get Plaintiff terminated from his second Teaching Aide position (Doc. 55, Pl.Decl.¶¶ 13, 15–16, 35). Huggins' alleged actions constitute an adverse action.

Again, to show that Huggins' adverse action was "because of" his protected conduct, Plaintiff must first demonstrate that Huggins knew of the protected conduct. *Corales,* 567 F.3d at 568. Defendants assert that Huggins was not aware that Plaintiff complained about her (Doc. 52 at 10). There is no evidence that Huggins spoke to the Security Sergeant to whom Plaintiff brought his complaint about Hernandez, nor is there evidence that Huggins spoke with CO IV Perry, to whom Plaintiff made complaints about Huggins. In his response, Plaintiff does not directly respond to Huggins' averment that she was not aware that Plaintiff had complained about her (Doc. 53, Ex. C, Huggins Decl. ¶ 21). Although some of the decla-rations submitted by Plaintiff reference generally his complaints and grievances against staff (Doc. 55, Ex. 2, Shahid Decl. ¶ 27; Ex. 3, Randy C. Milliner Decl. ¶¶ 8–9), and one other inmate avers that he also com-plained about Huggins to CO IV Perry (*id.,* Ex. 4, Maffi Arsalan Decl. ¶ 7), there is no evidence or al-

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

legation to establish that Huggins was put on notice of any of Plaintiff's complaints or grievances.

Because Plaintiff submits no probative evidence establishing that Huggins knew of his protected conduct, there exists no genuine issue of material fact on this element of the retaliation claim, and the Court need not proceed with the remainder of the *Rhodes* analysis. Summary judgment will be granted to Huggins on Plaintiff's retaliation claim in Count I, and summary judgment will be denied to Plaintiff.

### 3. Turner

**\*8** With respect to Turner, the first element in the *Rhodes* analysis is satisfied by evidence that Plaintiff complained to Administration about Turner and that on May 19, 2010, he filed two informal grievances against Turner, which is protected conduct (Doc. 55, Ex. 1, Pl. Decl. ¶ 23; Ex. 2, Shahid Decl. ¶ 18 [FN17]).

> FN17. Defendants object to ¶ 18 of Shahid's declaration on the grounds that the statement simply sets forth Shahid's feelings or conclusions and is not relevant (Doc. 71 at 4). The objection is overruled. In ¶ 18, Shahid testifies as to what he personally observed on May 19, 2010, and what he observed is relevant to Plaintiff's retaliation claim against Turner.

The alleged adverse action is Turner's attempts to get Plaintiff moved from Yard 1 to Yard 2 and later to Florence East. Courts have recognized that some transfers, or even the mere threat of a transfer, may be considered adverse actions. *See Brodheim,* 584 F.3d at 1269–70; *Rhodes,* 408 F.3d at 568 (initiation of a prison transfer and destruction of property in retaliation for filing grievances); *Pratt,* 65 F.3d at 805–06 (prison transfer and double-cell status in retaliation); *Rizzo,* 778 F.2d at 530–32 (retaliatory reassignment out of vocational class and transfer to a different facility).

The only evidence that Turner may have been involved in Plaintiff's transfers is the statement by Shahid that, on May 19, 2010, Turner said to him that she knew Plaintiff complained about her, that Plaintiff "doesn't know who he is messing with," and that she went with Huggins to Movement Control to try to get Plaintiff moved off of Yard 1 and that he would be moved that afternoon (Doc. 55, Ex. 2, Shahid Decl. ¶ 19). Defendants argue that, as a CO III, Turner had no authority to transfer an inmate and that only a Deputy Warden or his or her designee could have an inmate moved (Doc. 53, Ex. D, Turner Decl. ¶ 8). This does not necessarily preclude Turner's liability for retaliation. *See Gilbrook v. City of Westminster,* 177 F.3d 839, 854–55 (9th Cir.1999) (subordinate can be held liable for retaliation, even where final decisionmaker's determination was not retaliatory, if subordinate's "improper motive sets in motion the events that lead to [adverse action] that would not otherwise occur") (citation and emphasis omitted). However, the evidence does not support that it was Turner's motive or actions that led to Plaintiff's transfers.

The record reflects that on May 13, 2010, Plaintiff was reassigned to a groundskeeper position and this reassignment led to his transfer from Yard 1 to Yard 2 on May 19, 2010 (Doc. 53, Ex. C, Huggins Decl. ¶ 13). Thus, Plaintiff's transfer to Yard 2 was already planned pursuant to the job reassignment when, on May 19, 2010, Plaintiff filed his informal grievances against Turner. As such, there is no evidence that his informal grievances had any effect on the decision to move Plaintiff to Yard 2.

Plaintiff submits no evidence connecting Turner to his July 8, 2010 transfer to Florence East. The record shows that Turner did not have authority to effect an inmate transfer, and Plaintiff does not allege that Turner went to the Deputy Warden or took some other affirmative steps to attempt to get Plaintiff moved (Doc. 52 at 12; Doc. 53, DSOF ¶¶ 38–39). Plaintiff alleged in his Complaint that on July 8, 2010, he "was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

severely retaliated against by getting transferred to Florence–East ...," but he does not tie the transfer to any specific Defendant (Doc. 1 at 3B). And in his response, Plaintiff states that around July 8, 2010, Turner retaliated against him, and Plaintiff was moved to Florence East (Doc. 55, Ex. 1, Pl.Decl.¶ 34). These general and conclusory assertions are insufficient to establish a material factual dispute whether Turner had a role in Plaintiff's transfer. *See Leer,* 844 F.2d at 634 ("the prisoner must establish individual fault," and "[s]weeping conclusory allegations will not suffice to prevent summary judgment"); *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir.1986).

**\*9** Because Plaintiff submits no probative evidence establishing that Turner personally took an adverse action against Plaintiff, there exists no genuine issue of material fact on this element of the retaliation claim. Accordingly, the analysis ends, and summary judgment will be granted to Turner on the retaliation claim in Count I, and Plaintiff's request for summary judgment on this claim will be denied.

### IV. Count III–Shaving Waiver

Plaintiff asserts both a free-exercise claim and equal protection claim related to the denial of shaving waiver.

### A. Facts

When Plaintiff entered the ADC in December 2009, he designated his religious preference as Muslim (Doc. 53, DSOF ¶ 55). Plaintiff applied for a religious shaving wavier, and, on January 7, 2010, Brier interviewed Plaintiff regarding this request (*id.* ¶ 57; Doc. 1 at 5; Doc. 55, Ex. 1, Pl. Decl. ¶ 42 (in part)). Defendants state that on January 27, 2010, Brier presented his interview results to Senior Chaplain Becker and requested direction on how to proceed (DSOF ¶ 58). Defendants state that Becker advised further information was needed to aid in the determination of Plaintiff's beliefs; specifically, what in Islam shows that a beard is a tenet of Plaintiff's faith and how does Plaintiff know this (*id.*¶ 59).

Defendants state that after his meeting with Becker, Briar was approached by Plaintiff, and Brier advised him of the information requested by Becker (*id.* ¶ 60). Defendants state that Plaintiff told Brier that it was commanded by the prophet for him not to shave and that he would look for written material to this effect (*id.*). Defendants state that Brier advised Plaintiff that until he provided this information, it would be difficult to go forward in the process (*id.*).

Plaintiff states that he repeatedly inquired to Brier about the requested shaving waiver, to which Brier responded that they were still evaluating the request (Doc. 55, Ex. 1, Pl.Decl.¶ 43 [FN18]). Defendants state that Brier spoke with Plaintiff several times over the next few weeks and reminded him that the additional information was needed; Defendants state that Plaintiff merely responded that it was a command of the prophet (DSOF ¶ 61).

> FN18. Defendants object to ¶ 43 on the ground that it lacks foundation and is not supported by admissible evidence (Doc. 71 at 12). The objection is overruled. Plaintiff has personal knowledge of what he asked Brier and what Brier told him. *See* n. 8.

Plaintiff states that in April 2010, Brier told him his waiver application was lost and he needed to come in for another interview, which Plaintiff did (Doc. 55, Ex. 1, Pl.Decl.¶ 45 [FN19]). Plaintiff states that at this interview, he resubmitted proof in support of the waiver (*id.*). Defendants state that in April 2010, Plaintiff appeared at Brier's office and pressed him about the shaving waiver (DSOF ¶ 62). Defendants state that Brier advised Plaintiff of the needed information and that because it had been four months since the process was started and Plaintiff had not completed the interview, Brier was closing out the request until Plaintiff provided the additional information (*id.*).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

FN19. Defendants object to ¶ 45 on the ground that it lacks foundation and is not supported by admissible evidence. The objection is overruled. *See* n. 8.

On July 21, 2010, Brier issued an "Inmate Letter" to Plaintiff stating that based on an interview and a review of other information, his office "cannot currently identify a sincere religious reason for your request that is consistent with your declared religious preference" (Doc. 55, Ex. 11; Doc. 70, Ex. A, Ex. 1).

**B. Free Exercise Claim**

**1. Legal Standard**

**\*10** The First Amendment provides that the government shall not prohibit the free exercise of religion. U.S. Const. Amend. I. Prisoners must therefore be afforded reasonable opportunities to exercise their religious freedom. *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972). Nevertheless, free-exercise rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *O'Lone v. Shabazz,* 482 U.S. 342, 348 (1987).

To establish a First Amendment free-exercise violation, a plaintiff must first show that the religious practice at issue concerns a sincerely held belief and that the claim is rooted in religious belief. *Malik v. Brown,* 16 F.3d 330, 333 (9th Cir.1994) (internal citations omitted); *see Shakur v. Schriro,* 514 F .3d 878, 884–85 (9th Cir.2008). The plaintiff must then demonstrate a burden to his sincerely held belief. *See Shakur,* 514 F.3d at 884. To substantially burden the practice of an individual's religion, the interference must be more than an isolated incident or short-term occurrence. *See Canell v. Lightner,* 143 F.3d 1210, 1215 (9th Cir.1998). Prison official's negligent or accidental actions that impinge on an inmate's reli-

gious practice are insufficient to support a First Amendment claim. *See Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006).

Finally, if the regulation or conduct at issue impinges on the plaintiff's constitutional rights, it is valid if it is reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89 (1987). *Turner* sets out four factors to be balanced to determine whether a regulation is reasonable: (1) whether there is a "valid, rational connection" between the action or regulation and the "legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) whether "accommodation of the asserted constitutional right" will "impact ... guards and other inmates, and [ ] the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives." *Id.* at 89–90.

**2. Analysis**

The first step in the free-exercise analysis requires Plaintiff to show that he sincerely believes that keeping a beard is consistent with his Muslim faith. *See Shakur,* 514 F.3d at 884–85 (the plaintiff need not show that the religious practice at issue is required as a central tenet of the religion, only that he believes that the practice is consistent with his faith). Plaintiff avers that he was born Muslim and is a practicing Muslim, and he refers to verses from the Quran and Hadith that he believes establish that keeping a beard is one of the tenets in Islam (Doc. 55 at 5, 12). This is sufficient to show a sincerely held belief, and the prison's refusal to provide a shaving waiver therefore implicates the Free Exercise Clause. *See Shakur,* 514 F.3d at 885.

**\*11** Next, Plaintiff must demonstrate that Brier's actions burdened his sincerely held belief. *See id.* at 884. Defendants' first argument on this element is that Plaintiff was not burdened during the relevant period because he continued to grow his beard (Doc. 52 at 15). But Plaintiff denies that he said he was going to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

grow his beard until forced to shave it (Doc. 55, Ex. 1, Pl.Decl.¶ 47 [FN20]). Notably, Defendants do not refute Plaintiff's claim that ADC rules prohibit inmates from growing a beard beyond two days. Instead, they argue that there is no evidence that ADC staff actually forced Plaintiff to cut his beard (Doc. 71 at 27). Even if ADC did not enforce its grooming rule that required Plaintiff to cut his beard, that the rule existed meant the Plaintiff would risk a rule violation by growing his beard without a waiver. Such a rule puts significant pressure on an inmate to cut his beard; thus, it burdens the religious practice of an inmate like Plaintiff who sincerely believed that keeping a beard was consistent with his faith. *See Warsoldier v. Woodford,* 418 F.3d 989, 994, 996 (9th Cir.2005).

> FN20. Defendants object to ¶ 47 of Plaintiff's declaration on the ground that it includes argument (Doc. 71 at 13). The objection is overruled. Plaintiff has personal knowledge as to what he said and did not say to Brier. Fed.R.Civ.P. 56(c)(4). That Plaintiff began ¶ 47 with the words "[c]ontrary to Defendants' false statement," does not render his subsequent averment about what he told Brier "argumentative." *See Burch v. Regents of Univ. of Cal.,* 433 F.Supp.2d 1110, 1119 (E.D.Cal.2006) (discussing why many objections raised at summary judgment are unnecessary and not useful, such as objections to argumentative statements—argumentative statements in a declaration are not facts and are not considered at summary judgment, and objections on this ground "are simply superfluous in this context").

Defendants next argue that Brier is not personally responsible for burdening Plaintiff's religious exercise because he did not have the authority to approve a waiver and he handled Plaintiff's waiver request appropriately (Doc. 52 at 15; Doc. 71 at 27). The evidence reflects that only the Senior Chaplain and the Administrator of Pastoral Services have authority to approve a religious shaving waiver (Doc. 53, Ex. K, Becker Decl. ¶ 11). According to Brier's declaration, as a Correctional Chaplain at the Florence Complex, he was the official who interviewed the inmate and obtained the information necessary for presentation to the Senior Chaplain, who then approved or denied the waiver request (*id.,* Ex. E, Brier Decl. ¶¶ 1, 7–13). It is reasonable to infer that Brier's actions determined when the Senior Chaplain received the waiver request and accompanying information and, thus, Brier could affect the time it would take for a final decision.

The record reflects that on January 27, 2010, Brier presented the results of Plaintiff's January 7, 2010 interview to Senior Chaplain Becker (*id.,* Ex. E, Brier Decl. ¶¶ 7–8). Brier avers that Becker advised him to obtain further information from Plaintiff to support that a beard is a tenet of Islam (*id.*¶ 9). The parties dispute whether, thereafter, Brier repeatedly told Plaintiff that they were still evaluating the request-as Plaintiff alleges-or Brier kept reminding Plaintiff that he had to provide additional information-as Defendants claim (*id.* ¶¶ 61–62; Doc. 55, Ex. 1, Pl. Decl. ¶¶ 43, 45).

The evidence shows, however, that Plaintiff received a notice in writing from Brier on April 23, 2010, stating that he failed to supply "in depth information as to what, exactly, your religious reasons are for your claim that you must have a[s]having waiver. Until you do[,] you have not completed the process" (Doc. 53, Ex. E, Ex. 3). It is not clear from the record whether Plaintiff received this notice before or after his meeting that same day with Brier (*see id.,* Brier Decl. ¶ 12). If the notice was issued prior to their meeting, it would explain why Plaintiff went to Brier's office that same day to inquire about the waiver request, as Brier avers (*id.*). The parties dispute what transpired at this meeting; Defendants state that Brier advised Plaintiff that more information was needed and that he was "closing out the request" until Plaintiff provided the information, and Plaintiff states that he

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

submitted to another interview for a shaving waiver and resubmitted documents (*id.*; Doc. 55, Ex. 1, Pl. Decl. ¶ 45). Brier states that he documented this meeting on a Chaplain/Inmate Interview Worksheet (Doc. 53, Ex. E, Brier Decl. ¶ 12). This Worksheet is the exact same form used at Plaintiff's January 7 interview, and it does not document that Brier gave Plaintiff any advisements nor does it indicate that Brier was closing out the request; rather, it includes Plaintiff's responses to questions about his faith and includes a request for a shaving wavier (*id.*, Ex. 3). Thus, on its face, the April 23, 2010 Worksheet supports Plaintiff's claim that he submitted to a second interview for a shaving waiver. On Defendants' motion, when making all inferences in Plaintiff's favor, he was not told that he had to submit more information until he received the April 23, 2010 notice, at which time he went to Brier's office and underwent another interview for a shaving waiver. Plaintiff further alleges that Brier continued to "give him the run around" until his July 2010 transfer to Florence East (Doc. 55 at 6, 12).

**\*12** On this record, there are disputed material facts whether Brier waited from January until April 23, 2010, to communicate to Plaintiff his need to provide further information in support of his shaving waiver request. Further, there is no evidence that Brier re-presented Plaintiff's waiver request to Senior Chaplain Becker following the April 23, 2010 meeting. In his declaration, Becker avers that Brier presented to him the results of the January 7, 2010 interview with Plaintiff, but he does not indicate that Brier presented any information to him thereafter (Doc. 53, Ex. K, Becker Decl. ¶¶ 9–10 (Doc. 53–2 at 70)). Nor does Becker state that he ever made the determination to deny Plaintiff the waiver (*see id.*). Indeed, Defendants confirm that Plaintiff's waiver request "never reached the evaluation stage" (Doc. 52 at 15).

The record shows that in July 2010, Brier issued a notice to Plaintiff effectively denying the shaving waiver on the ground that Plaintiff could not present a sincere religious reason for his request. As Defendants assert, only Becker had the authority to make such a determination (Doc. 53, Ex. K, Becker Decl. ¶¶ 9–10 (Doc. 53–2 at 70)). A reasonable jury could find that Brier's actions either prevented a decision on Plaintiff's religious shaving waiver request or amounted to a denial of the waiver request. As such, there exists a genuine issue of material fact whether Brier's conduct burdened Plaintiff's religious practice.

The Court must proceed to the final step in the analysis, which considers whether the denial of a shaving waiver is reasonably related to legitimate penological interests and therefore valid. *Turner,* 482 U.S. 78, 89 (1987). But here, because they summarily conclude that Plaintiff's religious practice was not burdened, Defendants fail to address any of the *Turner* factors. As a result, they fail to satisfy their summary judgment burden on this element, and material factual disputes remain as to the Count III free-exercise claim against Brier. See *Greene v. Solano Cnty. Jail,* 513 F.3d 982, 990 (9th Cir.2008) (a pro se litigant "cannot be expected to anticipate and prospectively oppose arguments that an opposing defendant does not make"; thus, sua sponte grant of summary judgment inappropriate on claim the defendant failed to address in motion). Defendants' request for summary judgment on this claim will be denied, and, in light of the material factual disputes, Plaintiff's request for summary judgment on this claim will also be denied.

**C. Equal Protection Claim**

**1. Legal Standard**

The Equal Protection Clause requires the State to treat all similarly situated people equally, and ensures that prison officials cannot discriminate against particular religions. See *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause entitles each prisoner to "a reasonable opportunity of pursuing his faith com-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

parable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz, 405 U.S. at 322* (providing that Buddhist prisoners must be given opportunity to pursue faith comparable to that given Christian prisoners). But this does not require that prisons duplicate every religious benefit provided so that all religions are treated exactly the same, nor must prisons provide identical facilities or personnel to different faiths. Rather, the Equal Protection Clause requires prison officials to make a "good faith accommodations of the prisoner's rights in light of practical considerations." *Allen v. Toombs, 827 F.2d 563, 569 (9th Cir.1987).*

**\*13** The United States Supreme Court has held that "showing that different persons are treated differently is not enough without more, to show a denial of Equal Protection." *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty., 377 U.S. 218, 230 (1964).* Rather, a plaintiff must demonstrate that "the defendants acted with an intent or purpose to discriminate against [him] based upon membership in a protected class." *See Thornton v. City of St. Helens, 425 F.3d 1158, 1166 (9th Cir.2005).* In other words, he must show that he was treated differently because he belonged to a protected class.

**2. Analysis**

Plaintiff alleges that he was treated differently that other similarly situations prisoners. He states that Rastafarian prisoners were allowed to keep their beards and Native Americans were allowed to keep long hair for religious reasons; however, Brier did not permit Plaintiff and other Muslims to keep their beards (Doc. 55 at 13). In reply, Defendants contend that there is no evidence regarding the procedures followed by these other prisoners who were allegedly permitted to have a beard or long hair and that they may have provided the necessary information to obtain a religious waiver; something Defendants claim Plaintiff failed to do (Doc. 71 at 31).

Although there exists a genuine issue of material fact regarding whether Plaintiff provided the necessary information and Brier unlawfully delayed or denied the shaving waiver request, the Court notes that the only evidence that would tend to prove this denial stemmed from an intent to discriminate is Plaintiff's bare allegation. The Court is not obligated to accept as true "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).* Plaintiff does not set forth any facts pertaining to Brier's motivation for denying the waiver request, nor does he allege any specific conduct by Brier that would suggest discriminatory animus, such as derogatory comments about Muslims. Plaintiff proffers declarations from four other prisoners who identify themselves as fellow Muslims (Doc. 55, Ex. 2, Shahid Decl. ¶ 7; Ex. 3, Randy C. Milliner Decl. ¶¶ 6, 18; Ex. 6, Donald Portis Decl. ¶ 6; Ex. 7, Shawn Carmouche Decl. ¶ 7 (Doc. 55 at 29–35, 42–46)). None of these declarants state that they were denied or delayed shaving waivers (*see id.*). Moreover, Plaintiff fails to identify any specific Rastafarian or Native American prisoner who was similarly situated but granted a shaving waiver.

In short, Plaintiff's allegations that Brier's conduct was discriminatory and that Plaintiff was treated differently than other similarly situations inmates, without more, are insufficient to support a claim of intentional discrimination. Defendants' request for summary judgment on the equal protection claim in Count III will be granted, and Plaintiff's request for summary judgment on this claim will be denied.

**V. Count IV–Quran**

**A. Facts**

**\*14** There is no dispute that in December 2009, the Florence Complex Chaplaincy received a box of Arabic language books and copies of the Quran (DSOF ¶ 74; Doc. 55, Ex. 1, Pl. Decl. ¶ 50 (Doc. 55 at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

25 [FN21]). Senior Chaplain Becker states he spoke to the donor—whom he does not identify—and explained that under ADC policy, religious items can be donated to the Department for use in group worship but cannot be donated to a specific inmate (Doc. 53, Ex. K, Becker Decl. ¶¶ 6–7 (Doc. 53–2 at 70)). The parties dispute whether the box of books was donated to a specific inmate; however, neither party demonstrates personal knowledge of the addressee, nor does either party submit a copy of the invoice or any documentary evidence to establish to whom the books were sent (*see id.* 6; Ex. E, Brier Decl. ¶ 4 (Doc. 53–1 at 56–57); Doc. 55, Pl. Decl. ¶¶ 50–51 [FN22]). Becker states that the donor requested that the books be returned (Doc. 53, Ex. K, Becker Decl. ¶ 7).

> **FN21.** Defendants object to ¶ 50 of Plaintiff's declaration on the ground that it lacks foundation and is not supported by admissible evidence (Doc. 71 at 13). The objection is overruled. Defendants concede that a box of Arabic language books was received by the prison facility in December 2009, and they do not dispute that the books included copies of the Quran. The record also includes a prison official's response to Plaintiff's Inmate Letter regarding this complaint, and the response refers to a box of Holy Qurans (Doc. 22, Ex. 26 (Doc. 22–2 at 81)). *See* Fed.R.Civ.P. 56(c) (court may consider any materials in the record).

> **FN22.** Defendants' objection to ¶ 51 of Plaintiff's declaration is sustained as explained in the body (Doc. 71 at 13).

Plaintiff states that Brier refused to accept the books for almost seven months, during which time Brier told him that they were still evaluating the books (Doc. 55, Ex. 1, Pl.Decl.¶ 52 [FN23]). Plaintiff states that from December 2009 to July 2010, Brier repeatedly asked Plaintiff for information about the sender and the intended use of the Qurans, which Plaintiff pro-

vided (Doc. 1 at 5A). Plaintiff alleges that during this time, Brier provided holy books of other faiths without delay (*id.*). Plaintiff states that at one point, Brier offered him a copy of the Bible instead of the Quran (Doc. 55, Ex. 1, Pl.Decl.¶ 55 [FN24]). Brier disputes that he offered Plaintiff a Bible instead of a Quran (Doc. 70, Ex. A, Brier Supp. Decl. ¶ 6 (Doc. 70 at 6)).

> **FN23.** Defendants object to ¶ 52 of Plaintiff's declaration on the ground that it lacks foundation and is not supported by admissible evidence (Doc. 71 at 13). The objection is overruled. Plaintiff has personal knowledge as to what Brier told him about the books. Fed.R.Civ.P. 56(c)(4). *See* n. 8.

> **FN24.** Defendants' objection to ¶ 55 of Plaintiff's declaration is overruled (Doc. 71 at 13). Plaintiff has personal knowledge to attest that Brier offered him a Bible. *See* n. 8.

Plaintiff avers that after seven months, the box with Arabic Language books was accepted but the box with copies of the Quran was returned to the sender (Doc. 55, Ex. 1, Pl.Decl.¶ 54 [FN25]). In a supplemental declaration, Becker confirms that he accepted a box of Arabic language books and instructed Brier to keep the books in Brier's office and allow inmates to check out the books for review in the office (Doc. 70, Ex. B, Beck Supp. Decl. ¶ 3 (Doc. 70 at 10–11)).

> **FN25.** Defendants' objection to ¶ 54 of Plaintiff's declaration is overruled (Doc. 71 at 13). Defendants' own evidence supports Plaintiff's averment—that the box of Arabic language books was accepted and the box of Qurans was returned to sender (*see* Doc. 70, Ex. B, Becker Supp. Decl. 3; Doc. 53, DSOF 76 (Doc. 53 at 14)).

**B. First Amendment Claim**

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

**1. Legal Standard**

The legal standard governing free-exercise claims is set forth above.

**2. Analysis**

Defendants do not challenge whether Plaintiff has a sincere belief that having a copy of the Quran is necessary for the free exercise of his religion (see Doc. 52 at 15). Plaintiff has already presented his sincerely held Muslim beliefs, and a refusal to provide a copy of his religion's text, the Quran, implicates the Free Exercise Clause. *See Shakur,* 514 F.3d at 885.

As discussed above, the next step requires a showing that Brier's actions burdened Plaintiff's sincerely held belief. *See id.* at 884. Defendants maintain that Brier could not have burdened Plaintiff's religious practice because he was not personally involved in the alleged violation (Doc. 52 at 16; Doc. 71 at 28). Liability under a § 1983 claim arises "only upon a showing of personal participation by the defendant." *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) (citation omitted). Therefore, Plaintiff must allege facts that show Brier was personally involved in the deprivation of his civil rights. *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998). The personal-involvement inquiry "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer,* 844 F.2d at 633.

**\*15** Defendants' evidence establishes that Senior Chaplain Becker was the individual authorized to accept books donated to the Florence prison complex (Doc. 70, Ex. B, Becker Supp. Decl. ¶ 3). Becker was the person who spoke to the donor, who accepted only the Arabic language books and not the Qurans, and who instructed Brier as to how to make the language books available to inmates (*id.;* Doc. 53, Ex. K, Becker Decl. ¶ 7). Despite some evidentiary defi-

ciencies,[FN26] the record is sufficient to demonstrate that it was Becker's, not Brier's, responsibility to accept or refuse the books. *See Leer,* 844 F.3d at 633. And, unlike the claim related to the shaving waiver, there is no evidence that Brier prevented Becker from making the decision whether to accept the Qurans or that Brier's actions effectively constituted a denial of the books.

> FN26. For example, Defendants state that books donated to an individual inmate are not permitted by policy; however, they do not cite to any policy to support this statement, and the record shows that Becker accepted the Arabic language books that were allegedly donated to an individual inmate (*see* Doc. 53, Ex. K, Becker Decl. ¶¶ 6–7 (Doc. 53–2 at 70)).

On this record, there exists no genuine issue of material fact to support that Brier personally burdened Plaintiff's religious practice by rejecting donated copies of the Quran. This ends the First Amendment analysis, and Defendants' request for summary judgment on this First Amendment claim in Count IV will be granted, and Plaintiff's request for judgment on this claim will be denied.

**C. Equal Protection Claim**

**1. Legal Standard**

The legal standard governing equal protection claims is set forth above.

**2. Analysis**

As discussed above, liability requires a showing of personal participation by the defendant. *Taylor,* 880 F.2d at 1045. The Court has already determined that there is no evidence Brier was personally involved in refusing and returning the box of Qurans sent to the Florence complex. It follows that absent personal

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
(Cite as: 2014 WL 1047144 (D.Ariz.))

involvement, he cannot be liable for the equal protection claim arising from the same set of facts. Accordingly, summary judgment will be granted to Defendants on the equal protection claim in Count IV, and judgment will be denied to Plaintiff.

## VI. Count VI–Communal Prayer

### 1. Facts

Plaintiff's Count VI claim arose during the month of Ramadan in 2010, which occurred from August 11 to September 9 (Doc. 1 at 5C; Doc. 53, DSOF ¶ 79). Muslims observing Ramadan eat their breakfast meal before sunrise and their dinner meal after sunset (DSOF ¶ 80). On July 20, 2010, the Chaplain issued a memorandum stating that during Ramadan, "[w]hile there is a requirement for prayer prior to eating, it is not required to be communal prayer. It is suggested that 20–30 minutes be given for eating in the dining halls to allow inmates to pray, if they choose, while in the dining hall" (*id.* ¶ 82). During the relevant time, Riharb worked the graveyard shift, from 10 p.m. to 6 a.m., during which time she attended the chow hall breakfast turn out (*Id.* ¶¶ 83–84).

Plaintiff states that during Ramadan, he and approximately 20 other Muslim inmates were entering the dining hall in the early morning hours to pray when Riharb shouted to them "take back your rags"—a derogatory reference to the prayer rugs the inmates were holding (Doc. 55, Pl.Decl.¶¶ 56–57). Plaintiff states that he informed Riharb that they needed their prayer rugs to pray and cannot otherwise perform their prayers on the floor; however, Riharb ordered them to take them back to their cells (*id.* ¶ 58). Plaintiff states that he filed a grievance and spoke to a Sergeant about Riharb's conduct, who assured Plaintiff that staff would be notified of inmates' right to take their prayer rugs into the chow hall (*id.* ¶ 60). Plaintiff states that the following week, Riharb again ordered Muslim inmates to take back their rugs and Plaintiff

again brought a grievance to the administration (*id.* ¶ 61). Plaintiff states that the third time Riharb took the same action, inmates challenged her as a group, after which she spoke to the Sergeant and then finally allowed them to bring in their prayer rugs and pray (*id.* ¶¶ 62–63).

**\*16** Defendants state that inmates were permitted to bring their individual prayer rugs for prayers in the chow hall (DSOF ¶ 85). Defendants state that on one or two occasions at breakfast during Ramadan in 2010, several Muslim inmates tried to bring in sheets to be used as prayer rugs, which was not permitted, and Riharb instructed them to return their sheets to their cells (*id.* ¶ 90). Defendants state that Riharb never prevented Plaintiff from praying at breakfast meals during Ramadan (*id.* ¶ 92).

### 2. Legal Standard

The legal standard governing a First Amendment free-exercise claim is presented above.

### 3. Analysis

Defendants argue that communal prayer during Ramadan has not been established as an Islamic tenet and that the Chaplain never approved a communal prayer during Ramadan for Muslim inmates (Doc. 52 at 18). But in the first step of the free-exercise analysis, Plaintiff is not required to show that communal prayer during Ramadan is a central tenet of the Muslim religion or that the practice was officially approved by the Chaplain; he need only show that the practice is consistent with his faith. *See Shakur,* 514 F.3d at 884–85. Plaintiff expressed his personal belief that communal prayer was a central tenet of his religion (Doc. 1 at 5C). Further, as he points out in his response, this claim is not strictly about communal prayer; he alleges that Riharb's actions prevented all Muslim inmates from exercising their basic right to pray (Doc. 55 at 14). Indeed, Defendants acknowledge that during Ramadan, "there is a requirement for prayer prior to eating" (Doc. 53, DSOF ¶ 82). The Court finds that Plaintiff has demonstrated his belief

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

that conducting prayers with fellow Muslims prior to the morning meal during Ramadan is consistent with his faith.

Plaintiff must therefore demonstrate that Riharb's action burdened his sincerely held beliefs. *See Shakur, 514 F.3d at 884.* Plaintiff maintains that Riharb prevented inmates from taking their prayer rugs into the dining hall for prayers (Doc. 55 at 14). According to Plaintiff, no Muslims brought sheets instead of prayer rugs, and he argues that, even assuming, arguendo, that some did, it would not justify Riharb ordering all Muslim inmates to return their prayer rugs to their cells thereby prohibiting them from praying (*id.*).

Defendants maintain that Plaintiff nonetheless had the opportunity to pray in his cell (Doc. 52 at 19). But the Court has already found that Plaintiff expressed a sincere belief that communal prayers are consistent with his faith. Numerous courts addressing Muslim prisoners' rights have referred to the importance of communal prayer. *See O'Lone, 482 U.S. at 352* (in upholding a prison regulation, Supreme Court noted that Muslims were able to observe a number of their religious obligations, including the right to congregate for prayer outside of work hours); *Lovelace, 472 F .3d at 187* (relevant religious exercise was observing Ramadan and attending group prayer services); *Williams v. Morton, 343 F.3d 212, 219 (3d Cir.2003)* (weekly congregational prayer service was valid avenue through which Muslim prisoners could express their religious beliefs); *see also Cutter v. Wilkinson, 544 U.S. 709, 720 (2005)* (in case involving prisoners of "nonmainstream" religions, noting that the " 'exercise of religion' often involves ... assembling with others for a worship service") (quotation omitted); *Murphy v. Mo. Dep't of Corrs., 372 F.3d 979, 988 (8th Cir.2004)* (ban on communal worship may constitute a substantial burden under the Religious Land Use and Institutionalized Persons Act of 2000).

**\*17** Defendants also maintain that the com-

plained-of action occurred just once or twice (Doc. 53, DSOF ¶ 90). In his declaration, Plaintiff confirms that Riharb stopped Muslim inmates from bringing their prayer rugs into the dining room on just two occasions (Doc. 55, Ex. 1, Pl.Decl.¶¶ 57–63). Intrusions that are "relatively short-term and sporadic" do not constitute a substantial interference. *Canell, 143 F.3d at 1215* (finding that defendant interfered with inmate's prayer activities on some occasions but it did not constitute a substantial burden and summary judgment was appropriate). The Court finds that the denial of communal prayers on two mornings during the month of Ramadan does not amount to a substantial burden in violation of the First Amendment. Consequently, Defendants request for summary judgment on Count VI will be granted, and Plaintiff's request for summary judgment will be denied.

**VII. Qualified Immunity**

The only remaining claim is the Count III First Amendment free-exercise claim against Brier for the denial of a shaving waiver. Defendants claim that Brier is entitled to qualified immunity (Doc. 52 at 23–25).

A defendant is entitled to qualified immunity if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).* The qualified-immunity analysis requires a court to address two questions: whether the facts alleged or shown by the plaintiff establish a constitutional violation and whether the right at issue was clearly established at the time. *Saucier v. Katz, 533 U.S. 194, 201 (2001).* Courts may decide which prong to address first depending on the circumstances of the case. *Pearson v. Callahan, 555 U.S. 223, 242–43 (2009).*

Here, the Court has already determined that disputed facts, viewed in the light most favorable to Plaintiff, create triable issues of fact regarding whether Brier's actions violated Plaintiff's First

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

Amendment free-exercise rights. Thus, whether Brier is entitled to qualified immunity turns on whether the constitutional right at issue was clearly established such that he would understand that what he is doing violates that right. *See Saucier,* 533 U.S. at 201. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Hope v. Pelzer,* 536 U.S. 730, 739 (2002). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987) (citation omitted). "If the only reasonable conclusion from binding authority were that the disputed right existed, even if no case had specifically so declared, prison officials would be on notice of the right and would not be qualifiedly immune if they acted to offend it." *Blueford v. Prunty,* 108 F.3d 251, 255 (9th Cir.1997). In other words, " '[c]losely analogous preexisting case law is not required to show that a right was clearly established.' " *Sorrels v. McKee,* 290 F.3d 965, 970 (9th Cir.2002) (quotation omitted). Prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope,* 536 U.S. at 741.

**\*18** The Supreme Court long ago established that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 713–14 (1981). It was clearly established at the time Plaintiff's claim arose that the First Amendment protects a prisoner's sincere religious beliefs, not just central tenets of his faith, and that prison officials may not substantially burden inmates' right to the free exercise of their religion without some legitimate penological justification. *See Shakur,* 514 F.3d 883–85. In addition, case law existed to put Brier on notice that his alleged actions violated established law. *See Warsol-*

*dier,* 418 F.3d at 995 (finding inmate's religion was burdened by a grooming policy).

According to Defendants, Brier did not have authority to approve a shaving waiver, Plaintiff failed to provide the necessary information for the waiver, and he was not burdened because he continued to grow his beard (Doc. 52 at 23–24). Defendants conclude that in these circumstances, it would not be clear to Brier that his actions violated Plaintiff's constitutional rights (*id.* at 25).

This argument for qualified immunity rests entirely on Defendants' version of the facts, which Plaintiff disputes and which is an improper basis to support qualified immunity. *See Conner v. Heiman,* 672 F.3d 1126, 1131 (9th Cir.2012) (a district court should decide qualified immunity only when the material facts are not in dispute); *Wilkins v. City of Oakland,* 350 F.3d 949, 956 (9th Cir.2003) ("[w]here the [defendant's] entitlement to qualified immunity depends on the resolution of disputed issues of fact in [his or her] favor, and against the non-moving party, summary judgment is not appropriate"). Defendants' request for qualified immunity will therefore be denied.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 52) and Plaintiff's Motion for Summary Judgment (Doc. 55).

(2) Defendants' Motion for Summary Judgment (Doc. 52) is **granted in part** and **denied in part** as follows:

(a) the motion is **granted** as to the Count I First Amendment retaliation claims against Hernandez, Huggins, and Turner, and Count I is dismissed:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)
**(Cite as: 2014 WL 1047144 (D.Ariz.))**

(b) the motion is **granted** as to the Count III equal protection claim against Brier, and this claim within Count III is dismissed;

(c) the motion is **granted** as to the Count IV First Amendment and equal protection claims against Brier, and Count IV is dismissed;

(d) the motion is **granted** as to the Count VI First Amendment free-exercise claim against Riharb, and Count VI is dismissed; and

(e) the motion is otherwise **denied.**

(3) Plaintiff's Motion for Summary Judgment (Doc. 55) is **denied .**

(4) Hernandez, Huggins, Turner, and Riharb are dismissed as Defendants.

**\*19** (5) The sole remaining claim is the Count III First Amendment free-exercise claim against Brier for the denial/delay of a religious shaving waiver.

DATED this 17th day of March, 2014.

D.Ariz.,2014.
Halloum v. Ryan
Not Reported in F.Supp.2d, 2014 WL 1047144 (D.Ariz.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 5166626 (N.D.Ill.)
**(Cite as: 2013 WL 5166626 (N.D.Ill.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Sylvester JAMISON, (R21155) and Ali Evans,
(K83175), Plaintiffs,
v.
Commander William FRANKO, and Superintendent
Scott Bratlien, incorrectly sued as Scott Bradley, De-
fendants.

No. 12 C 0242.
Sept. 13, 2013.

Sylvester Jamison, Canton, IL, pro se.

Ali Evans, Mt. Sterling, IL, pro se.

Nile N. Miller, James Charles Pullos, Michael L.
Gallagher, Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*
RONALD A. GUZMAN, District Judge.

**\*1** *Pro se* plaintiffs Sylvester Jamison and Ali
Evans, Illinois Department of Corrections inmates,
have sued Cook County Jail Commander William
Franko and Superintendent Scott Bratlien pursuant to
42 U.S.C. § 1983, claiming that defendants wrong-
fully kept them in disciplinary segregation at Cook
County Jail ("the Jail"). Defendants have filed a Fed-
eral Rule of Civil Procedure ("Rule") 56 motion for
summary judgment. For the reasons set forth below,
the Court grants the motion.

### *Discussion*
As an initial point, defendants are correct that

plaintiffs failed to comply with the requirements of
Local Rule 56.1. However, plaintiffs are proceeding
*pro se.*[FN1] Due to plaintiffs' *pro se* status, the Court has
reviewed the record in full. It is clear that the parties
do not dispute the facts at issue, and the record does
not suggest any "unanswered questions" from dis-
covery that remain as a result of plaintiffs' *pro se*
status. *Junior v. Anderson,* ——F.3d ——, 2013 WL
3886791, at \*4 (7th Cir. July 30, 2013). Thus, the
Court proceeds with the summary judgment ruling.

> FN1. Plaintiffs never asked the Court to re-
> cruit counsel to assist them, perhaps because
> they were assisted by fellow inmate Larry
> Maurice Banks, who is extremely litigious.
> *See In re Banks,* No. 13 C 1014 (N.D.Ill.).

"The Court shall grant summary judgment if the
movant shows that there is no genuine dispute as to
any material fact and the movant is entitled to judg-
ment as a matter of law." Fed.R.Civ.P. 56(a); *Wackett
v. City of Beaver Dam,* 642 F.3d 578, 581 (7th
Cir.2011). The Court may not weigh conflicting evi-
dence or make credibility determinations, but the party
opposing summary judgment must point to evidence
demonstrating a genuine dispute of material
fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629
F.3d 697, 705 (7th Cir.2011) (citations omitted). The
moving party has the initial burden of showing there is
no genuine dispute and he is entitled to judgment as a
matter of law. *Carmichael v. Vill. of Palatine,* 605
F.3d 451, 460 (7th Cir.2010) (citing *Celotex Corp. v.
Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91
L.Ed.2d 265 (1986)). If the moving party meets this
burden, the non-moving party must respond with
specific facts showing that the jury could find in his
favor, and that there is a genuine dispute that needs to
be adjudicated at trial. *Carmichael,* 605 F.3d at 460
(citing *Anderson,* 477 U.S. at 251–52; *Matsushita
Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

Slip Copy, 2013 WL 5166626 (N.D.Ill.)
**(Cite as: 2013 WL 5166626 (N.D.Ill.))**

586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ..., or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *Dole v. Chandler,* 438 F.3d 804, 808 (7th Cir.2006). A prisoner is required to utilize a jail grievance system before filing a section 1983 claim so that jail officials have an opportunity to take remedial action. *Porter v. Nussle,* 534 U.S. 516, 524–25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Dole,* 438 F.3d at 809; *Massey v. Helman,* 196 F.3d 727, 733 (7th Cir.1999). Exhaustion requires "a prisoner [to] file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Brengettcy v. Horton,* 423 F.3d 674, 682 (7th Cir.2005) (quotation omitted).

**\*2** There is no dispute that Jamison did not file a grievance at any time. (*See* Def.'s Ex. A, Jamison Dep. at 141–42.) Instead, he attempted to rely upon the grievance filed by fellow inmate Larry Maurice Banks. (*Id.*) As the Court has previously ruled, however, Jamison cannot rely on Banks' grievance to satisfy the exhaustion requirement. *Jamison v. Franko,* No. 12 C 0098, 2013 WL 1093118, at \*4 (N.D.Ill. Mar.15, 2013); *see* Defs.' Ex. D, Johnson Aff. ¶ 4 ("The Inmate Grievance Procedure does not authorize one inmate to prepare and file grievances on behalf of another."). Because the record establishes that Jamison did not exhaust administrative remedies, defendants are entitled to summary judgment on his claim.

Turning to Evans, the record shows that he submitted a grievance on November 30, 2011. (Def.'s Ex. B, Evans Dep. Ex. 4, Grievance.) According to the Jail's grievance system, correction officials had thirty days, or until December 30, 2011, to respond to it.

Evans did not receive a response by that date. (*See* Def.'s Ex. D, Johnson Aff. ¶ 8.) Thus, on January 12, 2012, he filed this suit. [FN2]

> FN2. In theory, the suit was filed earlier than January 12, 2012. January 12th is the date the complaint was received by the Court. There is no proof of service to show when the complaint was submitted to jail officials with sufficient postage to allow for the benefit of the mailbox rule of *Houston v. Lack,* 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). The Court uses the January 12th date because it is the most favorable date possible for Evans in the record.

There is no dispute that Evans did not file an appeal of his grievance, which is required to exhaust administrative remedies. He claims, however, that he could not appeal because the Jail did not respond to his grievance, effectively making the process unavailable to him. *See Dole v. Chandler,* 438 F.3d 804, 809 (7th Cir.2006) (stating that the exhaustion requirement is excused if jail officials' failure to respond to a grievance renders the grievance process unavailable).

But as *Ford v. Johnson,* 362 F.3d 395 (7th Cir.2004) illustrates, a grievance process is not unavailable simply because the prison's response to a grievance is tardy. Though the prison officials in *Ford* were required to rule on inmate appeals within sixty days "whenever possible," it took them six months to rule on Ford's appeal. *Id.* When the sixty-day period set forth in the regulations had elapsed, Ford filed suit, arguing that he had exhausted all of the remedies that were available to him. *Id.* The Seventh Circuit disagreed:

> [The] regulation provides that decision will be rendered within 60 days of the appeal "whenever possible." That means, Ford contends, that once 60 days have expired without a decision, the adminis-

Slip Copy, 2013 WL 5166626 (N.D.Ill.)
**(Cite as: 2013 WL 5166626 (N.D.Ill.))**

trative process is no longer "available" and the prisoner may start the litigation. That's a non-sequitur. An aspiration to act quickly "whenever possible" does not mean that the prison system tosses out the papers and closes the files after two months.... Some appeals are simple and will be wrapped up within two months; others are more complex.... Section 1997e(a) applies to all grievances, not just to the simple ones. Illinois made a process available to Ford; he had to stick with that process until its conclusion rather than make a beeline for court just because the administrative officials gave his appeal the time needed to resolve it.

**\*3** *Id.; see Dole,* 438 F.3d at 812 (stating that an inmate must do "all that is reasonable to exhaust his administrative remedies"). Like the plaintiff in *Ford,* Evans made a "beeline" to court—getting his complaint through the prison and U.S. Mail systems and on file with this Court less than two weeks after the response was due—as soon as the Jail's response time elapsed. As in *Ford,* however, Evans' haste does not mean the Jail's grievance process was unavailable to him.[FN3]

> **FN3.** Exactly where the line is between a late response and an unavailable process is unclear. What is clear, however, is that the prison's delay and the inmate's efforts must be far greater than in this case for the process to be deemed unavailable. *See Dole,* 438 F.3d 807–08 (process unavailable to inmate who, over eighteen-month period, filed three different grievances and repeatedly asked jail officials about them before filing suit); *Brengettcy,* 423 F.3d at 678 (grievance process unavailable given Jail's failure to respond to inmate's grievance and inquiries about it and his follow-up grievance during four-month period after response was due).

### Conclusion

The record establishes that Jamison and Evans did not exhaust administrative remedies before filing this suit. Accordingly, the Court grants defendants' motion for summary judgment [23], and dismisses plaintiffs' claims without prejudice for failure to exhaust. *See Ford,* 362 F.3d 395, 401 (7th Cir.2004) (*"[A]ll* dismissals under § 1997e(a) should be without prejudice .") (emphasis original). This case is terminated.

### SO ORDERED.

N.D.Ill.,2013.
Jamison v. Franko
Slip Copy, 2013 WL 5166626 (N.D.Ill.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Devin KEITT, Plaintiff,
v.
A. SCHUN, et al., Defendants.

No. 11–CV–438.
Jan. 30, 2014.

Stormville, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

DECISION AND ORDER

RICHARD J. ARCARA, District Judge.

**\*1** The above-referenced case was referred to Magistrate Judge Jeremiah J. McCarthy, pursuant to 28 U.S.C. § 636(b)(1)(B). Defendants filed an unopposed motion to dismiss plaintiff's amended complaint pursuant to 28 U.S.C. § 1915A and Rules 12(b)(1), (2) and (6) of the Federal Rules of Civil Procedure. Defendants also moved for a stay of all proceedings pending resolution of the motion to dismiss. On September 19, 2013, Magistrate Judge McCarthy issued a Report and Recommendation recommending that the motion to dismiss be granted in part and denied in part, and ordered that the motion for a stay be granted.

On October 9, 2013 plaintiff filed objections to those portions of the Report and Recommendation which recommended that certain of his claims be dismissed. Defendants filed a reply on October 30, 2013. The Court deemed the matter submitted without oral argument.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon *de novo* review, and after reviewing the submissions of the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge McCarthy's Report and Recommendation, defendants' motion to dismiss the amended complaint is denied to the extent it seeks to dismiss the deliberate indifference/failure to protect claims against defendants Schunh, Dr. Evans, Dr. Rao and Dr. Kowski, in their individual capacities, but is otherwise granted.

The matter is referred back to Magistrate Judge McCarthy for further proceedings.

SO ORDERED.

**REPORT, RECOMMENDATION, ORDER**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

This case was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including preparation of a Report and Recommendation on dispositive motions [18].[FN1] Before me is defendants' unopposed motion [39] to dismiss the Amended Complaint pursuant to 28 U.S.C. § 1915A and Fed.R.Civ.P. ("Rules") 12(b)(1), (2), and (6), and for a stay of all proceedings pending resolution of the motion.[FN2] For the following reasons, I recommend that the motion to dimiss be granted in part and denied in part, and order that the motion for a stay is granted.

FN1. Bracketed references are to the CM/ECF docket entries.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

FN2. Although defendants move to dismiss the Amended Complaint [29] pursuant to Rules 12(b)(1) and (b)(2), they do not argue that either subject-matter or personal jurisdiction are lacking.

## BACKGROUND

Plaintiff, an inmate in the custody of the New York State Department of Correction and Community Supervision ("DOCCS") commenced this action *pro se* by Complaint filed May 20, 2011[1]. Defendants initially moved to dismiss the Complaint [14], and plaintiff responded by cross-moving [21] for leave to file an Amended Complaint seeking to add two new defendants. At a conference held on July 5, 2012, I denied plaintiff's motion for leave to amend [21] "as moot, since plaintiff [could] amend as of right", and defendants' motion to dismiss the Complaint [14] was withdrawn, without prejudice to their right to move against the Amended Complaint. July 6, 2012 Text Order [28]. Plaintiff filed an Amended Complaint [29] on July 11, 2012.

**\*2** Plaintiff's Amended Complaint centers on the medical treatment he received while incarcerated at Attica Correctional Facility. According to plaintiff, a bullet is lodged in his head, causing him to suffer "chronic" and "substantial pain" that hinders his ability to sleep or engage in physical activity. Amended Complaint [29], ¶¶ 17, 19. A pain management specialist who treated plaintiff in December of 2004 for his complaints that Tylenol and Motrin were causing gastrointestinal distress, including "blood in [his] underwear" (*id.*, ¶ 20), prescribed certain pain relievers, including Ultracet, "Morin", Neurontin, and Pepcid. *Id.* ¶ 21, p. 33 of 43. At the two facilities where he was housed prior to being transferred to Attica, plaintiff was prescribed the recommended medications. *Id.*, ¶¶ 22–23.

However, when he arrived at Attica on October 19, 2010, plaintiff was examined by defendant Schunh,[FN3] a "medical provider", who informed him that she was "not going to give pain medication for migraine headache" and was "withdraw [ing][the] treatment that was prescribed by [the] pain management [specialist]". *Id.*, ¶ 24.[FN4] Instead, she offered him Tylenol and Motrin, despite "being aware that ... [it] causes [him] *'distress' "*. *Id.*, ¶ 37 (emphasis in original). When plaintiff requested a second opinion, defendant Schunh told him that "she doesn't care who else Plaintiff speaks to about issue.... [S]he's going to make sure as long as plaintiff is in the facility, none of her co-workers is going to go against her". *Id.*, ¶ 26.

FN3. Whereas the Amended Complaint identifies this individual as "Schun", it's spelled "Schunh" by defendants.

FN4. Where the full names of the defendants are not contained in the record, I have identified them by their surnames.

Plaintiff repeats these allegations against several doctors at Attica, including Dr. Evans, who examined him on November 19, 2010 (*id.*, ¶ 41), Jadow Rao, M.D., who examined him on December 9, 2010 (*id.*, ¶ 64), and Dr. Kowski, who examined him on December 1, 2011 (*id.*, ¶ 83). He also alleges that he informed defendants Nurse Administrator Killinger, Superintendent Mark Bradt, and DOCCS's Commissioner Brian Fischer, that he was intentionally being denied treatment that was prescribed by a pain management specialist, but that they failed to remedy the wrong. *Id.*, ¶¶ 101–108, 115, 122–132, 137–154.

Plaintiff alleges that he was denied pain medication "because of the color of his skin" (*id.*, ¶ 30), and as a penalty for "exercising the right of free speech" (*id.*, ¶¶ 32, 48, 75, 94, 108, 126, 155). He alleges that he "is a member of racial minority[.] The defendant intended to discriminate on the basis of race[.] This discrimination concerned the rights to make and en-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

force contacts to sue both parties; give evidence and the full [*sic* ] and equal benefits of all laws and proceedings for security of persons and property." *Id.,* ¶¶ 56, 74, 93, 107, 127, 154. He also alleges that defendants "carried out a malicious retaliation against [him] because of the color of his skin. *Id.,* ¶¶ 73, 92, 106, 125, 153. According to plaintiff, defendants collectively

**\*3** "conspired to deprive [him] of the equal protection of the laws or privileges and immunities under the laws with avert act in furtherances [*sic* ] of the conspiracy and injury to the privilege of a citizen of the United States; some racial or perhaps otherwise class-based, invious [*sic* ] discriminatory animus." *Id.,* ¶¶ 31, 60, 79, 105.

Plaintiff's action is brought pursuant to "42 U.S.C. § 1981, 1983, 1985, 1986, 1988, civil rights first, eighth, fourteenth amendment, Discrimination, deliberate indifference, equal protection, failure to protect, and due process, cruel and unusual punishment." *Id.,* ¶ 1.[FN5] Each of the defendants are named in their individual and official capacities (*id.,* ¶¶ 16, 40, 63, 82, 100, 122, 137), and plaintiff seeks compensatory and punitive damages (*id.,* ¶ 157).

> FN5. Plaintiff's "Section 1988 claim for attorney's fees ... fails because the statute is not an independent cause of action". *Reid v. Toyota Motor Credit Corp.,* 2013 WL 3776201, *2 (S.D.N.Y.2013).

After defendants filed this motion, I appointed Attorney James Greco to represent plaintiff and set a briefing schedule on the motion to dismiss, giving plaintiff until November 30, 2012 to respond. October 3, 2012 Text Order [44]. To date, no response or motion for an extension of the November 30, 2012 deadline has been filed. Nevertheless, I "cannot grant a motion to dismiss solely on the ground that it is unopposed. Rather, where a Rule 12(b) motion has not

been opposed, this Court must review the merits of the motion and determine whether the movant has carried its burden." *Foster v. Phillips,* 2005 WL 2978686, *3 (S.D.N.Y.2005). *See McCall v. Pataki,* 232 F.3d 321, 323 (2d Cir.2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal").[FN6]

> FN6. Under 28 U.S.C. § 1915A(a), a district court "shall review ... a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and it "shall" dismiss the complaint (or any portion thereof) if the complaint is "frivolous, malicious, or fails to state a claim upon which relief may be granted." *Id.* § 1915A(b)(1). Since "Section 1915A's third ground for dismissal—legal sufficiency—is identical to the dismissal standard under Federal Rule of Civil Procedure 12(b)(6)" *McGhie v. Main,* 2011 WL 4852268, *1 (E.D.N.Y.2011), I have addressed defendants' motion only under the Rule 12(b)(6) standard.

## ANALYSIS

### A. Motion to Dismiss

#### 1. 42 U.S.C. § 1981

Defendants argue that plaintiff's 42 U.S.C. § 1981 claim must be dismissed because plaintiff "fails to allege any contract right ... nor of any infringement on his ability to give evidence, nor of a causal link between the defendants' actions and the plaintiff's race." Defendants' Memorandum of Law [40], p. 10. I agree.

42 U.S.C. § 1981 provides that "[a]ll persons ... shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

ceedings for the security of persons and property as is enjoyed by white citizens". 42 U.S.C. § 1981(a). "The essential elements of the claim are actions that were racially motivated and purposefully discriminatory." *Dove v. Fordham University,* 56 F.Supp.2d 330, 338 (S.D.N.Y.1999), *aff'd,* 210 F.3d 354 (2d Cir.2000) (Summary Order). In pleading a claim arising under § 1981, "[c]onclusory or naked allegations will not suffice .... Fact-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required." *Id.*

Plaintiff's conclusory allegations parroting the language of § 1981, which fail to include fact-specific conduct linking defendants' alleged deliberate indifference to his race, are insufficient to state a claim. Coupled with the absence of specific facts supporting his claim that defendants' conduct was racially motivated, plaintiff offers other reasons for the conduct that he experienced, including retaliation, and is equivocal as to whether this conduct was motivated by race, alleging that "some racial or perhaps otherwise class-based, invious [*sic*] discriminatory animus" was to blame. Amended Complaint [29], ¶¶ 31, 60, 79, 105.[FN7] Since "a complaint that sets forth other possible motives for the alleged conduct, and does not contain specific facts supporting a claim of racial animus, contradicts a claim of racial discrimination", *Korova Milk Bar of White Plains, Inc. v. PRE Properties, LLC,* 2013 WL 417406, *9 (S.D.N.Y.2013), I recommend that this claim be dismissed.

> FN7. Although not raised by defendants, it is questionable whether plaintiff's § 1981 claim is viable in its current form. "Plaintiff cannot assert a claim under 42 U.S.C. § 1981 because 42 U.S.C. § 1983 provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.... Defendants here are state actors. Therefore, Plaintiff's claims cannot be raised under 42 U.S.C. § 1981." *Hughes v. Butt,* 2009 WL 3122952, * 11 (N.D.N.Y.2009) (*citing Jett v. Dallas Independent School District,* 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). *See Wynder v. McMahon,* 2013 WL 1759968, *5 (E.D.N.Y.2013) ("When a plaintiff alleges § 1981 and § 1983 claims for the same conduct, a court may dismiss the § 1981 claim or deem it merged with the § 1983 claim; the result, in practice, is the same"). "Courts have interpreted this prohibition to extend to actions against individual defendants in their individual capacities." *Rehman v. State University of New York at Stony Brook,* 596 F.Supp.2d 643, 654 (E.D.N.Y.2009).

**2. Equal Protection**

**\*4** Defendants argue that plaintiff's conclusory allegations of racial discrimination likewise fail to state an equal protection claim. Defendants' Memorandum of Law [40], pp. 10–11. I agree.

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race ." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "In order to plead a facially valid equal protection claim, however, plaintiff must allege: (1) that he has been treated differently from similarly-situated inmates, and (2) that the discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right." *Nash v. McGinnis,* 585 F.Supp.2d 455, 462 (W.D.N.Y.2008) (Larimer, J.). "Conclusory allegations of disparate treatment or plaintiff's personal belief of discriminatory intent is insufficient." *Id.*

Here, plaintiff only sets forth conclusory allegations of discriminatory intent. He also fails to allege that he was treated differently from other similarly situated inmates. Therefore, I recommend that this claim be dismissed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

**3. Conspiracy**

Defendants argue that this claim must be dismissed because the Amended Complaint "is devoid of any factual allegations that plausibly suggest a meeting of the minds or agreement between any of the defendants". Defendants' Memorandum of Law [40], p. 15. I agree.

"In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord,* 340 F.3d 105, 110–11 (2d Cir.2003), *cert. denied,* 540 U.S. 1110, 124 S.Ct. 1077, 157 L.Ed.2d 897 (2004).[FN8] "To survive a motion to dismiss, plaintiff must include some facts in his complaint tending to show that defendants acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that violated his rights, privileges, or immunities secured by the Constitution or federal courts." *McLaurin v. New Rochelle Police Officers,* 368 F.Supp.2d 289, 295 (S.D.N.Y.2005). At best, plaintiff alleges that Schunh stated that her co-workers would not "go against her". Amended Complaint [29], ¶ 26. However, he has "not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants." *Webb,* 340 F.3d at 111.

> FN8. "The plaintiffs' [conspiracy] claim under 42 U.S.C. § 1983, ... should actually be stated as a claim under Section 1985, which applies specifically to conspiracies." *Webb,* 340 F.3d at 110.

"As for the § 1986 claim, no such claim lies unless there is a viable conspiracy claim under § 1985." *Abdi v. Brookhaven Science Associates, LLC,* 447 F.Supp.2d 221, 227 (E.D.N.Y.2006). Therefore, I recommend that plaintiff's §§ 1985 and 1986 con-

spiracy claims be dismissed.

**4. Retaliation**

Defendants argue that this claim is "nonsensical" since his grievance, which was filed *after* the termination of his pain medication, could not have prompted the decision to terminate his pain medication. Defendants' Memorandum of Law [40], p. 17.[FN9] I agree. To establish retaliation, "the plaintiff must prove that the alleged retaliatory action would not have been taken but for his having exercised his constitutional rights." *Andino v. Fischer,* 698 F.Supp.2d 362, 382 (S.D.N.Y.2010). Here, the challenged action occurred prior to his grievance, so it clearly could not have been taken in response to his grievance.[FN10] Although plaintiff's claim against defendant Schunh is also premised on her retaliation arising from his request for a second opinion (Amended Complaint [29], ¶ 32), this too, occurred after she had decided to terminate his pain medications. Therefore, I recommend that this claim be dismissed.

> FN9. It appears that plaintiff's grievance was not filed until December 16, 2010. Amended Complaint [29], p. 31 of 43. This was after he was seen by Schunh, Dr. Evans and Dr. Rao.

> FN10. If plaintiff's claim is that defendants continued to deprive him of pain medication after he filed his grievance in retaliation for that grievance, that is not evident from the allegations of the Amended Complaint as it is currently pled.

**5. Due Process**

**\*5** Defendants argue that other than plaintiff's conclusory claim that plaintiff was denied due process (Amended Complaint [29], ¶ 1), he "fails to complain about either a procedural or substantive due process violation." Defendants' Memorandum of Law [40], p. 18. I agree, and recommend that this claim be dismissed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

**6. Deliberate Indifference**

Defendants argues that "[a]s the very exhibits plaintiff relies upon demonstrate, he was actually continued on Ultram and then weaned off of it. Thereafter, he was prescribed a non-prescription pain reliever with food. That he preferred a prescription narcotic at a higher dose does not make for a claim of constitutional dimension". Defendants' Memorandum of Law [40], p. 14. I disagree.

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his] serious medical needs". *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The "deliberate indifference" standard has both objective and subjective components. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). To satisfy the objective component, the alleged medical need must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

To satisfy the subjective component, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* See also *Hernandez v. Keane,* 341 F.3d 137, 144 (2d

Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

"[D]isagreements over treatment do not rise to the level of a Constitutional violation", *Graham v. Gibson,* 2007 WL 3541613, *5 (W.D.N.Y.2007) (Siragusa, J.), as "[t]he Constitution does not require that an inmate receive a particular course of treatment". *Tafari v. Stein,* 2009 WL 331378, *7 (W.D.N.Y.), *recon. denied,* 2009 WL 1322317, 2009 WL 1579530 (W.D.N.Y.2009) (Scott, M .J.). Consequently, "a prison doctor *who relies on his medical judgment* to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference." *Williams v. Smith,* 2009 WL 2431948, *9 (S.D.N.Y.), *recon. denied,* 2009 WL 5103230 (S.D.N.Y.2009) (emphasis added).

**\*6** Accepting plaintiff's allegations as true for purposes of this motion, they plainly establish that defendants' decisions in discontinuing plaintiff's prior pain medications were not based on medical judgments. I also disagree that plaintiff's claims are belied by the medical records he attaches to his Amended Complaint. While these records demonstrate that he was weaned from Ultram (Amended Complaint [29], p. 32 of 43), they do not undermine his claim that this medication was ultimately discontinued in favor of Motrin, a medication plaintiff alleges defendants knew caused him "distress". *Id.,* ¶ 37. Therefore, I recommend that this claim not be dismissed.

**7. Failure to Protect**

Defendants argue that "[w]hile such a claim

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

generally arises in the context of an attack by another inmate, [they] assume that plaintiff's sweeping claim is based on the same medical indifference assertions". Defendants' Memorandum of Law [40], p. 19. Thus, they argue that "like the plaintiff's Eighth Amendment medical indifference claim, plaintiff's 'failure to protect' claim should be dismissed as well." *Id.* Defendants' Memorandum of Law [40], p. 19.

However, since I have recommended that plaintiff's deliberate indifference claim not be dismissed, I likewise recommend that plaintiff's failure to protect claim not be dismissed.

**8. Personal Involvement**

Defendants argue that there is insufficient personal involvement alleged to support the claims against Nurse Administrator Killinger, Superintendent Bradt, and Commissioner Fischer. Defendants' Memorandum of Law [40], pp. 19–20. FN11

> FN11. I have analyzed defendants' remaining arguments in light of the claims that I have recommended not be dismissed.

Prior to *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), it had been well settled that "[t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). However, in *Iqbal,* the Supreme Court

clouded this issue when it rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution", concluding that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal,* 556 U.S. at 677.

Since *Iqbal,* some districts courts have determined that not all five of *Colon's* categories of conduct that may give rise to supervisory liability remain viable. *See e.g., Spear v. Hugles,* 2009 WL 2176725, *2 (S.D.N.Y.2009) ("only the first and third *Colon* factors have survived the Supreme Court's decision in *Iqbal*" ); *Bellamy v. Mount Vernon Hospital,* 2009 WL 1835939, *6 (S.D.N.Y.2009), *aff'd,* 387 Fed. Appx. 55 (2d Cir.2010) (Summary Order) ("The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin.* Iqbal's active conduct standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal's* muster") FN12; *Bryant v. County of Monroe,* 2010 WL 4877799, *3 (W.D.N.Y.2010) (Siragusa, J .) ("The Court ... is persuaded by the analysis of ... *Iqbal* ... in *Bellamy*" ).FN13

> FN12. "[T]he *Iqbal* issue was not raised on appeal" in *Bellamy. Stresing v. Agostinoni,* 2012 WL 2405240, *4 (W.D.N.Y.2012) (Skretny, J.).

> FN13. Adding to the uncertainty, "[t]he Second Circuit has not yet addressed which, if any, of the *Colon* categories survive *Iqbal* ." *Jamison v. Fischer,* 2012 WL 4767173, *4 (S.D.N.Y.2012). *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013) ("Although the Supreme Court's decision in *Ashcroft v. Iqbal* ... may have heightened the requirements for showing a supervisory's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

personal involvement with respect to certain constitutional violations, we need not reach *Iqbal's* impact on *Colon* in this case").

**\*7** However, I agree "with the apparent majority view that where, as here, the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth and Fourteenth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." *Shepherd v. Powers,* 2012 WL 4477241, \*10 (S.D.N.Y.2012).

**a. Nurse Administrator Killinger**

Plaintiff alleges that on April 18, 201, he sent Nurse Administrator Killinger a letter complaining about the intentional interference with his pain medication. Amended Complaint [29], ¶ 101. The Amended Complaint attaches an April 19, 2011 response from Nurse Administrator Killinger stating "You are scheduled to see a medical clinician to assess your medical concerns". *Id.,* p. 39 of 43.

"The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983." *Hidalgo v. Kikendall,* 2009 WL 2176334, \*4 (S.D.N.Y.2009). Nevertheless, "[a] supervisor's detailed, specific response to a plaintiff's complaint" may suffice to establish personal involvement. *Mateo v. Fischer,* 682 F.Supp.2d 423, 430–31 (S.D.N.Y.2010); *see Rosario v. Fischer,* 2012 WL 4044901, \*5 (S.D.N.Y.), *adopted* 2012 WL 6681695 (S.D.N.Y.2012) ("a pro forma response to a letter or grievance" does not amount to personal involvement); *Brooks v. Chappius,* 450 F.Supp.2d 220, 226 (W.D.N.Y.2006) (Larimer, J.) ("in general personal involvement will not be found unless 'the supervisor's response is detailed and specific' ").

Nurse Administrator Killinger's generalized re-

sponse to plaintiff's complaint is not sufficient to establish personal involvement. *See Mateo,* 682 F.Supp.2d at 430–31. Beyond this, plaintiff only generally alleges that Nurse Administrator Killinger was informed of the violation through "grievances, appeal, [and] letters". Amended Complaint [29], ¶ 115. However, "the naked assertion ... that he complained to Defendants ... that he was being deprived of reasonable and adequate ... care ... is simply too lacking in factual detail to show that Plaintiff is entitled to relief.... Plaintiff's Complaint contains absolutely no factual enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints." *Jean–Laurent v. Lane,* 2013 WL 600213, \*16 (N.D.N.Y.), *adopted* 2013 WL 5999893 (N.D.N.Y.2013).

Moreover, "where the personal involvement of a defendant in a Section 1983 violation is premised upon a claim of conspiracy, '[i]t is incumbent on a plaintiff to state more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive him of his constitutional rights.' " *Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009), (*quoting Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990)). Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Nurse Administrator Killinger be dismissed.

**b. Superintendent Bradt**

**\*8** Although the Amended Complaint [29] generally alleges that Superintendent Bradt was informed of the violations through "grievances [,] appeal[, and] letters" (Amended Complaint [29], ¶ 132), the only specific communication identified is Superintendent Bradt's January 6, 2011 denial of plaintiff's grievance concerning the termination of his pain medication. *Id.,* ¶ 135, p. 41 of 43. However, "[t]he fact that [the] Superintendent ... affirmed the denial of plaintiff's grievance-which is all that is alleged against him-is insufficient to establish personal involvement".

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

*Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). *See Ramos v. Wright,* 2011 WL 2462482, *6 (N.D.N.Y.2011), *adopted* 2011 WL 2462472 (N.D.N.Y.2011) (dismissing claims against superintendent on personal involvement grounds where "[p]laintiff's sole factual allegation against Defendant Superintendent Smith, [was] that he affirmed the resolution of Plaintiff's institutional grievance and indicated that Plaintiff was receiving adequate medical attention"); *Henry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010) (Larimer, J.) ("To the extent that [Superintendent] Lempke may have, in the course of his official duties, denied or affirmed the denial of certain grievances filed by the plaintiff, 'the denial of [a] plaintiff's grievance—[where that] is all that is alleged against him-is insufficient to establish personal involvement [in a constitutional violation]' by a prison superintendent"); *Ramsey v. Goord,* 2005 WL 2000144, *8 (W.D.N.Y.2005) (Skretny, J.) ("the fact that a prison official in the prison chain of command affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official"); *Vogelfang v. Capra,* 2012 WL 832440, *7 (S.D.N.Y.2012) ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights"); *White v. Sears,* 2011 WL 2728443, *8 (N.D.N.Y.2011), *adopted* 2011 WL 2728431 (N.D.N.Y.2011) ("To the extent that Superintendent Sears is named as a defendant because he denied Plaintiff's grievance, the denial of Plaintiff's grievance is insufficient to establish personal involvement").[FN14] Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Superintendent Bradt be dismissed.

> FN14. *Compare with McKenna v. Wright,* 386 F.3d 432, 437–38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make [the defendant deputy superintendent for administration] liable for the conduct complained of", where the defendant was responsible for the prison's medical program and "allegations of improperly denied medical treatment come to [his] attention ..., his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility").

**c. Commissioner Fischer**

Without identifying any specific grievances, plaintiff alleges that he "sent grievances" to Commissioner Fischer. Amended Complaint [29], ¶ 138. However, there is no allegation that Commissioner Fischer ever responded to these grievances. "The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983." *Hidalgo v. Kikendall,* 2009 WL 2176334, *4 (S.D.N.Y.2009). Thus, "[t]he receipt of a prisoner's letter of grievance by a DOCS Commissioner who delegates to other prison officials the task of responding to such complaints is insufficient to establish the Commissioner's personal involvement ." *Spavone v. Fischer,* 2012 WL 360289, *5 (S.D.N.Y.2012). Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Commissioner Fischer be dismissed.

**9. Official Capacity Claims**

**\*9** Defendants argue that plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. I agree. *See Will v. Michigan Department of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that neither the state, its agencies, nor its employees acting in their official capacities are "persons" subject to suit under 42 U.S.C. § 1983). Therefore, I recommend that defendants' motion be granted to the extent it seeks dismissal of plaintiff's official capacity claims.

**10. Qualified Immunity**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants argue that they are entitled to qualified immunity "[g]iven that the ... Eighth Amendment is not violated when an inmate does no receive medication of his choosing ..., defendants had every reason to believe their actions were lawful." Defendants' Memorandum of Law [40], p. 22. I disagree.

Under the qualified immunity doctrine "a defendant is not liable if he did not violate clearly established law or it was objectively reasonable for him to believe that he was not violating clearly established law." *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). "Thus, government officials are entitled to qualified immunity at the dismissal stage only where it appears on the face of a plaintiff's complaint that they did not violate clearly established rights of which they should have known." *Richardson v. Department of Corrections of N.Y.S.,* 2011 WL 4091491, *4 (S.D.N.Y.2011), *recon. denied,* 2012 WL 76910 (S.D.N.Y.2012). "Usually, the defense of qualified immunity cannot support the grant of a Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). This case is no different.

It is undisputed that the right to be free from deliberate indifference to serious medical needs was clearly established throughout the period of the alleged deliberate indifference. "At this early procedural juncture, accepting plaintiff's allegations as true and drawing all inferences in his favor, I am unable to say that it was objectively reasonable for the defendants to conclude that their actions did not violate plaintiff's clearly established right to be free from deliberate medical indifference." *Taylor v. Goord,* 2010 WL 3825661, *11 (N.D.N.Y.), adopted, 2010 WL 3825656 (N.D.N.Y.2010). *See Briel v. Fields,* 2013 WL 1833248, *4 (E.D.N.Y.2013).

**B. Motion to Stay**

Defendants move to stay all proceedings until resolution of their motion to dismiss. Defendants' Notice of Motion [39]. Although there appears to have been no proceedings in this action since the filing of defendants' motion to dismiss, to the extent plaintiff seeks to move forward with discovery while any objections to this Report, Recommendation and Order are pending, a stay is granted.

**CONCLUSION**

For these reasons, defendants' motion [39] is granted to the extent it seeks a stay, and I recommend that their motion to dismiss the Amended Complaint be denied to the extent it seeks to dismiss the deliberate indifference/failure to protect claims against defendants Schunh, Dr. Evans, Dr. Rao and Dr. Kowski, in their individual capacities, but otherwise be granted.

***10** Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation, and Order must be filed with the clerk of this court by October 7, 2013 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson– Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal author-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

ity", and must include "a written statement either
certifying that the objections do not raise new le-
gal/factual arguments, or identifying the new argu-
ments and explaining why they were not raised to the
Magistrate Judge". Failure to comply with these pro-
visions may result in the district judge's refusal to
consider the objections.

W.D.N.Y.,2014.
Keitt v. Schun
Slip Copy, 2014 WL 347053 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Monte S. LEACH, Plaintiff,
v.
NEW YORK CITY, Defendant.

No. 12 Civ. 3809(PAC)(JCF).
Aug. 2, 2013.

*ORDER ADOPTING REPORT AND RECOM-
MENDATION*

Honorable PAUL A. CROTTY, District Judge.

**\*1** On May 11, 2012, *pro se* Plaintiff Monte
Leach ("Leach") commenced this action against De-
fendant New York City [FN1] (the "City") for interfer-
ence with his right to practice his religion while in
custody, pursuant to 42 U.S.C. § 1983, Leach identi-
fies himself as an "unorthodox [J]ewish religious
observer" (Compl. at 3), and alleges that the City
failed to provide him with adequate access to religious
services. In particular, he alleges that the City failed to
provide him with "Kosher Matzos ... on a regular
basis" or to respond to his request to speak with a
Rabbi to find out "the exact days in which Jewish
services are held" while he was incarcerated at the
Anna M. Kross Center ("AMKC"). (*Id.* at 3, 5.)

> FN1. Grant also named New York State as a
> defendant. On May 22, 2012, the Court is-
> sued in Order of Service dismissing all
> claims against the State of New York, with
> prejudice.

On September 10, 2012, the Defendant filed a
motion to dismiss, pursuant to Federal Rule of Civil
Procedure 12(b)(6). Leach did not submit papers in
opposition, On March 6, 2013, Magistrate Judge
James C. Francis IV issued a Report and Recom-
mendation ("R & R") recommending that the case be
dismissed for failure to state a claim. No objections
were timely filed. For the reasons that follow, the
Court adopts the R & R: the City's motion to dismiss is
granted, with leave to replead.

*DISCUSSION*
**I. STANDARD OF REVIEW**

District courts are entitled to "accept, reject, or
modify, in whole or in part, the findings or recom-
mendations made by [a] magistrate judge," 28 U.S.C §
636(b)(1). Specifically, the Court may adopt those
portions of the R & R "to which no objections have
been made and which are not facially erroneous."
*Wilds v. UPS* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003)
(quoting *La Torres v. Walker,* 216 F.Supp.2d 157, 159
(S.D.N.Y.2000)). "The complaints of *pro se* litigants
are held to less stringent standards than formal
pleadings drafted by lawyers, especially when the
plaintiff asserts a violation of his civil rights. The
leniency with which courts treat *pro se* complaints
protects litigants who may mistakenly forfeit essential
rights simply because they lack a legal education."
*Headley v. Fisher,* No. 06 Civ. 6331, 2010 WL
2595091, at \*4 (S.D.N.Y. June 28, 2010),

**II. ANALYSIS**

Magistrate Judge Francis recommended that
dismissal be granted because Leach failed to plead that
he fully exhausted his administrative remedies. The
Prison Litigation Reform Act ("PLRA") prohibits a
prisoner from bringing claims until they have "
'complete[d] the administrative review process in
accordance with the applicable procedural rules,' "
which "are defined not by the PLRA, but by the prison
grievance process itself." *Jones v. Bock,* 549 U.S. 199,
218 (2007) (quoting *Woodford v. Ngo,* 548 U .S. 81,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

88 (2006)), At AMKC, an inmate must (1) file a grievance with the Inmate Grievance Resolution Committee, (2) appeal to the facility warden or his designee, (3) appeal to the Central Office Review Committee, and (4) appeal to the New York City Board of Correction, (Department of Correction Directive 3375R–A, *available at* http://www.nyc.gov/html/doc/downloads/pdf/3375R-A.pdf (last visited June 28, 2013)), In addition, a grievance must be filed within ten days after the issue arose to be timely. (*Id.*) The Second Circuit recognizes three exeeptions to the PLRA's exhaustion requirements, where (1) "administrative remedie are not available to the prisoner; (2) defendants have either waibved the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006), Despite the fact that Leach "complained constantly over a period of seven month[s]" (Compl. at 10), he nonetheless failed to properly comply with the available grievance process or to explain why he might qualify for an exception to the exhaustion requirement. Leach thus failed to exhaust the administrative remedies available to him.

**\*2** Moreover, he also failed to allege fasts sufficient to state a valid claim under the First Amendment A prisoner's "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)), In order for a prisoner to prevail on a free exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs," *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006), Leach does not assert that eating matzos on a regular basis is a central tenet of Judaism, nor does he specify how often he was denied

access to Kosher meals, if at all. The intermittent failure to provide incarcerated individuals with food complying with their religious dietary restrictions is a *de minimis* imposition falling far short of the substantial burden requirement, *Rapier v. Harris,* 172 F.3d 999, 1006 fn. 4 (7th Cir.1999), Likewise, the Leach's assertion that his request to speak with a Rabbi was ignored on only a single occasion constitutes a *de minimis* imposition, Accordingly, the facts presented by the plaintiff do not "contain sufficient factual matter ... to 'State a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Since no objections have been filed and the Court finds no clear error, the R & R is adopted in its entirety.

### CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Francis's R & R in full. Defendant's motion to dismiss is GRANTED and Plaintiff is granted leave to replead, *See Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith. *See Coppedge v. U.S.,* 369 U.S. 138 (1962). The Clerk of Court is directed to enter judgment and close this case.

### SO ORDERED.

### REPORT AND RECOMMENDATION

JAMES C. FRANCIS IV, United States Magistrate Judge.

TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:

Monte S. Leach brings this action *pro se,* alleging interference with his right to practice his Jewish religion while he has been in the custody of the New York City Department of Correction, incarcerated at the Anna M. Kross Center ("AMKC").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

The City of New York (sued here as "New York City") now moves to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that (1) the plaintiff failed to exhaust his administrative remedies, (2) the Complaint fails to allege facts sufficient to state a cognizable federal claim, (3) the Complaint fails to allege facts that would support municipal liability, and (4) the plaintiff is not entitled to the relief sought in the Complaint.[FN1] The plaintiff has not submitted papers in opposition to the motion. For the reasons set forth below, the motion should be granted and the suit dismissed with leave to file an amended complaint.

FN1. New York State was also listed as a defendant in the Complaint, but the Honorable Paul A. Crotty, U.S.D.J., dismissed all claims against it. (Order dated May 22, 2012).

*Background*

**\*3** In accordance with the standard for assessing a motion to dismiss, the following facts are derived from the allegations in the Complaint and taken as true.

Mr. Leach identifies himself as an "unorthodox [J]ewish religious observer." (Complaint ("Compl.") at 3).[FN2] Since his arrival at AMKC on or about September 2, 2011, he has been "denied [J]ewish services, which consist of not just Kosher meals, but also Kosher matsos [sic] which are Kosher cracker like pieces of bread." (Compl. at 3). The plaintiff asked to speak with a Rabbi to find out "the exact days in which Jewish services are held," but his request was ignored. (Compl. at 3). He also did not receive "Kosher Matsos [sic] for breakfast, on a regular basis." (Compl. at 5).

FN2. For the sake of clarity, I will refer to the pages in Mr. Leach's Complaint as numbered by the Case Management/Electronic Case Filing (CM/ECF) System.

Mr. Leach's efforts to pursue grievances regarding his treatment will be discussed below.

*Discussion*

A. *Standard of Review for a Motion to Dismiss*

Courts considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 110–11 (2d Cir.2010). A complaint must contain more than mere " 'labels and conclusions' " or " 'formulaic recitation[s] of the elements of a cause of action,' " but it need not make " 'detailed factual allegations.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Where the complaint's factual allegations permit the court to infer only that it is possible, but not plausible, that misconduct occurred, the complaint fails to meet the minimum standard. *Id.* at 678. When ruling on a motion to dismiss, the task before a court " 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " " *GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.,* 580 F.Supp.2d 321, 327 (S.D.N.Y.2008) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir.2004)).

*Pro se* complaints are held to less stringent standards than those drafted by lawyers. *Erickson,* 551 U.S. at 94; *see also McKeown v. New York State Commission on Judicial Conduct,* 377 F. App'x 121, 122 (2d Cir.2010). The pleadings of a *pro se* party should be read " 'to raise the strongest arguments that they suggest.' " " *Kevilly v. New York,* 410 F. App'x 371, 374 (2d Cir.2010) (quoting *Brownell v. Krom,*

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

446 F.3d 305, 310 (2d Cir.2006)). Even after the Supreme Court in *Iqbal* imposed heightened pleading standards for all complaints, *pro se* complaints are to be liberally construed. *See Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009). Dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements. *See, e.g., Paul v. Bailey,* No. 09 Civ. 5784, 2010 WL 3292673, at \*4 (S.D.N.Y. July 21, 2010) (citing *Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997)), *report and recommendation adopted,* 2010 WL 3292672 (S.D.N.Y. Aug. 18, 2010).

**\*4** Finally, where, as here, the plaintiff does not oppose a Rule 12(b)(6) motion, the court must still determine, as a matter of law, whether the complaint sufficiently states a claim on which relief may be granted. *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000); *Haas v. Commerce Bank,* 497 F.Supp.2d 563, 564 (S.D.N.Y.2007). If the pleading is adequate, "the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *McCall,* 232 F.3d at 323.

**B. *Exhaustion***

The Complaint states facts establishing that Mr. Leach failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act (the "PLRA"). The PLRA prohibits a prisoner from bringing a prison conditions claim under 42 U.S.C. § 1983 "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The prisoner must utilize "all steps that the agency holds out, and do[ ] so *properly.' " Woodford v. Ngo,* 548 U.S. 81, 90 (2006) (emphasis in original) (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.2002)); *accord, e.g., Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir.2011). In other words, he must comply with the procedural rules of the local administrative agency. *Jones v. Bock,* 549 U.S. 199, 218 (2007). Merely "[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion," *Macias v. Zenk,* 495

F.3d 37, 44 (2d Cir.2007) (internal quotation marks omitted) (alteration in original), nor does an "untimely or [ ] procedurally defective" grievance, *Woodford,* 548 U.S. at 83–84.

At AMKC, an inmate must exhaust all of the steps of the DOC Inmate Grievance Resolution Program ("IGRP") prior to filing a complaint in federal court. This requires the inmate to (1) file a grievance with the Inmate Grievance Review Committee ("IGRC") and request a formal hearing, (2) appeal to the facility warden or his designee, (3) appeal to the DOC Central Office Review Committee, and (4) appeal to the New York City Board of Correction. (DOC Directive 3375R–A ("Directive 3375R–A") *available at* http://www.nyc.gov/html/doc/downloads/pdf/3375R-A.pdf (last visited Feb. 28, 2013)). In addition, for a grievance to be timely, it must be filed within ten days after the issue arose. (Directive 3375R–A).

Here, the plaintiff alleges that he deposited a grievance "[i]n the [g]rievance box on the first flr. wall" (Compl. at 10, ¶ IV(E)) and received "[n]othing at all" in response (Compl. at 10, ¶ IV(E)(2)). When prompted to describe what steps he took to appeal, he states, "I complained constantly over a period of seven month[s], with all the chain of command made available for myself." (Compl. at 10, ¶ IV(E)(3)). He goes on to allege:

> I put in a mess of grievances over a period of seven months, with no prevail [sic]. I put these grievances in on the grievance box on the wall of the first flr. I do not know whatever became of these grievances[.] As of 4/21/12–It turns out that this box might have been the Social Services box on the wall of the first flr.! (The attempt was made!)

**\*5** (Compl. at 11, ¶ IV(G)).

Mr. Leach thus did not comply with the available grievance process. He acknowledges that it is likely he

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

did not properly transmit his grievances in the first place, and he never appealed when he received no response to his complaints. An inmate whose grievances initially go unanswered must nevertheless pursue his claims through all levels of the administrative process in order to satisfy the exhaustion requirement. *See Dixon v. Thom,* No. 11 Civ. 5901, 2013 WL 264602, at *2 (S.D.N.Y. Jan. 11, 2013); *Hecht v.. Best,* No. 12 Civ. 4154, 2012 WL 5974097, at *3 (S.D.N.Y. Nov. 28, 2012); *Swanston v. Department of Corrections,* No. 11 Civ. 1219, 2011 WL 5105489, at *2 (S.D.N.Y. Oct. 27, 2011); *George v. Morrison,* No. 06 Civ. 3188, 2007 WL 1686321, at *3 & n. 55 (S.D.N.Y. June 11, 2007).

The Second Circuit has recognized three exceptions to the PLRA's exhaustion requirements. Notwithstanding the failure to exhaust, a plaintiff may proceed with a prison conditions claim if

(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such as way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)). Nevertheless, these exceptions do not assist the plaintiff here. Administrative remedies were available to Mr. Leach; the defendant did not waive the exhaustion defense and is not estopped from asserting it; and, even if the plaintiff's apparent misdirection of his grievances could be excused, his subsequent failure to pursue his claims through the full IGRP process is fatal. The Complaint should therefore be dismissed for failure to exhaust administrative remedies.

**C. *Merit s***

Even if the plaintiff had exhausted his administrative remedies, his Complaint fails to allege facts sufficient to state a valid claim under the First Amendment. Inmates are entitled to practice religion and must be offered " 'reasonable opportunities' " by the authorities to do so. *See, e.g., Hudson v. Palmer,* 468 U.S. 517, 523 (1984) (quoting *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972) (per curiam)). To establish a free exercise claim, an incarcerated plaintiff must demonstrate that the targeted policy or practice constitutes a burden on his religious beliefs. *See Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008). Prison officials must justify restrictions on a prisoner's observances by demonstrating that the restrictions are " 'reasonably related to legitimate penological interests.' " *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

The Second Circuit has stated that in order to prevail on a free exercise claim "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006); *accord Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006). A substantial burden arises when "the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (alteration in original) (quoting *Thomas v. Review Board Of the Indiana Employment Security Division,* 450 U.S. 707, 718 (1981)). The substantial burden requirement is not met by a *de minimis* imposition on the free exercise of religion. *See, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) ("There may be inconveniences [regarding denial of religiously required food] so trivial that they are most properly ignored. In this respect, this area of the law is no different from many others in which the time-honored maxim *'de minimis non curat lex'* applies.").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

**\*6** Here, Mr. Leach fails to allege facts showing that the defendant placed a substantial burden on his religious beliefs. The Complaint makes no mention of any occasion where he was prohibited from attending Jewish services or forced to violate a central tenet of his religious faith. It mentions only a single occasion where Mr. Leach's request to speak with a Rabbi was ignored. (Compl. at 3).

The plaintiff alleges that he did not receive "Kosher Matsos [sic] ... on a regular basis," but he does not assert that receiving matzos with every meal is a tenet of the Jewish faith. (Compl. at 5). Moreover, there is no mention of how frequently he was denied Kosher meals, if at all. Isolated denials of Kosher matzos are a minor inconvenience and do not meet the substantial burden requirement. *See, e.g., Norwood v. Strada,* 249 F. App'x 269, 272 (3d Cir.2007) (denial of religiously certified halal meals during prison's emergency lock-down was "a mere de minimis intrusion" that failed to substantially burden inmate's religious beliefs); *Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (affirming summary judgment for defendants where denial of pork-free meal on three occasions constituted *de minimis* burden, caused by "institutional shortage" and plaintiff "has not alleged a routine or blanket practice of denying him pork-free meals"); *Thomas v. Picio,* 04 Civ. 3174, 2008 WL 820740 at \*6 & n. 8 (S.D.N .Y. March 26, 2008) (assuming that inmate plaintiff was denied Kosher meals for eight days, "such a denial is not a substantial burden" on her free exercise of religion).

**C. *Leave to Amend***

The Second Circuit has held that a *pro se* litigant should be afforded at least one opportunity to " 'amend his complaint prior to its dismissal for failure to state a claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.' " *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam)). Because there is

some prospect, however slim, that the plaintiff could state a valid claim, he should be given an opportunity to amend his complaint.

*Conclusion*

For the foregoing reasons, I recommend that the defendant's motion to dismiss be granted and the Complaint be dismissed with leave to refile if, after all administrative remedies have been exhausted, the plaintiff can state facts satisfying the elements of a free exercise claim. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, Room 735, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

S.D.N.Y.,2013.
Leach v. New York City
Slip Copy, 2013 WL 3984996 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Monte S. LEACH, Plaintiff,
v.
NEW YORK CITY, Defendant.

No. 12 Civ. 3809(PAC)(JCF).

Aug. 2, 2013.

### ORDER ADOPTING REPORT AND RECOMMENDATION

Honorable PAUL A. CROTTY, District Judge.

**\*1** On May 11, 2012, *pro se* Plaintiff Monte Leach ("Leach") commenced this action against Defendant New York City FN1 (the "City") for interference with his right to practice his religion while in custody, pursuant to 42 U.S.C. § 1983, Leach identifies himself as an "unorthodox [J]ewish religious observer" (Compl. at 3), and alleges that the City failed to provide him with adequate access to religious services. In particular, he alleges that the City failed to provide him with "Kosher Matzos ... on a regular basis" or to respond to his request to speak with a Rabbi to find out "the exact days in which Jewish services are held" while he was incarcerated at the Anna M. Kross Center ("AMKC"). (*Id.* at 3, 5.)

> FN1. Grant also named New York State as a defendant. On May 22, 2012, the Court issued in Order of Service dismissing all claims against the State of New York, with prejudice.

On September 10, 2012, the Defendant filed a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). Leach did not submit papers in opposition, On March 6, 2013, Magistrate Judge James C. Francis IV issued a Report and Recommendation ("R & R") recommending that the case be dismissed for failure to state a claim. No objections were timely filed. For the reasons that follow, the Court adopts the R & R: the City's motion to dismiss is granted, with leave to replead.

### DISCUSSION
### I. STANDARD OF REVIEW

District courts are entitled to "accept, reject, or modify, in whole or in part, the findings or recommendations made by [a] magistrate judge," 28 U.S.C § 636(b)(1). Specifically, the Court may adopt those portions of the R & R "to which no objections have been made and which are not facially erroneous." *Wilds v. UPS* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003) (quoting *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000)). "The complaints of *pro se* litigants are held to less stringent standards than formal pleadings drafted by lawyers, especially when the plaintiff asserts a violation of his civil rights. The leniency with which courts treat *pro se* complaints protects litigants who may mistakenly forfeit essential rights simply because they lack a legal education." *Headley v. Fisher,* No. 06 Civ. 6331, 2010 WL 2595091, at \*4 (S.D.N.Y. June 28, 2010),

### II. ANALYSIS

Magistrate Judge Francis recommended that dismissal be granted because Leach failed to plead that he fully exhausted his administrative remedies. The Prison Litigation Reform Act ("PLRA") prohibits a prisoner from bringing claims until they have " 'complete[d] the administrative review process in accordance with the applicable procedural rules,' " which "are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock,* 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo,* 548 U .S. 81,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

88 (2006)), At AMKC, an inmate must (1) file a grievance with the Inmate Grievance Resolution Committee, (2) appeal to the facility warden or his designee, (3) appeal to the Central Office Review Committee, and (4) appeal to the New York City Board of Correction, (Department of Correction Directive 3375R–A, *available at* http://www.nyc.gov/html/doc/downloads/pdf/3375R-A.pdf (last visited June 28, 2013)), In addition, a grievance must be filed within ten days after the issue arose to be timely. (*Id.*) The Second Circuit recognizes three exeeptions to the PLRA's exhaustion requirements, where (1) "administrative remedie are not available to the prisoner; (2) defendants have either waibved the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006), Despite the fact that Leach "complained constantly over a period of seven month[s]" (Compl. at 10), he nonetheless failed to properly comply with the available grievance process or to explain why he might qualify for an exception to the exhaustion requirement. Leach thus failed to exhaust the administrative remedies available to him.

**\*2** Moreover, he also failed to allege fasts sufficient to state a valid claim under the First Amendment A prisoner's "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)), In order for a prisoner to prevail on a free exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs," *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006), Leach does not assert that eating matzos on a regular basis is a central tenet of Judaism, nor does he specify how often he was denied

access to Kosher meals, if at all. The intermittent failure to provide incarcerated individuals with food complying with their religious dietary restrictions is a *de minimis* imposition falling far short of the substantial burden requirement, *Rapier v. Harris,* 172 F.3d 999, 1006 fn. 4 (7th Cir.1999), Likewise, the Leach's assertion that his request to speak with a Rabbi was ignored on only a single occasion constitutes a *de minimis* imposition, Accordingly, the facts presented by the plaintiff do not "contain sufficient factual matter ... to 'State a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Since no objections have been filed and the Court finds no clear error, the R & R is adopted in its entirety.

### CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Francis's R & R in full. Defendant's motion to dismiss is GRANTED and Plaintiff is granted leave to replead, *See Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith. *See Coppedge v. U.S.,* 369 U.S. 138 (1962). The Clerk of Court is directed to enter judgment and close this case.

**SO ORDERED.**

*REPORT AND RECOMMENDATION*
JAMES C. FRANCIS IV, United States Magistrate Judge.

TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:

Monte S. Leach brings this action *pro se,* alleging interference with his right to practice his Jewish religion while he has been in the custody of the New York City Department of Correction, incarcerated at the Anna M. Kross Center ("AMKC").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

The City of New York (sued here as "New York City") now moves to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that (1) the plaintiff failed to exhaust his administrative remedies, (2) the Complaint fails to allege facts sufficient to state a cognizable federal claim, (3) the Complaint fails to allege facts that would support municipal liability, and (4) the plaintiff is not entitled to the relief sought in the Complaint.[FN1] The plaintiff has not submitted papers in opposition to the motion. For the reasons set forth below, the motion should be granted and the suit dismissed with leave to file an amended complaint.

> FN1. New York State was also listed as a defendant in the Complaint, but the Honorable Paul A. Crotty, U.S.D.J., dismissed all claims against it. (Order dated May 22, 2012).

*Background*

**\*3** In accordance with the standard for assessing a motion to dismiss, the following facts are derived from the allegations in the Complaint and taken as true.

Mr. Leach identifies himself as an "unorthodox [J]ewish religious observer." (Complaint ("Compl.") at 3).[FN2] Since his arrival at AMKC on or about September 2, 2011, he has been "denied [J]ewish services, which consist of not just Kosher meals, but also Kosher matsos [sic] which are Kosher cracker like pieces of bread." (Compl. at 3). The plaintiff asked to speak with a Rabbi to find out "the exact days in which Jewish services are held," but his request was ignored. (Compl. at 3). He also did not receive "Kosher Matsos [sic] for breakfast, on a regular basis." (Compl. at 5).

> FN2. For the sake of clarity, I will refer to the pages in Mr. Leach's Complaint as numbered by the Case Management/Electronic Case Filing (CM/ECF) System.

Mr. Leach's efforts to pursue grievances regarding his treatment will be discussed below.

*Discussion*

A. *Standard of Review for a Motion to Dismiss*

Courts considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 110–11 (2d Cir.2010). A complaint must contain more than mere " 'labels and conclusions' " or " 'formulaic recitation[s] of the elements of a cause of action,' " but it need not make " 'detailed factual allegations.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Where the complaint's factual allegations permit the court to infer only that it is possible, but not plausible, that misconduct occurred, the complaint fails to meet the minimum standard. *Id.* at 678. When ruling on a motion to dismiss, the task before a court " 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " " *GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.,* 580 F.Supp.2d 321, 327 (S.D.N.Y.2008) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir.2004)).

*Pro se* complaints are held to less stringent standards than those drafted by lawyers. *Erickson,* 551 U.S. at 94; *see also McKeown v. New York State Commission on Judicial Conduct,* 377 F. App'x 121, 122 (2d Cir.2010). The pleadings of a *pro se* party should be read " 'to raise the strongest arguments that they suggest.' " " *Kevilly v. New York,* 410 F. App'x 371, 374 (2d Cir.2010) (quoting *Brownell v. Krom,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

446 F.3d 305, 310 (2d Cir.2006)). Even after the Supreme Court in *Iqbal* imposed heightened pleading standards for all complaints, *pro se* complaints are to be liberally construed. *See Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009). Dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements. *See, e.g., Paul v. Bailey,* No. 09 Civ. 5784, 2010 WL 3292673, at *4 (S.D.N.Y. July 21, 2010) (citing *Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997)), *report and recommendation adopted,* 2010 WL 3292672 (S.D.N.Y. Aug. 18, 2010).

**\*4** Finally, where, as here, the plaintiff does not oppose a Rule 12(b)(6) motion, the court must still determine, as a matter of law, whether the complaint sufficiently states a claim on which relief may be granted. *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000); *Haas v. Commerce Bank,* 497 F.Supp.2d 563, 564 (S.D.N.Y.2007). If the pleading is adequate, "the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *McCall,* 232 F.3d at 323.

**B.** *Exhaustion*

The Complaint states facts establishing that Mr. Leach failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act (the "PLRA"). The PLRA prohibits a prisoner from bringing a prison conditions claim under 42 U.S.C. § 1983 "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The prisoner must utilize "all steps that the agency holds out, and do[ ] so *properly.'* " *Woodford v. Ngo,* 548 U.S. 81, 90 (2006) (emphasis in original) (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.2002)); *accord, e.g., Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir.2011). In other words, he must comply with the procedural rules of the local administrative agency. *Jones v. Bock,* 549 U.S. 199, 218 (2007). Merely "[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion," *Macias v. Zenk,* 495

F.3d 37, 44 (2d Cir.2007) (internal quotation marks omitted) (alteration in original), nor does an "untimely or [ ] procedurally defective" grievance, *Woodford,* 548 U.S. at 83–84.

At AMKC, an inmate must exhaust all of the steps of the DOC Inmate Grievance Resolution Program ("IGRP") prior to filing a complaint in federal court. This requires the inmate to (1) file a grievance with the Inmate Grievance Review Committee ("IGRC") and request a formal hearing, (2) appeal to the facility warden or his designee, (3) appeal to the DOC Central Office Review Committee, and (4) appeal to the New York City Board of Correction. (DOC Directive 3375R–A ("Directive 3375R–A") *available at* http://www.nyc.gov/html/doc/downloads/pdf/3375R-A.pdf (last visited Feb. 28, 2013)). In addition, for a grievance to be timely, it must be filed within ten days after the issue arose. (Directive 3375R–A).

Here, the plaintiff alleges that he deposited a grievance "[i]n the [g]rievance box on the first flr. wall" (Compl. at 10, ¶ IV(E)) and received "[n]othing at all" in response (Compl. at 10, ¶ IV(E)(2)). When prompted to describe what steps he took to appeal, he states, "I complained constantly over a period of seven month[s], with all the chain of command made available for myself." (Compl. at 10, ¶ IV(E)(3)). He goes on to allege:

> I put in a mess of grievances over a period of seven months, with no prevail [sic]. I put these grievances in on the grievance box on the wall of the first flr. I do not know whatever became of these grievances[.] As of 4/21/12–It turns out that this box might have been the Social Services box on the wall of the first flr.! (The attempt was made!)

**\*5** (Compl. at 11, ¶ IV(G)).

Mr. Leach thus did not comply with the available grievance process. He acknowledges that it is likely he

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

did not properly transmit his grievances in the first place, and he never appealed when he received no response to his complaints. An inmate whose grievances initially go unanswered must nevertheless pursue his claims through all levels of the administrative process in order to satisfy the exhaustion requirement. *See Dixon v. Thom,* No. 11 Civ. 5901, 2013 WL 264602, at *2 (S.D.N.Y. Jan. 11, 2013); *Hecht v.. Best,* No. 12 Civ. 4154, 2012 WL 5974097, at *3 (S.D.N.Y. Nov. 28, 2012); *Swanston v. Department of Corrections,* No. 11 Civ. 1219, 2011 WL 5105489, at *2 (S.D.N.Y. Oct. 27, 2011); *George v. Morrison,* No. 06 Civ. 3188, 2007 WL 1686321, at *3 & n. 55 (S.D.N.Y. June 11, 2007).

The Second Circuit has recognized three exceptions to the PLRA's exhaustion requirements. Notwithstanding the failure to exhaust, a plaintiff may proceed with a prison conditions claim if

(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such as way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)). Nevertheless, these exceptions do not assist the plaintiff here. Administrative remedies were available to Mr. Leach; the defendant did not waive the exhaustion defense and is not estopped from asserting it; and, even if the plaintiff's apparent misdirection of his grievances could be excused, his subsequent failure to pursue his claims through the full IGRP process is fatal. The Complaint should therefore be dismissed for failure to exhaust administrative remedies.

### C. *Merits*

Even if the plaintiff had exhausted his administrative remedies, his Complaint fails to allege facts sufficient to state a valid claim under the First Amendment. Inmates are entitled to practice religion and must be offered " 'reasonable opportunities' " by the authorities to do so. *See, e.g., Hudson v. Palmer,* 468 U.S. 517, 523 (1984) (quoting *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972) (per curiam)). To establish a free exercise claim, an incarcerated plaintiff must demonstrate that the targeted policy or practice constitutes a burden on his religious beliefs. *See Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008). Prison officials must justify restrictions on a prisoner's observances by demonstrating that the restrictions are " 'reasonably related to legitimate penological interests.' " *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

The Second Circuit has stated that in order to prevail on a free exercise claim "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006); *accord Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006). A substantial burden arises when "the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (alteration in original) (quoting *Thomas v. Review Board Of the Indiana Employment Security Division,* 450 U.S. 707, 718 (1981)). The substantial burden requirement is not met by a *de minimis* imposition on the free exercise of religion. *See, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) ("There may be inconveniences [regarding denial of religiously required food] so trivial that they are most properly ignored. In this respect, this area of the law is no different from many others in which the time-honored maxim *'de minimis non curat lex'* applies.").

Slip Copy, 2013 WL 3984996 (S.D.N.Y.)
**(Cite as: 2013 WL 3984996 (S.D.N.Y.))**

**\*6** Here, Mr. Leach fails to allege facts showing that the defendant placed a substantial burden on his religious beliefs. The Complaint makes no mention of any occasion where he was prohibited from attending Jewish services or forced to violate a central tenet of his religious faith. It mentions only a single occasion where Mr. Leach's request to speak with a Rabbi was ignored. (Compl. at 3).

The plaintiff alleges that he did not receive "Kosher Matsos [sic] ... on a regular basis," but he does not assert that receiving matzos with every meal is a tenet of the Jewish faith. (Compl. at 5). Moreover, there is no mention of how frequently he was denied Kosher meals, if at all. Isolated denials of Kosher matzos are a minor inconvenience and do not meet the substantial burden requirement. *See, e.g., Norwood v. Strada,* 249 F. App'x 269, 272 (3d Cir.2007) (denial of religiously certified halal meals during prison's emergency lock-down was "a mere de minimis intrusion" that failed to substantially burden inmate's religious beliefs); *Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (affirming summary judgment for defendants where denial of pork-free meal on three occasions constituted *de minimis* burden, caused by "institutional shortage" and plaintiff "has not alleged a routine or blanket practice of denying him pork-free meals"); *Thomas v. Picio,* 04 Civ. 3174, 2008 WL 820740 at *6 & n. 8 (S.D.N .Y. March 26, 2008) (assuming that inmate plaintiff was denied Kosher meals for eight days, "such a denial is not a substantial burden" on her free exercise of religion).

**C.** *Leave to Amend*

The Second Circuit has held that a *pro se* litigant should be afforded at least one opportunity to " 'amend his complaint prior to its dismissal for failure to state a claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.' " *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam)). Because there is

some prospect, however slim, that the plaintiff could state a valid claim, he should be given an opportunity to amend his complaint.

*Conclusion*

For the foregoing reasons, I recommend that the defendant's motion to dismiss be granted and the Complaint be dismissed with leave to refile if, after all administrative remedies have been exhausted, the plaintiff can state facts satisfying the elements of a free exercise claim. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, Room 735, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

S.D.N.Y.,2013.
Leach v. New York City
Slip Copy, 2013 WL 3984996 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry; F. Englese; Sergeant Edwards; K. Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
March 31, 2010.

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

### I. RELEVANT LEGAL STANDARD

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court," and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[FN1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[FN2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

> FN1. *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

> FN2. The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[FN3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respec-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

tively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[FN4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[FN5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[FN6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

> FN3. *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

> FN4. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,*

05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

FN5. *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

FN6. *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned

a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

§ 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available

and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[FN7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[FN8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[FN9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [FN10] (b) the inmate was specifically informed that the claim in question was grievable,[FN11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[FN12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[FN13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[FN14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[FN15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[FN16]

FN7. The Court recognizes that the Supreme

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

FN8. *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

FN9. *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internal-

ly"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

FN10. *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

FN11. *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

F.Supp.2d at 75-76.

FN12. *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

FN13. *See, e.g., Petrusch v. Oilioushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

FN14. *See, e.g., Benjamin v. Comm'r N.Y.*

*State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

FN15. *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

FN16. *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [FN17]

FN17. *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v.*

*Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[FN18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[FN19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[FN20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.)[FN21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Pos-

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

ner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. See *Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied, --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009).* The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[FN22]

FN18. *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

FN19. *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that

"[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326741, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

FN20. *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326741, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639,

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

FN21. *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the ad-

ministrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

FN22. *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

*7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007)

(internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [FN23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [FN24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [FN25]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

**FN23.** The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

**FN24.** In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

**FN25.** For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administra-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

tive remedies based on the actions (or inactions) of other individuals.[FN26]

> FN26. *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16

(N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

own.").

**C. Special Circumstances**

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's

cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations,[FN27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order.[FN28]

FN27. *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

FN28. The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

N.D.N.Y.,2010.
Murray v. Palmer
Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Jack ROBINSON, Plaintiff,
v.
Officer JIMMINEZ, Defendant.

No. 08–CV–902 (NGG)(LB).
March 6, 2012.

Jack Robinson, Staten Island, NY, pro se.

Timothy D. Lynch, Assistant United States Attorney, United States Attorney's Office, Eastern District of New York, Brooklyn, NY, for Defendant.

### REPORT and RECOMMENDATION

BLOOM, United States Magistrate Judge.

**\*1** Plaintiff, Jack Robinson, formerly incarcerated at the Metropolitan Detention Center in Brooklyn ("MDC"),FN1 brings this *pro se* action against Officer Jimminez, a correctional officer at MDC. Plaintiff alleges defendant deprived him of his right to religious worship under the First Amendment. Defendant moves for summary judgment. The Honorable Nicholas G. Garaufis, United States District Judge, referred defendant's motion to me for a Report and Recommendation ("R & R") in accordance with 28 U.S.C. § 636(b). For the following reasons, I respectfully recommend that defendant's motion should be granted.

FN1. At the time this action was filed, plaintiff had been released from federal custody.

### *BACKGROUND*

The following facts are supported by admissible evidence or taken in the light most favorable to plaintiff.FN2

FN2. Plaintiff did not file a statement of material facts pursuant to Local Civil Rule 56.1(b). Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit "a separate, short and concise statement" of the allegedly undisputed material facts, set out in numbered paragraphs, on which the moving party relies in arguing that there is no genuine issue to be tried. *See also Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 72 (2d Cir.2001). A party opposing summary judgment is required to submit a counter-statement under Rule 56.1(b). As plaintiff did not do so, the Court may deem the defendants' Rule 56.1 statement as admitted. *See* Local Rule 56.1(c). However, the Court may not rely solely on the statement of undisputed facts in the Rule 56.1 statement. The Court accepts as true only those facts which are supported by record evidence. *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004); *Giannullo,* 322 F.3d at 143, n. 5.

From March 30, 2007 to December 21, 2007, plaintiff was incarcerated at MDC. Lynch Declaration ("Lynch Decl."), Exhibits 3–4. On or about September 13, 2007, plaintiff, along with other Jewish prisoners, celebrated Rosh Hashanah (Jewish New Year) by conducting a service in the religious purpose room at MDC's Unit H–53; the service was interrupted by Correctional Officer Bryan Jimenez.FN3 Am. Compl. ¶

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**

IV; Lynch Decl., Exhibit 12, Deposition Transcript of Jack Robinson ("Robinson Dep.") at 77.

> FN3. Defendant Jimenez's name was misspelled by plaintiff and appears as "Jimminez" in the caption, however, the Court shall refer to the correct spelling of his name herein.

Defendant Jimenez was assigned to work the 4 p.m. to 12 a.m. shift on September 13, 2007 at MDC's Unit H–53. Jimenez Decl. at ¶¶ 21, 28. Defendant Jimenez had been approached by a Muslim prisoner complaining that Muslim prisoners were scheduled to use the religious purpose room then occupied by plaintiff and other Jewish prisoners. *Id.* at ¶ 34. Defendant states that he went to the H–53 Unit office and found a memorandum from the Religious Services Program staff which indicated that the Muslim prisoners were authorized to use the religious purpose room for their Ramadan service on the day in question. *Id.* at ¶ 36; Lynch Decl., Exhibit 13, Robinson Dep. 98:7–14. Thereafter, defendant Jimenez notified plaintiff and the other Jewish prisoners that they would have to vacate the room. Jimenez Decl. at ¶ 37. Plaintiff showed defendant that he had a memorandum from Rabbi Hoenig allowing him and the other Jewish inmates the use of the room. Jimenez Decl., Exhibit C. The Religious Services Program staff, consisting of a Chaplain, a Rabbi and an Imam, were responsible for scheduling the use of the religious purpose room. Lynch Decl., Exhibit 10, Robinson Dep. 64:17–22. Defendant contacted Father McDevitt of the Religious Services Program staff and he confirmed that the Muslim inmates had permission to use the religious purpose room. Jimenez Decl. at ¶ 40.

Defendant Jimenez alleges that he contacted his supervisor, Lieutenant Paul Murdock, who accompanied him to the religious purpose room and informed the Jewish inmates that they had to leave. Jimenez Decl. at ¶¶ 41–42. Plaintiff alleges that the Jewish religious service was "abruptly terminated by officer

Jim[e]nez" who then "contacted the Removal Team" and removed plaintiff and another inmate in handcuffs. Am. Compl. at 4, ¶ IV; Lynch Decl., Exhibit 14, Robinson Dep. 102:14. Plaintiff further alleges that he was "man handled, taken into the elevator and assaulted." Am. Compl. at 4, ¶ IV; Lynch Decl., Exhibit 15, Robinson Dep. 103:10–14. Plaintiff injured his "arm during the confrontation and ha[s] had problems with pain and range of motion, along with psychological injuries." Am. Compl. at 4, ¶ IV.A. As a result of this incident, plaintiff alleges that he suffers from anxiety and depression for which he receives treatment. *See* generally Pl. Opposition ("Pl.Opp."), Exhibit D (Docket Entry 119). The entire incident lasted less than ten minutes. Lynch Decl., Exhibit 16, Robinson Dep. 105:10–23. Plaintiff does not identify defendant Jimenez as the person who physically removed him from the religious purpose room. Defendant Jimenez alleges that he "and Lieutenant Murdock remained in the religious purpose room until it had been completely vacated." Jimenez Decl. at ¶ 45. Sometime later that same evening, the Jewish inmates, along with plaintiff, returned to the religious purpose room "after letting the Muslims [use it] and giving them another room," Lynch Decl., Exhibit 16, Robinson Dep. 104:2–5. Thereafter, plaintiff continued to use the religious purpose room to conduct daily prayers "on a regular basis" until he was released from MDC. Lynch Decl., Exhibit 17, Robinson Dep. 113:8–13.

### PROCEDURAL HISTORY

**\*2** On January 23, 2008, plaintiff commenced this *pro se* action against the United States Government and the Federal Bureau of Prisons ("BOP") alleging that while incarcerated at MDC in September 2007, staff terminated his religious worship and he was maltreated.[FN4] On March 7, 2008, plaintiff amended his complaint to name A. Jimenez. (Docket Entry # 8, "Compl."). Specifically, plaintiff alleged that on September 12, 2007, while holding High Holy Day Services for Rosh Hashanah, MDC Officer Jimenez "burst in told the participants the service was over and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**

ordered them out of the room, he contacted the response staff, who in turn handcuffed members of the congregation. The Plaintiff, who presided over these services, because he is fluent [in] Hebrew, was taken into the elevator & physically assaulted." (Compl. at 1). On March 28, 2008, the Court granted plaintiff's request to proceed *in forma pauperis* and directed the United States Marshals Service to serve the summons and complaint on defendants.

> **FN4.** Plaintiff commenced this action in the Northern District of New York by filing a "Brief in Support" and a request to proceed *in forma pauperis,* but not a complaint. By order dated February 7, 2007, the case was transferred to this Court. (Docket Entry # 6).

On September 12, 2008, defendants United States, BOP and A. Jimenez moved to dismiss the complaint. By Memorandum and Order dated September 16, 2008, the Court granted defendants' motion in part and denied it in part. (Docket Entry # 30). Specifically, the Court dismissed plaintiff's constitutional claims against the United States and the BOP based on sovereign immunity. The Court directed plaintiff to file an amended complaint to allege a claim under the Federal Tort Claims Act ("FTCA") and to allege any BOP employees' personal involvement in the alleged physical assault against plaintiff. Finally, the Court denied defendants' motion to dismiss plaintiff's First Amendment claim against defendant Jimenez.

On November 14, 2008, plaintiff filed an amended complaint (Docket Entry # 33, "Am. Compl.") against the BOP, Officer Jimenez, MDC Warden Lindsay, Rabbi Hornic, Reverend McDevett and John Does # 1–7. On April 22, 2009, defendants moved to dismiss plaintiff's amended complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") on the ground that the Court lacked subject matter jurisdiction over any Federal Tort Claims Act claim because plaintiff had

failed to exhaust his administrative remedies. (Docket Entry # 44–46). Defendants also moved to dismiss plaintiff's amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) against the individual defendants arguing that plaintiff had failed to allege their personal involvement in the excessive force claim. Plaintiff opposed defendants' motion. (Docket Entry # 41, "Pl. Opp."). On March 24, 2010, I issued a Report and Recommendation recommending that defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) should be granted, including dismissal of plaintiff's First Amendment claim against Warden Lindsay, Rabbi Hornic,[FN5] Reverend McDevett and John Does # 1–7. I further recommended that plaintiff's motion for summary judgment should be denied. (Docket Entry # 54). By Order dated April 28, 2010, Judge Garaufis adopted the R & R in its entirety. Only plaintiff's First Amendment claim against defendant Jimenez proceeded. (Docket Entry # 55). Defendant Jimenez now moves for summary judgment alleging that plaintiff's claim that he was deprived of his right to religious worship was *de minimis* and that defendant is entitled to qualified immunity. (Docket Entry # 115). Defendant provided plaintiff with the requisite Local 56.2 notice. Plaintiff opposes the motion and files a "Revised Motion for Summary Judgment" seeking damages and to include defendants Lindsay, Hornic and McDevitt who were previously dismissed from this action. (Docket Entry # 119, 127, 129–131).

> **FN5.** The Court assumes that plaintiff is referring to Rabbi Hoenig when he refers to Rabbi Hornic or Rabbi Hornick and has just misspelled his name.

### *STANDARD OF REVIEW*

**\*3** "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.' " *Doninger v. Niehoff,* 642 F.3d 334, 344 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)). A fact is material if it is one that "might affect

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**

the outcome of the suit under the governing law." *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine dispute as to any material fact exists where "a reasonable jury could return a verdict for the nonmoving party." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (internal quotation marks omitted); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000); *see also Baker v. The Home Depot,* 445 F.3d 541, 543 (2d Cir.2006) (resolving all ambiguities and drawing all inferences in favor of the non-moving party on summary judgment).

The Court views the facts here in the light most favorable to plaintiff. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record ..." Fed.R.Civ.P. 56(c)(1) (A); *see Matsushita,* 475 U.S. at 586–87. In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. *Anderson,* 477 U.S. at 257.

"Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chemical, Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998)); *Davis v. State of New York,* 316 F.3d 93, 100 (2d Cir.2002) (same). Moreover, " '[t]he mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara,* 315 F.3d at 175 (quoting *Anderson,* 477 U.S. at 252). Finally, "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The Court construes plaintiff's pleadings liberally "to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 82 n. 4 (2d Cir.2001) (internal quotation marks omitted).

## *DISCUSSION*

### A. First Amendment

**\*4** Plaintiff commenced this action pursuant to *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1346 (2d Cir.1972) ("*Bivens*" ). A claim under *Bivens* must allege facts showing that the defendant acted under color of federal law to deprive plaintiff of a constitutional right. *Id.; Butz v. Economou,* 438 U.S. 478, 498–99, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir.1995) (*per curiam* ). Here, plaintiff alleges that defendant Jimenez violated his rights under the First Amendment when defendant interrupted plaintiff's religious worship service on Rosh Hashanah in September, 2007.

It is well-settled that while incarcerated a prisoner retains his right to religious freedom under the Free Exercise Clause of the First Amendment and is "entitled to a reasonable accommodation of his religious beliefs," *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (citations omitted); *see also Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003), including the "right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citation omitted). However, a prisoner's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

right to the free exercise of his religion is restricted due to his confinement and an infringement will not be held to violate a prisoner's right to free exercise of religion if that infringement is "reasonably related to legitimate penological interests," *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (internal quotation marks omitted), *superseded on other grounds by statute,* Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.,*[FN6] and did not result in a substantial burden on the exercise of a prisoner's beliefs. *Ford,* 352 F.3d at 591 (discussing whether a substantial burden analysis is still necessary, but nevertheless, applying it in the case).

> FN6. RLUIPA provides, in pertinent part, that

> > 1. [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person–1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

> 42 U.S.C. § 2000cc–l(a). The same principles underlying the plaintiff's free exercise claim apply to the RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks, *see Salahuddin v. Goord,* 467 F.3d 263, 264 (2d Cir.2006); *Taylor v. Halladay,* No. 9:09–CV–385, 2010 WL 3120036, at *9 (N.D.N.Y. Jul.1, 2010). "District courts in this circuit ... treat claims under the First Amendment and under RLUIPA as separate causes of action." *Jones v. Goord,* 435

F.Supp.2d 221, 260 (S.D.N.Y.2006). Here, neither side has raised RLUIPA and therefore the Court need not address RLUIPA as a separate cause of action.

Defendant Jimenez argues that plaintiff's religious service "was stopped due to a scheduling conflict with another group of inmates who had also reserved the religious purpose room for the same time as Plaintiff." Def. Memorandum of Law ("Def.Memo.") at 5–6; *see also* Jimenez Decl. at ¶¶ 36–42. Plaintiff testified at his deposition that he was notified of the scheduling conflict. *See* Lynch Decl., Exhibit 13, Robinson Dep. 98:7–14. Defendant further argues that the one-time interruption of plaintiff's religious service was *de minimis* and did not constitute a substantial burden on plaintiff's free exercise rights under the First Amendment. Def. Memo. at 6–7.

Plaintiff opposes defendant's motion and relies on the memorandum from Rabbi Hoenig "authorizing the service." Plaintiff argues that defendant Jimenez "exceeded due process." Pl. Opp. at 10. Plaintiff includes identical affidavits from three prisoners who were present at the time of the incident. Pl. Opp., Exhibit 2.[FN7] These witnesses allege that defendant Jimenez notified them of a conflict in the schedule for use of the religious room "as the Moslem's need the room too." Pl. Opp., Exhibit 2, Affidavits of Albert Ilyayev, William T. Liebowitz, Richard Turkieltaub, at ¶ 5. These witnesses also allege that defendant Jimenez ignored Rabbi Hoenig's memorandum and "informed the remaining Jewish inmates in the religious room that they had no rights of any kind in the B.O.P. and that in cases of religion the Moslem faith came first and were more important than the Jewish faith." *Id.* at ¶¶ 6, 14.

> FN7. Plaintiff also includes "telephonic affidavits" taken of Rabbi Potasnik and Dr. Lendvei (Docket Entry 121–122), as well as his own "deposition" taken by Anthony Frallicciardi, who does not appear to be an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**

attorney. (Docket Entry 120). These telephonic affidavits and the "deposition" transcript appear to be submitted in support of plaintiff's claim for damages.

**1. Reasonably Related to Legitimate Penological Interests**

**\*5** Defendant Jimenez argues that plaintiff's religious service was "stopped due to a scheduling conflict with another group of inmates who had also reserved the religious purpose room for the same time as plaintiff." Def. Memorandum of Law ("Def.Memo.") at 5; *see also* Jimenez Decl. at ¶¶ 36–42. The Court must consider four factors in evaluating the constitutionality of defendant's conduct. "1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison systems; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest." *Turner v. Safley,* 482 U.S. 78, 90–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). "An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise." *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citation omitted).

The record shows that defendant Jimenez's interruption of plaintiff's Rosh Hashanah service was "reasonably related to legitimate penological interests" in order to maintain order and to prevent an altercation between Muslim and Jewish prisoners who both claimed they had reserved the room for their religious services. Defendant Jimenez states that he attempted to ascertain which group of prisoners was authorized to use the religious purpose room and that he reviewed two competing memorandums from the Religious Services Program staff and consulted with Father McDevitt. Jimenez Decl. at ¶¶ 36, 39–40. Plaintiff does not dispute that Muslim prisoners were also authorized to use the same room at the same time.

*See* Lynch Decl., Exhibit 13, Robinson Dep. 98:7–14.[FN8] In fact, plaintiff provides a copy of a Muslim inmate's "Cop Out" or "Inmate Request to Staff" dated September 16, 2007, referring to the interruption of plaintiff's Rosh Hashanah service as a result of the scheduling conflict. *See* Pl. Opp., Exhibit 2.

> FN8. Plaintiff further testified: "[defendant Jimenez] didn't ask the Jewish people to leave. What he say is a conflict. Instead of him taking the Muslim to another room that was available, he didn't do that. He just failed." Lynch Decl., Exhibit 13, Robinson Dep. 98:19–23.

When plaintiff and another Jewish inmate refused to leave the religious purpose room as ordered by defendant Jimenez and Lieutenant Murdock, other MDC correctional officers were called to clear the room. Plaintiff does not dispute that he refused to leave the room. Instead, plaintiff relies on Rabbi Hoenig's memorandum allowing Jewish inmates access to the religious room for Rosh Hashanah services as his basis for refusing to leave. *See* Pl. Opp., Exhibit 2. Contrary to plaintiff's conclusion that this "case is open and shut with one exhibit the memo from Rabbi Hornick Authorizing the service," Pl. Opp., the record demonstrates that the conflict here was not caused by a prison policy or regulation prohibiting plaintiff's religious exercise, but rather by a scheduling error by MDC's Religious Services Program staff.

Although plaintiff maintains that his right to free exercise was violated when the Jewish inmates were made to leave the room, "the burden remains with the prisoner to 'show that the[ ] [articulated] concerns were irrational.' " *Salahuddin,* 467 F.3d at 275 (citing *Ford,* 352 F.3d at 595). Plaintiff does not dispute that there was a scheduling conflict between the Muslim and Jewish prisoners over who would be permitted to use the religious purpose room. Other than affidavits by prisoners attributing statements to defendant

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**

Jimenez that Muslim prisoners' worship was more important than the Jewish prisoners' worship needs, *see* Pl. Opp., Exhibit 2,[FN9] nothing in the record shows that defendant's reason for interrupting the service was not reasonably-related to the legitimate penological interest of maintaining order and preventing a dispute between prisoners from escalating. The Court gives deference to "prison administrators ... to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoner's Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Graham v. Mahmood,* No. 05 Civ. 10071(NRB), 2008 WL 1849167, at *12–13 (S.D.N.Y. Apr.22, 2008) (prison policy regarding religious meetings reasonably-related to legitimate penological interests).[FN10] Despite the statement attributed to defendant, the incident appears to have been isolated and not a result of any BOP policy to deny Jewish inmates congregate religious services.

FN9. *See* Pl. Opp., Exhibit 2, Affidavits of Albert Ilyayev, William T. Liebowitz, Richard Turkieltaub:

"11) Lt. Murdock informed Robinson, Swapp and the other assembled Jewish inmates, "YOU GUYS HAVE NO RIGHTS, NOT EVEN RELIGIOUS RIGHTS HERE ... THE MOSLEM'S COME FIRST IN THE B.O.P. AND THE JEW'S ARE AFTER THEM!" (emphasis and spelling as in original).

"14) After Robinson and Swap were removed to the hallway, CO. Jimmenez informed the remaining Jewish inmates in the religious room that they had no rights of any kind in the B.O.P. and that in cases of religion the Moslem faith came first and was more important than the Jewish faith."

FN10. The Clerk of Court is directed to send plaintiff the attached copies of all unreported cases cited herein.

**2. Substantial Burden or De Minimis Standard**

**\*6** Defendant Jimenez further argues that the one-time interruption of plaintiff's religious service, even if it was a violation, was *de minimis.* Def. Memo at 6–7. Plaintiff does not dispute or address this argument. However, plaintiff did testify at his deposition that he was allowed to return to the religious purpose room to resume the service and that he used the religious purpose room daily for the remainder of his incarceration at MDC. *See* Lynch Decl., Exhibit 17, Robinson Dep. 104:2–5; 113:8–13.

In *Ford,* the Second Circuit found that "the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims" but still applied the substantial burden test to plaintiff's claim that the prison's denial of the Eid ul Fitr meal violated his First Amendment rights. *Ford,* 352 F.3d at 592. Moreover, the "courts in the Second Circuit are divided on the issue of whether missing one religious service constitutes a violation of an inmate's right to the free exercise of religion," *Page v. Breslin,* No. 02–CV–6030 (SJF), 2004 WL 2713266, at *6 (E.D.N.Y. Nov.29, 2004) (citing cases); *but see Hanton v. Mathiau,* 29 F.App'x 772 (2d Cir.2002) (affirming dismissal of prisoner's complaint that he was denied two days of congregate religious services over a three month period) and *Gill v. DeFrank,* No. 98 Civ. 7851(NRB), 2000 WL 897152, at *1–2 (S.D.N.Y. July 6, 2000) ("missing one religious service does not constitute a substantial burden"), *aff'd,* 8 F.App'x 35 (2d Cir.2001); *see also Graham,* 2008 WL 1849167 at *12–13 (prisoner was able to participate in weekly religious classes, the prison's failure to provide more services was *de minimis* ).

Here, the record does not demonstrate that plaintiff's religious exercise was substantially burdened by defendant's action on September 13, 2007. Plaintiff

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**

testified that his religious worship of Rosh Hashanah was interrupted, not denied; plaintiff was allowed to resume his religious worship that same evening in the religious purpose room. *See* Lynch Decl., Exhibit 16, Robinson Dep. 104:2–5 ("and brought us down back to the religious room, after letting the Muslims and giving them another room, which should have been done to begin with"). Plaintiff also continued to use the religious purpose room to conduct daily prayers "on a regular basis" until he was released from MDC. Lynch Decl., Exhibit 17, Robinson Dep. 113:8–13. Accordingly, there is no record evidence to show that defendant's interruption of the Rosh Hashanah service substantially burdened plaintiff's religious beliefs. *See, e.g., Johnson v. Newton,* No. 02–CV–1277, 2007 WL 778421, at *5 (N.D.N.Y. Mar.13, 2007) (plaintiff failed to prove that defendants had substantially burdened his religion when he alleged that he was prevented from entering a mosque, but then later testified at his deposition that the officer initially blocked the door to the mosque *but eventually let him enter* ) (emphasis added). I therefore recommend that defendant's motion for summary judgment should be granted.

**B. Qualified Immunity**

**\*7** In the alternative, if the Court were to find that defendant's actions violated plaintiffs rights, defendant Jimenez argues that he is entitled to qualified immunity. Def's. Memo. at 7–10. The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In analyzing claims of qualified immunity, a Court must assess: (1) "whether the facts that a plaintiff has ... shown make out a violation of a constitutional right"; and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The district

court may address either prong first in light of the circumstances of each case. *Id.* at 236. "A defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiff, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." *Ford v. Moore,* 237 F.3d 156, 162 (2d Cir.2001). When determining whether a right is clearly established, this Court looks to the law of the Supreme Court and the Second Circuit at the time of the defendant's actions. *Huminski v. Corsones,* 396 F.3d 53, 88 (2d Cir.2005) (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

Here, neither party disputes that defendant Jimenez interrupted plaintiff's Rosh Hashanah service and there is no dispute that the defendant's interruption was caused by a scheduling error. As discussed above, the record demonstrates that defendant's one-time interruption of the Rosh Hashanah service did not violate plaintiff's First Amendment rights as it was reasonably-related to a legitimate penological interest and did not substantially burden plaintiff's free exercise of religion.

However, even if defendant's interruption of plaintiff's service did rise to a constitutional violation, no reasonable jury could conclude that defendant Jimenez acted unreasonably when faced with a scheduling conflict for use of the religious purpose room. Even if defendant Jimenez showed "poor judgment" as plaintiff contends, *see* Pl. Opp. at 9, qualified immunity protects government officials when they make "reasonable mistakes" about the legality of their actions, *Saucier,* 533 U.S. at 206, and is "applied regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact," *Pearson,* 555 U.S. at 231 (internal quotation marks omitted). "In this respect, the Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**

the law.' " *Walczyk v. Rio,* 496 F.3d 139, 154 (2d Cir.2007).

**\*8** Moreover, it was not clearly established at the time of the incident that the interruption of one religious service would have violated a prisoner's First Amendment rights. The case law at the time did not provide definitive guidance on whether defendant Jimenez's action violated plaintiff's free exercise of religion. Def. Memo. at 9–10; *Gill v. DeFrank,* 8 F.App'x 35, 37 (2d Cir.2001); *Hanton,* 29 F.App'x at 773. I therefore recommend, in the alternative, that defendant Jimenez's motion should be granted as he is entitled to qualified immunity.

## C. Plaintiff's Revised Motion for Summary Judgment[FN11]

> **FN11.** Although not formally referred, I include plaintiff's motion in this Report to be complete.

Plaintiff cross-moves for summary judgment and seeks to "reintroduce Defendants B thru D [Cameron Lindsey, Reverend McDermett, Rabbi Hornic]. (Docket Entry 127, Pl. Revised Summary Judgment Motion at ECF p. 3.) [FN12] Plaintiff alleges that defendant Jimenez interrupted the Rosh Hashanah service "with Anti Semitic Banters," *Id.* at ECF p. 6. Plaintiff further alleges that Father McDevitt "acrimoniously scheduled the Muslim service in the same room. Causing more confusion." *Id.* at ECF p. 7. Plaintiff alleges that Rabbi Hoenig should have presided over the Rosh Hashanah service and that Warden Lindsay should have conducted an "internal and external investigation." *Id.* at ECF p. 6–7. Defendant filed a letter-motion dated December 30, 2010, seeking denial of plaintiff's motion. (Docket Entry # 128). Plaintiff filed a reply or opposition to defendant's letter-motion. (Docket Entry # 129–130).

> **FN12.** As not all of plaintiff's submissions

are paginated, the Court relies on the page numbers assigned by the Electronic Case Filing system ("ECF").

Despite plaintiff's insistence to the contrary, the Court has already dismissed defendants Lindsay, McDevitt and Hoenig from this action. (Docket Entry # 55, Order adopting R & R dated April 28, 2010). Even liberally construing plaintiffs submission as a request for reconsideration, there is no basis for granting plaintiff summary judgment.

Plaintiffs allegation regarding defendant Jimenez does not alter the Court's recommendation that defendant Jimenez's motion for summary judgment should be granted. Although plaintiff alleges that defendant Jimenez interrupted the Rosh Hashanah service with "Anti Semitic Banters" which the Court would never condone, this allegation is not supported by admissible evidence.[FN13] Rather, plaintiff's deposition testimony is to the contrary. When asked what defendant Jimenez said to him, plaintiff responded: "I don't recall." ... "All what he did, he just pressed the emergency button to interrupt our religious...." *See* Lynch Decl., Exhibit 15, Robinson Dep. 49:23–50:10. Moreover, plaintiff does not describe defendant Jimenez as the MDC Officer who physically removed him from the room and Jimenez states that he and Lt. Murdock remained in the religious purpose room until it had been completely vacated. Jimenez Decl. ¶ 45. As such, there is no basis in the record for holding defendant Jimenez liable for any injuries attributed to plaintiff's removal from the religious purpose room or plaintiff's claim that he was "manhandled" in the elevator. Pl. Opp. at 3. As for Warden Lindsay, Father McDevitt and Rabbi Hoenig, plaintiff has fallen short of providing admissible evidence from which one could reasonably conclude that their conduct violated plaintiff's constitutional rights. I therefore recommend that plaintiff's cross-motion for summary judgment should be denied. Similarly, plaintiff's "Demand for Damages" should be denied as moot. (Docket Entry # 131).

Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)
**(Cite as: 2012 WL 1038917 (E.D.N.Y.))**

FN13. Moreover, verbal abuse does not rise to the level of a constitutional violation. *See* Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986) (holding that name-calling without "any appreciable injury" did not violate inmate's constitutional rights).

### CONCLUSION

**\*9** Accordingly, it is respectfully recommended that defendant's motion for summary judgment should be granted (Docket Entry # 115) and that plaintiffs "Revised Motion for Summary Judgment" and "Demand for Damages" should be denied. (Docket Entry # 127, 129–131).

### FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be made within the ten-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital District Physicians' Health Plan, Inc.,* 293 F.3d 42 (2d Cir.2002); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

E.D.N.Y.,2012.
Robinson v. Jimminez
Not Reported in F.Supp.2d, 2012 WL 1038917 (E.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Gary SMITH, Plaintiff,
v.
M. GRAZIANO, Acting Superintendent/Deputy Superintendent of Administration, Greene Correctional Facility; Philip Heath; Deputy Superintendent of Programs, Greene Correctional Facility; John Doe, Correctional Officer # 1, Greene Correctional Facility; John Doe, Correctional Officer # 2, Greene Correctional Facility; John Doe, Correctional Officer # 3, Greene Correctional Facility; and John Doe, Ministerial Program Coordinator, Greene Correctional Facility, Defendants.

Civ. No. 9:08-CV-469 (GLS/RFT).
March 16, 2010.

Gary Smith, Jamaica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants Graziano and Heath [FN1].

> FN1. Several Defendants remain unidentified, and thus, unserved. Only Defendants Graziano and Heath have appeared in this action.

**REPORT-RECOMMENDATION AND ORDER**
RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** On April 30, 2008, *pro se* Plaintiff Gary Smith filed a civil rights Complaint alleging the Defendants violated his rights established by the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act (RLUIPA), codified at 42 U.S.C. § 2000cc, *et seq.* Dkt. Nos. 1, Compl.; [FN2] 22, Am. Compl. He further alleges violations of Articles 1, 3, and 11 of the New York State Constitution as well as New York Corrections Law § 610. The basis for Plaintiff's lawsuit is his contention that the Defendants infringed upon and interfered with his right to freely exercise his religion when he was denied the opportunity to attend Protestant religious services on three separate occasions during his incarceration at Greene Correctional Facility in 2006.

> FN2. At the time Plaintiff initiated this lawsuit, he was housed at the Anna M. Kross Center (AMKC), located in East Elmhurst, New York. Since the allegations contained in his Complaint (and Amended Complaint) concern matters that took place during his incarceration in 2006 at Greene Correctional Facility, venue was properly maintained in this District. 28 U.S.C. § 1391(b). The address currently on file for Plaintiff is a civilian address and appears to be inaccurate. *See infra* Part I.

Currently pending before the Court is Defendants Graziano's and Heath's Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 47. Despite being granted multiple extensions of time, Dkt. Nos. 48, 52, 56, & 59, Plaintiff has failed to respond to the Motion. For the reasons that follow, it is recommended that Defendants' Motion be **granted,** and Plaintiff's Amended Complaint be **dismissed** in its entirety.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

### I. FAILURE TO PROSECUTE

At the outset, we are compelled to note that, not only has Plaintiff failed to respond to Defendants' Motion for Summary Judgment, but he has also failed to communicate with this Court in over six months, causing this Court to wonder whether Plaintiff has abandoned his case.

Throughout this litigation, Plaintiff has stumbled over his responsibility to timely ensure that the Court (and his adversaries) has a current address for him. Plaintiff's shirking of his duty has resulted in the return of multiple documents sent to him. *See* Mail Returned to the Court, Dkt. Nos. 34, 42-44, & 61-62. Time and again, Plaintiff belatedly provided current addresses to the Court, resulting in the Clerk of the Court having to re-serve documents that had been returned as undeliverable. *See* Notification of Updated Address, Dkt. Nos. 7, 8, 24, 28, 36, 37, 39, 53, 60. Plaintiff's belated notices of changes in his address have stymied the effective administration of this case, and, yet, this is not the only negative effect caused by Plaintiff side-stepping his responsibility. For example, earlier in the litigation, Plaintiff's failure to timely update his address directly impacted the Defendants' ability to serve responses to Plaintiff's discovery demands. *See* Dkt. No. 41, Order, dated Apr. 6, 2009, at p. 2 (detailing the Defendants' effort to serve Plaintiff with their discovery responses, only to have such responses returned on multiple occasions). Thus, Defendants too have incurred extra-expenses by having to re-serve discovery responses. We conclude that Plaintiff's failure to ensure that his address is current not only burdened the Court and Defendants with extra expenses, but also caused confusion and delay.

**\*2** Plaintiff's apathetic approach to this litigation is not only reflected by his failure to update his address. He has also, inexplicably, failed to respond to Defendants' Motion for Summary Judgment, which was filed approximately nine months ago, on June 9, 2009, and which we believe Plaintiff received. Dkt.

No. 47. The Motion was served on Plaintiff at his then-current address, the Anna M. Kross Center (AMKC). *Id.* Though Plaintiff twice updated his address thereafter, there has been no indication from Defendants that their Motion was returned to them as undeliverable. Furthermore, on numerous occasions, Plaintiff sought, and was granted, extensions of time to respond to Defendants' Motion for Summary Judgment. *See* Dkt. Nos. 51, 52, 56, & 59. We note that in one of his extension requests, Plaintiff sought to distinguish his claim for relief from one of the cases Defendants relied upon in seeking summary judgment.[FN3] Dkt. No. 51. In view of these facts, we can safely presume that Plaintiff indeed received a copy of that Motion, as well as the notice that, in accordance with this District's Local Rules 7.1(a)(3) and 56.2, accompanied the Motion and warned Plaintiff of the consequences that could occur should he fail to respond to the Defendants' Motion. Dkt. No. 47 at pp. 1-2. Similarly, Court Orders/Notices that were resent in September 2009 to Plaintiff's last known address have not been returned as undeliverable, thus we can presume that Plaintiff received these mailings as well, and that he is aware of the gravity of a motion for summary judgment. *See Young v. City of Syracuse Dep't of Public Works,* 307 Fed. Appx. 502, 2009 WL 136920, at *1 (2d Cir. Jan.21, 2009) (unpublished opinion) ("[T]he failure of a district court to apprise *pro se* litigants of the consequences of failing to respond ... to a motion for summary judgment is ordinarily grounds for reversal." (quoting *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620 (2d Cir.1999))).

FN3. In his letter to the Court, Plaintiff noted that the Defendants cited *Hanton v. Mathiau,* 29 Fed. Appx. 772, 773 (2d Cir.2000) in support of their Motion for Summary Judgment. Plaintiff advised the Court that the *Hanton* case is distinguishable from his because it is a First Amendment case and not one brought pursuant to RLUIPA, which, according to Plaintiff, "is evaluated under a different standard." Dkt. No. 51 at pp. 1-2.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

Despite all the above precautions and warnings provided to Plaintiff, he has failed to oppose Defendants' Motion for Summary Judgment. And, it further appears that Plaintiff has again failed to notify the Court of a change in his address. The last communication this Court received from Plaintiff is a letter, dated August 26, 2009, wherein he provides an updated civilian address. Dkt. No. 60. Though documents mailed to this address have not been returned to the Court, in light of Plaintiff's apparent abandonment of this case, a Chambers staff member conducted a review of the New York State Department of Corrections (DOCS) Inmate Locator Website. According to the information available on that website, as of December 7, 2009, Plaintiff was returned to prison from parole and is currently housed at Fishkill Correctional Facility. *See* Attach. 1, http://nysdocslookup.docs.state.ny.us. Yet, he has not notified the Court of his change in address, nor has he responded to Defendants' Motion.

**\*3** Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute an action or comply with any order of the court. *Link v. Wabash R.R. Co.,* 370 U.S. 626, 629-30, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). "This power to dismiss an action may be exercised when necessary to achieve orderly and expeditious disposition of cases." *Freeman v. Lundrigan,* 1996 WL 481534, at \*1 (N.D.N.Y. Aug.22, 1996) (citing *Rodriguez v. Walsh,* 1194 WL 9688, at \*1 (S.D.N.Y. Jan. 14, 1994)).

Moreover, a litigant has the duty to inform the court of any address changes. As then District Judge Pooler stated:

It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

*Dansby v. Albany County Corr. Facility Staff,* 1996 WL 172699, at \*1 (N.D.N.Y. Apr.10, 1996) (quoting *Perkins v. King,* No. 84-3310, slip op. at 4 (5th Cir. May 19, 1985) (other citations omitted)); *see generally* N.D.N.Y.L.R. 41.2(b).

In light of the facts that more than six months have elapsed since Plaintiff communicated with the Court, he has failed to respond to Defendants' Motion, and has failed to maintain a current address with the Court, the Court finds that he has failed to prosecute this matter and presumably has abandoned his case. Smith's failure to prosecute this matter and provide a change of address warrants a recommendation of dismissal. *See* FED. R. CIV. P. 41(b) (allowing for dismissal of an action for failure to prosecute); *see also* N.D.N.Y.L.R. 41.2(a) (noting that a plaintiff's failure to take action for four months is "presumptive evidence of lack of prosecution; N.D.N.Y.L.R. 41.2(b) (authorizing dismissal for failure to provide a change of address). Indeed, courts in the Northern District of New York have dismissed lawsuits brought by *pro se* plaintiffs for failure to provide a current address. *See Rivera v. Goord,* 1999 WL 33117155 (N.D.N.Y. Sept.14, 1999); *Fenza v. Conklin,* 177 F.R.D. 126 (N.D.N.Y.1988); *Morgan v. Dardiz,* 177 F.R.D. 125 (N.D.N.Y.1998); *Williams v. Faulkner,* 1998 WL 278288 (N.D.N.Y. May 20, 1998); *Dansby v. Albany County Corr. Facility Staff,* 1996 WL 172699 (N.D.N.Y. Apr.10, 1996).

Nevertheless, while we recommend dismissal of this action due to Plaintiff's failure to prosecute, we will continue our analysis of the substance and merits

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

of Plaintiff's claims.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

*4 Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the non-moving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing [that there is] a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,*

344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Plaintiff's Failure to Respond to the Defendants' Motion

*5 As noted above, Plaintiff has failed to respond to Defendants' Motion for Summary Judgment. Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown ." N.D.N.Y.L.R. 7.1(b)(3); *see also Douglas v. New York State Div. of Parole,* 1998 WL 59459, at * 1 (N.D.N.Y. Feb.10, 1998) (noting that plaintiff's failure to oppose defendants' dispositive motion, and his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

failure to show good cause for the omission, may alone justify granting the motion).

"The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted ly." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Rule 7.1 Statement of Facts ("7.1 Statement"), supplemented by Plaintiffs' verified Amended Complaint (Dkt. No. 22), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997); N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

**C. John Doe Defendants**

In his Original Complaint, filed on April 30, 2008, (Dkt. No. 1), and in the Amended Complaint, filed on October 8, 2008, (Dkt. No. 22), Plaintiff lists four John Doe Defendants. To date, Plaintiff has failed to identify these John Does. At the outset of this litigation, Plaintiff was advised by this Court that he must take steps to ascertain the identities of the three John Doe Defendants should he wish to maintain his suit against them. Dkt. No. 5 at p. 2. Within that Order, this Court specifically stated that "Plaintiff is further advised that if [the John Doe Defendants] are not timely served, this action will be dismissed as against them." *Id.* Months later, Plaintiff asked permission to amend his Complaint so that he may add another John Doe Defendant and further bolster some factual allegations. Dkt. No. 20. In an Order, dated October 8, 2008, this Court noted that Plaintiff could, under Federal Rule of Civil Procedure 15(a), file his Amended Complaint as of right and needn't ask for permission to do so. Dkt. No. 21. Nevertheless, we took the oppor-

tunity to again warn Plaintiff of the importance of timely identifying and serving the John Doe Defendants to avoid dismissal of his claims against them. *Id.* at pp. 1-2. Then, after noticing Plaintiff had not responded to Defendants' Motion, even after being granted multiple extensions of time to do so, this Court issued a Notice/Order advising Plaintiff of the importance of responding to such a motion, and further directing him to submit a status report regarding his efforts to identify each John Doe Defendant. Dkt. No. 56, Notice/Order, dated Aug. 25, 2009, at p. 3. Neither a response nor a status report was forthcoming.[FN4]

> FN4. While Plaintiff has not provided a status report, this Court is familiar with at least some of the efforts undertaken by Plaintiff to ascertain the Doe identities. During the discovery phase of this action, this Court held a couple of telephone conferences to address some discovery disputes that arose out of Defendants' failure to timely respond to Plaintiff's discovery demands. *See* Minute Entries, dated April 6, 2009 and July 1, 2009; *see also* Dkt. No. 41, Order, dated Apr. 6, 2009; Dkt. No. 52, Order, dated July 1, 2009. It is this Court's impression that Plaintiff had made some attempt to heed the Court's warning and ascertain the identities of certain John Doe Defendants. In his Motions to Compel, and during the subsequent related conferences with the Court, Plaintiff objected to, *inter alia,* Defendants' response to Interrogatory Number 18 and Document Request Number 2. Therein, Plaintiff sought the names of the Corrections Officers on duty during a specific time period, presumably during the time period he was denied the right to attend Protestant Religious Services. Defendants responded that such information (charts and records) had been destroyed in a fire in January 2008. *See* Dkt. No. 45, Pl.'s Mot. to Compel, at p. 5. We thereafter mod-

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

ified and narrowed the request and directed Defendants to respond accordingly. Dkt. No. 52. The Court has not received any further communication from Plaintiff indicating that the Defendants failed to abide by the Court's directives. These efforts possibly concern the three John Doe Corrections Officers. However, it is not clear what steps Plaintiff took to identify the last John Doe Defendant, identified only as the Ministerial Program Coordinator.

**\*6** Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m).[FN5] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

> FN5. Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

Because he failed to timely identify and serve the John Doe Defendants, and because as outlined below, no cognizable cause of action is asserted herein, we recommend **dismissal** of all claims asserted against them. *Cooks v. Delpiano,* 2008 WL 4186337, at *1 n. 1 (N.D.N.Y. Sept.10, 2008); *Pravda v. City of Albany,* 178 F.R.D. 25, 26 (N.D.N.Y.1998).

**D. Exhaustion**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that for actions brought by prisoners under 42 U.S.C. § 1983, the inmate must first exhaust his or her administrative remedies. The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citations omitted). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at *5 (N.D.N.Y. Oct.11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Review Committee (IGRC), a committee comprised of both inmates and facility employees. [FN6] N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Cental Office Review Committee (CORC) makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing *Sulton v. Greiner,* 2000 WL 1809190, at *3 (S.D.N.Y. Dec.11, 2000)); *Petit v. Bender,* 2000 WL 303280, at *2-3 (S.D.N.Y. Mar.22, 2000).

> FN6. The IGRC is a five-member body con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

sisting of two voting inmates, two voting staff members, and a nonvoting chair (who may be an inmate, staff member, or volunteer). N.Y. COMP.CODES R. & REGS tit.7, § 701.4.

**\*7** Within his Amended Complaint, Plaintiff alleges that, after being transferred to Greene Correctional Facility on or about July 18, 2006, he was denied access to Protestant religious services on three separate occasions: July 23, 2006, September 10, 2006, and September 17, 2006. Am. Compl. at ¶¶ 4, 5, 12, & 16. He categorically states that he made "a formal complaint with all the proper personnel departments." *Id.* at ¶ 20. Without the benefit of Plaintiff's response, the Court accepts as true, and relies primarily, on the following facts as set forth by the Defendants. With regard to the denial of access to religious services, Plaintiff filed one grievance in 2006 which he appealed to CORC. Dkt. No. 47-2, Karen Bellamy Decl., dated Mar. 13, 2009, at ¶ 3, Ex. 1; Dkt. No. 47-3, Steven Schwartz, Esq., Affirm., dated June 9, 2009, Ex. B. Within that Grievance, dated September 17, 2006, Plaintiff complains of being denied the right to practice his religious beliefs "for the past two following Sundays." Schwartz Affirm., Ex. B. There is no mention of having been similarly denied access on July 23, 2006, and the ensuing investigation within the Inmate Grievance Program centered solely on the two dates in September. *Id.* Accordingly, Plaintiff has failed to fully exhaust his claim with regard to being denied religious services on July 23, 2006, and thus, the Court will only consider whether denial of religious services on two separate dates in September 2006 constitutes a violation of Plaintiff's First Amendment and RLUIPA rights.[FN7]

> **FN7.** In liberally construing Plaintiff's Amended Complaint, it appears that the July 23rd event is distinguishable from the September events. Plaintiff notes that he was transferred to Greene on or about July 18, 2006. Am. Compl. at ¶ 4. Upon admission,

Plaintiff was reportedly held in the F-1 dormitory. *Id.* at ¶ 5. These facts are confirmed by the Defendants' records. Schwartz Affirm., Ex. A. Plaintiff was reportedly told on July 23, 2006, that religious services were not available to inmates in the F-1 dormitory and Plaintiff had to wait until he was transferred to another dormitory. Am. Compl. at ¶ 5. Thereafter, on or about July 28, 2006, Plaintiff was transferred from the F-1 dormitory unit to the E-2 dormitory unit. *Id.* at ¶ 7. On or about July 30, 2006, Plaintiff was allowed to attend weekly communal Protestant services. *Id.* at ¶ 8. On the other hand, the September denials, as discussed more fully below, were not made based upon Plaintiff's housing status, but rather, were later revealed to be a result of miscommunication amongst the prison staff.

**E. RLUIPA and First Amendment**

*1. Relevant, Uncontested Facts*[FN8]

> **FN8.** Defendants' Motion for Summary Judgment is supported entirely by prison records, namely grievance records. It is well settled that motions for summary judgment must be supported by admissible evidence. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Hearsay evidence is not admissible unless it falls within an exception to the hearsay rule. FED.R.EVID. 802. Prison grievance records, although hearsay, may be admissible under the business records exception to the hearsay rule. That exception renders admissible records of "acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge" but only if such records are "kept in the course of a regularly conducted business activity, and if it was the regular

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
(Cite as: 2010 WL 1330019 (N.D.N.Y.))

practice of that business activity to make the memorandum, report, record, or data compilation." Facts supporting admissibility must be supplied "by the testimony of the custodian or other qualified witness or by certification" that complies with Federal Rule of Evidence 902. FED.R.EVID. 803(6). Defendants submit a Declaration from Karen Bellamy, Director of the Inmate Grievance Program, who is the "custodian of the records maintained by the [CORC]." Dkt. No. 47-2 at ¶ 1. While attached to Ms. Bellamy's Declaration is a certified printout of all the grievances Mr. Smith filed and appealed to CORC, she does not certify the relevant grievance packet. That packet is instead attached to Assistant Attorney General Schwartz's Affirmation. Since the proper custodian failed to certify the grievance packet, it is technically inadmissible. *See Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir.1980).* Nevertheless, we have considered the grievance packet because it appears that in bringing this action and naming certain Defendants, Plaintiff relied upon the same records.

As mentioned above, Plaintiff filed a grievance on September 17, 2006, alleging he was denied religious services on two occasions: September 10, 2006 and September 17, 2006. Schwartz Affirm., Ex. B at p. 3. Defendant Philip Heath, Deputy Superintendent for Program Services, conducted an investigation and concluded that Protestant religious services did not take place on either September 10 or September 17 due to a lack of communication involving security staff and ministerial services. *Id.* at p. 4. According to Defendant Heath's Interdepartmental Communication, dated September 27, 2006, the miscommunication arose after security staff had been directed, on September 8, 2006, that all programs, including religious services, had to be conducted on a call-out basis. *Id.* That information, however, had not been shared with

Ministerial Services staff, and thus, services were cancelled due to a lack of call-outs. *Id.* Defendant Heath further explained that Ministerial Services staff were advised, via e-mail, on September 14, 2006, of the need for a call-out, and yet, they still failed to conform to the new policy. As a consequence, services were again cancelled on that date. *Id.* Defendant Heath concluded his memo with the assurance that these issues had been resolved and no further interruptions to religious services were anticipated. *Id.* The IGRC agreed with the investigation and Plaintiff appealed to the Superintendent. *Id.* at p. 5. On October 4, 2006, Defendant Graziano, in his capacity of Acting Superintendent/Deputy Superintendent of Administration, affirmed the investigation and denied the grievance, finding no substantiation to Plaintiff's claim that he was denied access to religious services by staff. *Id.* at p. 7. Plaintiff appealed that decision to CORC. *Id.* On October 25, 2006, CORC accepted the grievance in part, acknowledged the investigation, and emphasized that appropriate administrative action had been taken to resolve the issues. *Id.* at p. 9.

*2. Personal Involvement*

**\*8** Plaintiff attributes the denial of religious services to the acts of the unnamed Ministerial Program Coordinator, who allegedly advised and counseled Defendants Graziano and Heath. Am. Compl. at ¶¶ 12 & 16. Yet, Plaintiff never articulates the factual basis for holding Defendants Graziano and Heath responsible. Indeed, it appears that the Defendants' inclusion in this lawsuit is based upon their responses to Plaintiff's Grievance. In other words, they are being sued in their supervisory capacity.

a. Section 1983

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977),* and furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims. *Polk County v. Dodson, 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)* (citing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

*Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) ("[I]t is well settled that to state a civil rights claim under § 1983, a complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983") (citations omitted).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted).

Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because he holds a high position of authority).

The record before the Court reveals that the extent of Defendants Graziano's and Heath's participation was merely investigating and ruling upon Plaintiff's Grievance. Even Plaintiff's pleading reveals that these two Defendants had limited to no involvement in the events leading up to Plaintiff's denial of religious services attendance. Indeed, Defendant Graziano merely responded to Plaintiff's Grievance, and thus was not personally involved in any wrongdoing. Thus,

the only basis from which the Court may find some responsibility as to Graziano and Heath is if we were to determine that Plaintiff's rights had been violated and Defendants Graziano and Heath failed to remedy the wrong after learning about it.

b. RLUIPA

**\*9** Neither the Supreme Court nor the Second Circuit has directly addressed the issue of whether personal involvement is a prerequisite for any valid RLUIPA claim, as it is under § 1983. However, district courts in this Circuit and elsewhere have held that personal involvement is a necessary component of valid RLUIPA claims. *See Joseph v. Fischer,* 2009 WL 3321011, at *18 (S.D.N.Y. Oct.8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith,* 2009 WL 3199520, at *9 (N.D.N.Y. Sept.30, 2009) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at *2 (S.D.Ohio Sept.9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill,* 2009 WL 890521, at *3 (S.D.Ohio Mar.31, 2009) & *Alderson v. Burnett,* 2008 WL 4185945, at *3 (W.D.Mich. Sept.8, 2008)). We are in agreement with that conclusion. RLUIPA provides that "[n]o government" shall substantially burden the religious exercise of confined persons, 42 U.S.C. § 2000cc-1(a), and defines "government" as "(i) a State, county, municipality, or other governmental entity created under the authority of the state; (ii) any branch, department, agency, instrumentality, or official of an entity listed in cause (i); and (iii) any other person acting under color of state law," 42 U.S.C. § 2000cc-5(4)(A). Thus, RLUIPA protects inmates (and others) against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of a defendant in the alleged RLUIPA viola-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

tion.

*3. First Amendment Analysis*

Prisoners still maintain some measure of constitutional protection afforded by the Free Exercise Clause of the First Amendment. *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Among those protected rights is the right to participate in congregate religious services. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993). These rights, however, are balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system," such as maintaining prison security and discipline. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974). Free exercise claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)); *see also Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison official furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d at 926 (citations omitted). A threshold question may be whether the cancellation of two religious services substantially burdened Plaintiff's free exercise rights.[FN9] *Gill v. Defrank,* 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000), *aff'd,* 8 Fed. Appx. 35 (2d Cir.2001). We first note that, even if we were to find that Plaintiff's religious beliefs are sincerely held, the cancellation of the religious services did not prevent Plaintiff from practicing his religion in other ways. We also note that the cancellation of the two events appears to have been isolated occurrences, and not a systematic problem or policy of denying religious

services. Instead, the cancellations were a result of a breakdown in communication between prison officials and security staff. In this regard, Plaintiff does not appear to challenge the "call-out" practice as violating his rights, in fact, he seems to question why Protestant services were not made to participate in the same call-out procedure as is the practice with other denominations. Dkt. No. 22, Am. Compl. at ¶¶ 9-10. In this Court's assessment, the cancellation of two religious services is a *de minimis,* or insubstantial, burden on an inmate's ability to freely exercise his religion. *Williams v. Weaver,* 2006 WL 2794417, at *5 n. 29 (N.D.N.Y. Sept.26, 2006) (missing two religious services is not a substantial burden on an inmate's right to practice his religion); *Persad v. Savage,* 2004 WL 1570286, at *4 & 7 (W.D.N.Y. May 25, 2004) (noting that the cancellation of two services was isolated and not a "systemic problem" and later, citing *Gill v. De-Frank,* 8 Fed. Appx. 35, 37 (2d Cir.2001), for the proposition that the defendants were entitled to qualified immunity since it was not clearly established that the cancellation of two religious services constituted a substantial burden on an inmate's right to freely exercise his religion; *see also Hanton v. Mathiau,* 29 Fed. Appx. 772, 773 (2d Cir.2002) (affirming the district court's dismissal of the prisoner's free exercise claim based on a denial of services on two separate occasions); *Graham v. Mahmood,* 2008 WL 1849167, at *10 (S.D.N.Y. Apr.22, 2008) (citing, *inter alia, Hanton* for the proposition that preventing a prisoner who practiced Nation of Islam from making one round of bean pie deliveries had a *de minimis* and insubstantial burden on the prisoner's free exercise rights). Therefore, whether we apply the substantial burden test or simply look to the level of infringement on Plaintiff's ability to freely exercise his religion, we find that the cancellation of two services did not violate Plaintiff's free exercise rights and such First Amendment claim should be **dismissed.**

FN9. It seems to be a matter of considerable debate in this Circuit as to whether a plaintiff must first establish a "substantial" burden

prior to bringing a First Amendment free exercise claim. *See McEachin v. McGuinnis, 357 F.3d 197, 202 (2d Cir.2004)* (questioning whether the substantial burden standard must be applied in *constitutional* free exercise claims and citing to *DeHart v. Horn, 227 F.3d 47, 51 (3d Cir.2000)* and *Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, 170 (3d Cir.2002)* as support for the Third Circuit's policy of explicitly rejecting the substantial burden analysis as violating the precept, articulated in *Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 887, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)*, that "courts must not presume to determine the place of a particular belief in a religion"). In those narrow circumstances, when the Second Circuit has applied the substantial burden test, they defined a substantial burden as "a situation where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (quoting *Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir.1996)*).

*4. RLUIPA Analysis*

**\*10** RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation of exercise of their religion."[FN10] *Cutter v. Wilkinson, 544 U.S. 709, 721, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)*. RLUIPA provides that

> FN10. RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration (RFRA) Act of 1993 in *City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)*, on the grounds that it exceeded Congress's power under section five of the Fourteenth Amendment ("The Congress shall have power to enforce this article by

appropriate legislation"). RLUIPA "corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord, 2007 WL 4560597, at \*5 (W.D.N.Y. Mar.12, 2007)* (citations omitted).

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

> (1) is in furtherance of a compelling governmental interest;

> (2) and is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Thus, Plaintiff can establish a RLUIPA violation by proving that the acts of prison officials constitute a "substantial burden" on his religious exercise without promoting a *compelling* governmental interest that is advanced through *the least restrictive means.* As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests.

As noted above, Plaintiff has failed to establish that the cancellation of two religious services constituted a substantial burden on his ability to exercise his religious beliefs. Thus, for the same reasons articulated above, Plaintiff's RLUIPA claim fails and should

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)
**(Cite as: 2010 WL 1330019 (N.D.N.Y.))**

be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the John Doe Defendants be **dismissed** due to Plaintiff's failure to timely identify and serve such individuals; and it is further

**RECOMMENDED,** that the Defendants' Motion for Summary Judgment (Dkt. No. 47) be granted and the entire Amended Complaint be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2010.
Smith v. Graziano
Not Reported in F.Supp.2d, 2010 WL 1330019 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5330980 (D.Vt.)
**(Cite as: 2012 WL 5330980 (D.Vt.))**



Only the Westlaw citation is currently available.

United States District Court,
D. Vermont.
Lester TORRES, Plaintiff,
v.
Al CORMIER, Fred Gorham, Officer Dingham, and
Officer Forrtier, Defendants.

Civil Action No. 5:12–CV–63.
Sept. 19, 2012.

Lester Torres, St. Johnsbury, VT, pro se.

Jana M. Brown, Vermont Office of the Attorney
General, Montpelier, VT, for Defendants.

### REPORT AND RECOMMENDATION

(Doc. 10)
JOHN M. CONROY, United States Magistrate Judge.

**\*1** Plaintiff Lester Torres, a Vermont inmate,
brings this action *pro se* under 42 U.S.C. § 1983
claiming that Defendants violated his constitutional
rights. Specifically, Plaintiff contends that, on De-
cember 25, 2011, after the toilet in his cell overflowed,
insufficient steps were taken to clean and sanitize the
cell, and, thereafter, he had to remain in the unsanitary
cell to eat Christmas dinner. He brings his claim under
the Due Process Clause of the Fifth and Fourteenth
Amendments, as well as the Eighth Amendment's
prohibition on cruel and unusual punishment. De-
fendants, various officials at the correctional facility,
move to dismiss under Fed.R.Civ.P. 12(b)(6) for four
reasons: (1) the claims against Defendants in their
official capacity are barred by the Eleventh Amend-
ment; (2) Plaintiff has failed to exhaust his adminis-

trative remedies; (3) Plaintiff has failed to allege
personal involvement on the parts of Defendants
Cormier, Gorham, and Dingham; and (4) Plaintiff has
failed to state a valid claim under the Eighth
Amendment. (Doc. 10.) Plaintiff has not filed a re-
sponse to the pending motion to dismiss.

For the reasons that follow, I recommend that the
motion to dismiss be GRANTED and that this case be
DISMISSED with leave to amend.

### *Factual and Procedural Background*

For purposes of the motion to dismiss, all facts
alleged in the Complaint (Doc. 5) will be accepted as
true. On December 25, 2011, Plaintiff's cell at the
Northeast Regional Correctional Facility, a state
prison run by the Vermont Department of Corrections
where he was incarcerated, flooded due to an overflow
of his toilet. (*Id.* at 4.) Plaintiff stood on a chair to
avoid contact with the "feces and urine" that had fallen
onto the floor, (*id.*) but when Officer Forrtier offered
him a plastic bag to cover his feet, Plaintiff had no
choice but to walk in the waste to retrieve the bag. (*Id.*
at 4–5.) Plaintiff mopped up the mess, and was also
"forced to clean [the cell] and sanitize" it without
boots, gloves, or other "hazmat gear." (*Id.* at 5.)
Thereafter, Plaintiff was unable to spend time with his
family for Christmas dinner, because he was forced to
eat the meal in the dirty cell, which still smelled of
sewage. (*Id.*)

Having been granted leave to proceed *in forma
pauperis* (Doc. 3), Plaintiff filed his Complaint on
March 26, 2012. (Doc. 5.) In the Complaint, Plaintiff
argued that the above set of facts constituted a viola-
tion of the Eighth Amendment to the United States
Constitution, as well as a violation of the due process
guarantees of the Fifth and Fourteenth Amendments.
(*Id.* at 5.) Plaintiff seeks damages in the amount of
$1,000,000. (*Id.* at 6.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5330980 (D.Vt.)
**(Cite as: 2012 WL 5330980 (D.Vt.))**

*Discussion*

**I. Legal Standard**

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. This does not require a plaintiff to provide "detailed factual allegations" to support his claims, *Twombly,* 550 U.S. at 555, but "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

**\*2** The Court has the added obligation in this case to "construe a *pro se* complaint liberally," *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009), by "reading such submissions 'to raise the strongest arguments they suggest.' " *Berlin v. United States,* 478 F.3d 489, 491 (2d Cir.2007) (quoting *Burgos v. Hopkins,* 14 F .3d 787, 790 (2d Cir.1994)). This admonition applies with particular force when a plaintiff's civil rights are at issue. *See McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). *Pro se* litigants, however, "remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in *Twombly* and *Iqbal.*" *Brickhouse v. City of New York,* No. 09 CIV. 9353, 2010 WL 3341845, at \*2 (S.D.N.Y. Aug. 16, 2010).

As noted above, Plaintiff has not filed a response to the motion to dismiss. Nonetheless, a plaintiff's failure to oppose a Rule 12(b)(6) motion does not by itself merit dismissal of a complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183–84 (2d Cir.2010); *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). "[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and

knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *Goldberg,* 599 F.3d at 184 (citing *McCall,* 232 F.3d at 322–23).

**II. Eleventh Amendment Immunity**

Defendants first argue for dismissal of all claims brought against them in their official capacities, maintaining that, to whatever extent they have been sued in such capacities (which is unclear from the face of the Complaint), they are immune from suit under the Eleventh Amendment to the United States Constitution.[FN1] (Doc. 10 at 3.) It is, of course, doctrinal that federal jurisdiction over suits against unconsenting states or state officials "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans v. Louisiana,* 134 U.S. 1, 15 (1890). As a consequence, unless the state consents to suit or provides an express or statutory waiver of immunity, the Eleventh Amendment bars suit in federal court for damages against states, state agencies, and state officials acting in their official capacity. *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006). Any waiver of Eleventh Amendment immunity by a state must be unequivocally expressed. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 n. 1 (1985).[FN2]

> FN1. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has also been interpreted to bar federal suits against state governments by a state's own citizens. *See Hans v. Louisiana,* 134 U.S. 1, 15 (1890).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5330980 (D.Vt.)
**(Cite as: 2012 WL 5330980 (D.Vt.))**

FN2. Congress also may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976), which it has not done in any way relevant to this case. Further, the Supreme Court has recognized that Congress did not intend to abrogate sovereign immunity by the enactment of § 1983. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

As relevant to this case, the state has not waived immunity from a § 1983 suit in federal court. Indeed, the state has expressly preserved its immunity under the Eleventh Amendment. *See* 12 V.S .A. § 5601(g). Accordingly, the damages claims against Defendants in their official capacities should be DISMISSED.

## III. Failure to Exhaust Administrative Remedies

**\*3** Defendants next argue that the Complaint should be dismissed because Plaintiff failed to exhaust his administrative remedies. (Doc. 10 at 3–5.) In his Complaint, Plaintiff admits that he has not filed a grievance, as "others are pursuing this course." (Doc. 5 at 2.) Plaintiff further maintains that he declined to file a grievance because "[n]othing is usually done," (*id.* at 3) so he decided he would "go ahead and sue." (*Id.* at 2.)

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Suits related to "prison conditions" under the PLRA include "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Proper exhaustion of administrative remedies under

the PLRA requires inmates to comply with and complete the prison grievance procedures in place at the institution to which they are confined. *See Jones v. Bock,* 549 U.S. 199, 218 (2007). As relevant to this case, I note that "[e]ven when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter,* 534 U.S. at 524.

The grievance process at the facility, succinctly stated, allows the inmate to file an informal grievance, followed by a formal grievance if the inmate is not satisfied, which can then be appealed to the facility superintendent. (Doc. 10–1, Murphy Aff. ¶ 3.) Ultimately, the inmate can appeal the superintendent's decision to the Commissioner of the Department of Corrections, who is the final arbiter of an inmate's grievance. (*Id.* at ¶ 4.) Thus, appeal to the Commissioner and subsequent disposition of the grievance by the Commissioner constitute exhaustion of administrative remedies in this setting.

Although the exhaustion requirement is "mandatory," *id.,* the Second Circuit has recognized certain caveats that can apply in limited circumstances. "These caveats fall into three categories: when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a[ ] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006), citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004).

At all times relevant to this incident, the Vermont Department of Corrections had this grievance procedure, which was thus formally "available" to Plaintiff. (Doc. 10–1, Murphy Aff. ¶ 2.) But the formal availability of a grievance procedure does not necessarily end the inquiry. *See Hemphill,* 380 F.3d at 687. Alt-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5330980 (D.Vt.)
**(Cite as: 2012 WL 5330980 (D.Vt.))**

hough Plaintiff admits that he did not file a grievance, (Doc. 5 at 2) he states in his Complaint that "[n]othing is usually done" in response to grievance filings, (*id.* at 3) so he decided to skip the ineffectual process and "go ahead and sue." (*Id.* at 2.) While the Second Circuit takes a functional approach to the question of the availability of grievance procedures, *see Hemphill,* 380 F .3d at 687, the test for availability remains "an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available," *id.* at 688 (internal quotation marks omitted). As such, an inmate's unilateral expression of the futility of filing a grievance is insufficient to negate the PLRA's exhaustion requirement and absolve him of the failure to exhaust. *See Shariff v. Coombe,* 655 F.Supp.2d 274, 286 (S.D.N.Y.2009) (inmate's perception of futility insufficient to excuse his failure to exhaust); *Harrison v. Goord,* No. 07 Civ. 1806, 2009 WL 1605770, at *4 (S.D.N.Y. June 9, 2009) (inmates are required to exhaust their remedies "even if they believe that administrative remedies would be ineffective or futile"); *see also Booth v. Churner,* 532 U.S. 731, 741 n. 6 (2001) (construing PLRA, Court stated that it would not "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"). Thus, despite Plaintiff's perception that filing a grievance would have been ineffective, administrative remedies remained available to him for the purposes of the PLRA, and he was required to exhaust those remedies before filing a claim in this Court.[FN3]

> FN3. Similarly, Plaintiff cannot rely on the fact that another inmate has filed a grievance, which he avers in his Complaint (Doc. 5 at 2), as evidence that he has in any way initiated (let alone exhausted) the administrative grievance procedure himself. *See Shariff v. Coombe,* 655 F.Supp.2d 274, 286 (S.D.N.Y.2009) (concluding that inmate cannot rely on grievance filed by another inmate as evidence of exhaustion).

**\*4** Furthermore, Plaintiff has identified no reason why Defendants should be estopped from raising his failure to exhaust as a defense, and has pointed to no special circumstances that would justify his failure to file a grievance. Accordingly, the damages claim against Defendants should be DISMISSED.

**IV. Personal Involvement**

Defendants Cormier, Gorham, and Dingham—officials from the Northeast Regional Correctional Facility—next maintain that the claims against them should be dismissed for Plaintiff's failure to allege their personal involvement in the claimed constitutional violations. (Doc. 10 at 5–6.) "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). "When monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required." *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973). As it relates specifically to supervisors, mere "linkage in the prison chain of command" is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); *see also Wright,* 21 F.3d at 501 (noting that a defendant in a § 1983 action may not be held liable for constitutional violations merely because he held a high position of authority).

Nonetheless, under certain limited circumstances, a supervisor may be held liable for unconstitutional conduct. The Second Circuit has held that

> [s]upervisor liability under § 1983 "can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5330980 (D.Vt.)
**(Cite as: 2012 WL 5330980 (D.Vt.))**

custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Hernandez,* 341 F.3d at 145; *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

*Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *see also Iqbal,* 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

In his Complaint, Plaintiff does not claim that any of these three Defendants were either directly involved in, or even aware of, his claims. He identifies only Officer Forrtier, the fourth Defendant, in his recitation of the facts forming the basis of his complaint. (Doc. 5 at 4.) He also does not allege that a policy or custom existed sanctioning the conduct at issue. Finally, he does not claim that either Cormier, Gorham, or Dingham were made aware of the problem through a report, nor does Plaintiff allege negligent supervision or that these Defendants failed to take corrective action based on information provided to them. On this basis, I recommend that the Court GRANT the motion to dismiss all claims against Defendants Cormier, Gorham, and Dingham.

**V. Eighth Amendment**

**\*5** Finally, Defendants argue that, at bottom, Plaintiff's allegations—that he was exposed to an overflowing toilet water without being permitted to sanitize his cell—fail to state a valid Eighth Amendment claim. The Eighth Amendment's prohibition against "cruel and unusual punishments," U.S. CONST. amend. VIII, requires prison conditions to be "humane," though not necessarily "comfortable." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (internal quotation marks omitted) (citing *Farmer v.*

*Brennan,* 511 U.S. 825, 832 (1994), and *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). "To establish an Eighth Amendment violation, an inmate must show: '(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities[;] and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety.' " *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012) (quoting *Gaston,* 249 F.3d at 164).

The objective component of this test calls for the alleged prison conditions to be "evaluated in light of contemporary standards of decency." *Blissett v. Coughlin,* 66 F.3d 531, 537 (2d Cir.1995) (citing *Rhodes,* 452 U.S. at 346). In making this assessment, the Second Circuit has held that "prisoners may not be deprived of their basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health." *Jabbar,* 683 F.3d at 57. As relevant to this case, "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment." *Whitnack v. Douglas County,* 16 F.3d 954, 958 (8th Cir.1994).

The subjective component, "deliberate indifference," requires "more than mere negligence," *Farmer,* 511 U.S. at 835; "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar,* 683 F.3d at 57. It is not enough to show that an officer should have been aware that a prisoner was in immediate danger. Rather, the evidence must allow a reasonable juror to conclude that the officer "was actually aware of that immediate danger." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009); *see Farmer,* 511 U.S. at 837 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5330980 (D.Vt.)
**(Cite as: 2012 WL 5330980 (D.Vt.))**

Plaintiff's claim fails on both fronts. As to the objective seriousness of the claimed deprivation, I note that, while chronic exposure to human waste may give rise to a colorable Eighth Amendment claim, "where exposure to such waste is intermittent or limited to a matter of hours, courts normally will not entertain such actions." *Ortiz v. Department of Corrections,* No. 08 Civ. 2195, 2011 WL 2638137, at *7 (S.D.N.Y. April 29, 2011), *adopted in full,* 2011 WL 2638140 (S.D.N.Y. July 5, 2011). For example, in *Gaston v. Coughlin,* 249 F.3d 156, 165–66 (2d Cir.2001), the Second Circuit reinstated an inmate's Eighth Amendment claim against two prison officers where the area in front of his cell was filled with human waste for several consecutive days. But courts of this circuit have repeatedly held that, where the claimed exposure lasts only a matter of hours rather than days, an inmate cannot make a colorable claim under the Eighth Amendment. *See Ortiz v. Department of Corrections,* 2011 WL 2638137, at *7 (collecting cases). Because Plaintiff only alleges a temporary exposure to waste, his claim is insufficiently serious to violate the Eighth Amendment.

**\*6** Furthermore, Plaintiff has not sufficiently alleged "deliberate indifference" on the part of prison officials for his claim to survive the motion to dismiss. The Complaint recites the steps that prison officials took to assist him after his toilet began to overflow. When informed of the problem, officers handed him plastic bags to cover his feet, and later provided a mop with which Plaintiff could clean up the mess. (Doc. 5 at 4–5.) Although Plaintiff was never provided with boots, gloves, or other "hazmat gear" to clean the cell, "[t]here is a clear difference between cases where defendants allegedly knew about unsanitary conditions but did nothing and cases where officials actually acted to resolve or alleviate the problem, as they are alleged to have done here." *Ortiz v. Department of Corrections,* 2011 WL 2638137, at *9. Prison officials made some, admittedly imperfect, efforts to help Plaintiff clean his cell in the circumstances of this case. Such attempts are hardly indicative of indifference.

Because Plaintiff's claims do not rise to the level of unconstitutional conduct under the Eighth Amendment,[FN4] I recommend that claims against all Defendants be DISMISSED.

FN4. As an inmate, Plaintiff's rights are protected under the Eighth Amendment, rather than the Fourteenth Amendment, which applies to pre-trial detainees. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979). As a consequence, to whatever extent Plaintiff has brought his claim under the Due Process Clause of either the Fifth or Fourteenth Amendments (Doc. 5 at 5), he has failed to state a valid claim under those amendments as well.

**VI. Leave to Amend**
The Second Circuit has emphasized that a district court should not dismiss a *pro se* filing "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation marks omitted). "[E]ven after *Twombly,* dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." *Boykin v. KeyCorp,* 521 F.3d 202, 216 (2d Cir.2008). Here, given the exceedingly high bar of unsustainability the claim must clear for Plaintiff not to be given leave to amend, as well as the liberal reading due his *pro se* pleading, Plaintiff should be granted an opportunity to amend his Complaint.

If Plaintiff chooses to submit an amended filing, the filing shall be entitled "Amended Complaint" and must contain all claims against all parties, as it will supersede the original Complaint in all respects. The Court should also require that the Amended Com-

Not Reported in F.Supp.2d, 2012 WL 5330980 (D.Vt.)
**(Cite as: 2012 WL 5330980 (D.Vt.))**

plaint be filed within thirty days of its ruling on this Report and Recommendation. Failure to so amend should result in the dismissal of all claims with prejudice.

### Conclusion

For the reasons set forth above, I recommend that Defendants' motion to dismiss (Doc. 10) be GRANTED and the case be DISMISSED. I further recommend that, if this Report and Recommendation is adopted by the Court, Mr. Torres be allowed thirty days to file an Amended Complaint. Failure to file an Amended Complaint should result in the dismissal of the case with prejudice.

D.Vt.,2012.
Torres v. Cormier
Not Reported in F.Supp.2d, 2012 WL 5330980 (D.Vt.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

C
Only the Westlaw citation is currently available.


United States District Court,
N.D. New York.
Jason R. WHITE, Plaintiff,
v.
Brian FISCHER, Commissioner, Dept. of Correctional Services; Theresa A. Knapp–David, Director, Classification and Movement; and R. Woods, Superintendent, Upstate Correctional Facility, Defendants.

No. 9:09–CV–240.
Feb. 18, 2010.

Jason R. White, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Brian J. O'Donnell, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER
DAVID N. HURD, District Judge.
**\*1** Plaintiff, Jason R. White, commenced this civil rights action in February 2009, pursuant to 42 U.S.C. § 1983. By Report–Recommendation dated January 25, 2009, the Honorable David E. Peebles, United States Magistrate Judge, recommended that defendant's motion to dismiss (Dkt. No. 10) be granted, and that plaintiff's complaint in this action be dismissed without leave to replead. No objections to the Report–Recommendation have been filed.


Based upon a careful review of the entire file and the recommendations of Magistrate Judge Peebles, the Report–Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant's motion to dismiss (Dkt. No. 10) is GRANTED;

2. Plaintiff's complaint in this action is DISMISSED without leave to replead; and

3. The Clerk is directed to file judgment accordingly and close the file.

IT IS SO ORDERED.

JASON R. WHITE,

Plaintiff,

-v.-

BRIAN FISCHER, THERESA A. KNAPP–DAVID, and R. WOODS,

Defendants.

### REPORT AND RECOMMENDATION
DAVID E. PEEBLES, United States Magistrate Judge.
Plaintiff Jason R. White, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In his complaint, plaintiff asserts that his transfer into special housing unit ("SHU") disciplinary confinement at the Upstate Correctional Facility, to serve what was originally intended to be a three-month

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

disciplinary sentence of less restrictive keeplock confinement imposed while at another facility, represented a deprivation of a liberty interest without the requisite procedural due process. As relief for the violation, plaintiff's complaint seeks an award of compensatory damages in the amount of $25,000.

In response to plaintiff's complaint, defendants have moved seeking its dismissal for failure to state a cause of action upon which relief may be granted. In their motion, defendants argue that plaintiff's allegations do not demonstrate the existence of a meritorious due process claim since, at best, it implicates a failure of prison officials to comply with governing regulations regarding transfers into an SHU unit, a matter not of constitutional concern, noting further that plaintiff has no constitutional right to be designated to a particular correctional facility or to a desired security classification. Defendants also seek dismissal of plaintiff's claims against them based upon lack of personal involvement, and additionally assert their entitlement to qualified immunity from suit as a basis for their dismissal motion.

For the reasons set forth below, I find that White's complaint fails to set forth a plausible due process violation and that defendant Fischer is also entitled to dismissal of the claims against him based upon the lack of allegations showing of his personal involvement in the conduct allegedly giving rise to plaintiff's claims. I further recommend a finding that, even if plaintiff were able to plead a cognizable due process cause of action, defendants Knapp–David and Woods nonetheless should be granted qualified immunity from suit in this instance.

## I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for

purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964). I have also considered the exhibits attached to plaintiff's memorandum, which accompanied his complaint, to the extent that they are consistent with the allegations of his complaint. *See Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

**\*2** Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to his claims plaintiff was designated first to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York, and later to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. *Id.,* § 6.

On March 28, 2007, while confined at Auburn, plaintiff was found guilty following a Tier I II disciplinary hearing of engaging in violent conduct and refusing a direct order, in violation of disciplinary rules 104.11 and 106.10, respectively.[FN2] *See* Plaintiff's Memorandum (Dkt. No. 1–1) Exh. A. [FN3] As a result of that determination plaintiff was sentenced to serve three months of keeplock confinement, with a corresponding loss of package, commissary, and telephone privileges. *See id.*

> FN2. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
(Cite as: 2010 WL 624081 (N.D.N.Y.))

concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

FN3. Plaintiff filed what he labeled as a "memorandum of law", with exhibits attached, in conjunction with his complaint. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his ... memorandum." *Rivera v. Selsky,* No. 9:05–CV–0967, 2007 WL 956998, at *1 n. 2 (N.D.N.Y. Jan. 5, 2007) (quoting *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997)).

On April 11, 2007, while serving his keeplock sentence at Auburn, White was processed out of that facility and, following completion of an inter-prison transfer process which included a stop at another facility, was transferred into Upstate on or about April 13, 2007. Complaint (Dkt. No. 1) § 6. At Upstate, plaintiff was assigned to a two-person cell in the facility's SHU to serve the balance of his disciplinary confinement sentence.[FN4] *Id.*

FN4. Upstate is a maximum security prison comprised exclusively of SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

On April 23, 2007 plaintiff filed a grievance with prison authorities, arguing that his transfer into the SHU at Upstate was not authorized by DOCS directives. Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. C. The grievance was denied by the facility's Inmate Grievance Review Committee ("IGRC"). Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff appealed the denial to defendant Woods, the Superintendent at Upstate, who upheld the IGRC's unfavorable determination by decision dated May 15, 2007. Complaint (Dkt. No. 1) § 6 at p. 4B. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff's further appeal of the matter to the DOCS Central Office Review Committee ("CORC") was likewise unsuccessful. *Id.* Exh. E.

Also on April 23, 2007, plaintiff sent a letter to the DOCS Commissioner Brian Fischer, complaining of the SHU designation. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. F. That letter was referred by Commissioner Fischer to defendant Theresa A. Knapp–David, the DOCS Director of Classification and Movement. Complaint (Dkt. No. 1) § 6 at pp. 4B–4C. In response, defendant Knapp–David wrote to the plaintiff on May 7, 2007, advising that his SHU assignment was in accordance with established DOCS procedures. Plaintiff's Memorandum at (Dkt. No. 1.1) Exh. G.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 27, 2009, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Commissioner Fischer; Director Knapp–David; and Upstate Superintendent R. Woods. Complaint (Dkt. No. 1) § 3. Plaintiff's complaint asserts a single cause of action for deprivation of procedural due process. *Id.,* § 7.

**\*3** Following service, in lieu of answering plaintiff's complaint, defendants filed a motion to dismiss asserting a variety of grounds for the relief sought. Dkt. No. 10. In their motion defendants argue, *inter*

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

*alia,* that plaintiff's complaint 1) does not implicate a cognizable due process violation, 2) plaintiff's complaint fails to establish their personal involvement in the deprivation alleged; and 3) in any event they are entitled to qualified immunity.[FN5] Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 13, which is now fully briefed and ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN5. Defendant's also seek a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure staying discovery in this matter pending final determination of their dismissal motion. Discerning no basis to conclude that plaintiff would be unduly prejudiced by such a stay, that application will be granted.

### III. *DISCUSSION*

#### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal

conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* ––– U.S. ––––, 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974). When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)).

#### B. *Procedural Due Process*
**\*4** In their motion, defendants assert that because plaintiff's due process claim rests on alleged violations of DOCS regulations, his complaint in fact fails to assert a cognizable due process claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Inmates' liberty interests

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

may arise out of the Due Process Clause of the Fourteenth Amendment, or state statute or regulation. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).

Recognizing that lawful imprisonment necessarily restricts the rights and privileges of inmates, the Supreme Court has narrowly circumscribed the scope of liberty interests arising out of the Due Process clause to protect only the most basic liberty interests of prisoners. *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869 (1983). Accordingly, the Due Process Clause does not guard against every change in the conditions of confinement having a substantial adverse impact on inmates, but only those conditions or restraints that "exceed[ ] the sentence in ... an unexpected manner." *Arce,* 139 F.3d at 333 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995)).

In this instance plaintiff does not claim that he was denied procedural due process in connection with the disciplinary hearing that led to the imposition of a three-month period of keeplock confinement as a sanction. Instead, he argues that his due process rights were abridged after the sanction was imposed when, in violation of DOCS Directive No. 4933,[FN6] he was transferred from keeplock confinement at Auburn to an SHU cell at Upstate, and as a result required to endure a more restrictive confinement. Unfortunately for plaintiff, neither the Due Process Clause nor state statute or regulation give rise to a liberty interest in these circumstances.

> FN6. Section 301.6(a) of DOCS Directive No. 4933 permits an inmate confined in a medium or minimum security facility, or at Upstate, to be admitted into an SHU for various reasons, which can include confinement pursuant to a Tier II or III hearing disposition. Plaintiff asserts that because he was transferred from Auburn, a maximum

security facility, into an SHU unit, that section does not apply. Interestingly, a prior version of DOCS Directive No. 4933 provided, in relevant part, that

> [a]n inmate who is assigned to keeplock status and who is transferred to a maximum security facility shall not be assigned to the special housing unit at the receiving facility. Such inmate shall be assigned to keeplock within general population and shall have the same rights and responsibilities as other keeplock inmate in that facility.

> *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998) (quoting prior version of 7 NYCRR § 301.6(h)).

Preliminarily, it is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, "and transfers among facilities do not need to be proceeded by any particular due process procedure." *Halloway v. Goord,* No. 9:03–CV01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) [FN7] (citing *Wilkinson v. Austin,* 545 U.S. 209, 221–22 (2005)) (other citation omitted); *see also, Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009) (per curiam); *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). As a result, the constitution did not present any impediment to plaintiff's transfer to Upstate.

> FN7. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

**\*5** Additionally, it is equally well established, as defendants now argue, that state regulations, including DOCS Directives, do not ordinarily confer constitu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

tional rights sufficient to give rise to a due process claim. *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009). A state can, however, by statute or regulation confer a liberty interest which cannot be abridged without due process. *Black v. Lansberg,* No. 9:06–CV–1243, 2009 WL 3181111, at *3 (Sept. 29, 2009) (Suddaby, J., adopting Report and Recommendation of Lowe, M.J.). Nonetheless, contrary to plaintiff's contention, DOCS Directive No. 4933 does not give rise to a cognizable liberty interest.

It should be noted that on at least four separate occasions, addressing the same issues raised by the plaintiff in this case, this court has held that an inmate's transfer from keeplock to SHU after being sentenced to serve time in keeplock does not implicate a cognizable liberty interest. *McEachin v. Goord,* No. 9:06–CV–1192, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J. and Treece, M.J.) (dismissing complaint alleging that plaintiff was unlawfully transferred from keeplock to SHU while serving disciplinary sentence); *Halloway,* 2007 WL 2789499 (granting summary judgment dismissing claim that plaintiff should have received hearing before transfer to Upstate after sentenced to keeplock at Elmira Correctional Facility); *Carlisle v. Goord,* No. 9:03–CV–296, 2007 WL 2769566, at *2 n. 1 (N.D.N.Y. Sept. 21, 2007) (Scullin, S.J., adopting Report and Recommendation of Lowe, M.J.) (granting summary judgment finding that "an inmate has no liberty interest in not having his sentence of keeplock confinement at one prison converted to a sentence of SHU confinement at another facility without receiving a hearing regarding the conversion."); and, *Chavis v. Kienert,* 9:03–CV–0039, 2005 WL 2452150, at *9–10 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) (finding that transfer from keeplock at Coxsackie Correctional Facility to SHU at Upstate did not implicate a liberty interest). *See also, Holmes v. Grant,* No. 03–Civ. 3426, 2006 WL 851753, at *18–19 (S.D.N.Y. mar. 31, 2006 (dismissing claim plaintiff's claim that discipli-

nary sentence was improperly converted from keeplock sentence to SHU). These decisions are premised upon the court's conclusion that a transfer from keeplock in one facility to SHU in another does not implicate a constitutionally protected liberty interest and that "New York has not created, by regulation or statute, any liberty interest in remaining in one particular prison[,]" noting that "the DOCS ... possesses sole discretion to determine 'where a [state] inmate will be housed.' " *Halloway,* 2007 WL 2789499, at *5 (quoting *Grullon v. Reid,* No. 97 CIV. 7616, 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999)) (other citations omitted). These cases are indistinguishable from the case presently before the court.

**\*6** Moreover, contrary to the interpretation offered by the plaintiff, the court has read section 301.6 of DOCS Directive No. 4933 as "explicitly permitt[ing] keeplock sentences to be served in SHU and subject to the same restrictions and amenities ...." *McEachin,* 2008 WL 1788440, at *4; *see also, Halloway,* 2007 WL 278499, at * 5 ("[N]ot only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same ... limitations.") and *Holmes,* 2006 WL 851753, at * 19 ("Section 301.6 ... relat[es] to keeplock admissions and authorizes placement of inmates in SHU 'at a medium or minimum security correctional facility or *Upstate Correctional Facility* ... for confinement pursuant to disposition of a disciplinary (Tier II) or superintendent's (Tier II hearing.' ") (emphasis in original).

In view of the foregoing, it is clear that plaintiff's transfer from Auburn, where he was keeplocked, to SHU confinement at Upstate does not implicate a liberty interest arising out of either Due Process Clause, or state statute or regulation. According to plaintiff's complaint, he was sentenced to keeplock after a Tier III disciplinary hearing; he does not allege that he was denied due process in connection with that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
(Cite as: 2010 WL 624081 (N.D.N.Y.))

hearing. The Tier II I hearing that he was provided was all that was required by the constitution before he was sentenced to disciplinary confinement. *Holmes,* 2006 WL 851753, at *19. Plaintiff was entitled to no further procedure at the time of transfer to Upstate, and therefore cannot show that he was deprived of a protected liberty interest without due process of law.[FN8] *Id.* Accordingly, I recommend that plaintiff's complaint be dismissed for failure to state a cause of action.

> **FN8.** Plaintiff alleges a litany of differences between the conditions experienced while in keeplock at Auburn and those in SHU at Upstate asserting, for example, that with regard to visits, he was required to travel to and from them in handcuffs, had to remain in handcuffs if he needed to use the restroom, and was not permitted to take photographs, and also that he did not have the same opportunities for social interaction with other prisoners and had to sleep with a light on. Plaintiff's Memorandum (Dkt.1–1) at pp. 11–12. As a matter of law, these alleged conditions can hardly be characterized as "exceed[ing] his sentence in an unexpected manner" or as imposing an "atypical and substantial hardship upon the [plaintiff] in relation to the ordinary incidents of prison life". *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300. "[T] fact that 'life in one prison is much more disagreeable than another does not itself signify that a Fourteenth Amendment liberty interest is implicated....'" *Halloway,* 2007 WL 2789499, at * 7 (quoting *Meachum v. Fano,* 427 U.S. 215, 225 (1976). Moreover, even if a liberty interest were alleged, plaintiff was afforded all the process he was due, by way of a disciplinary proceeding, before the alleged deprivation. *Carlisle,* 2007 WL 2769566, at * 3.

## C. *Personal Involvement*

In their motion, defendants also challenge the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Two of the three defendants, Brian Fischer and Robert Woods, appear to be named as defendants in their supervisory capacities, based solely upon their positions as the DOCS Commissioner and the Superintendent at Upstate, respectively. As supervisors, neither of those individuals can be liable for damages under section 1983 solely by virtue of their respective positions as supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v.. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937.; *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

### 1. *Commissioner Fischer*

**\*7** Aside from allegations centering upon his role as the DOCS Commissioner, which are clearly insufficient in and of themselves to establish his liability, plaintiff's claims against defendant Fischer appear to revolve around the letter written by him to the Commissioner on or about April 23, 2007, complaining of his SHU confinement at Upstate. That letter, it appears from the limited materials now before the court, was referred to defendant Knapp–David for response. It is well established that when the Commissioner receives a letter and forwards it on to another individual for investigation and a response, his or her involvement in the constitutional violation cannot be predicated solely upon those circumstances. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Rivera v. Fischer,* No. 08–CV–6505L, 2009 WL 2981876, at \*2 (W.D.N.Y. Sept. 18, 2009). I therefore recommend dismissal of plaintiff's claims against Commissioner Fischer on the basis of lack of his personal involvement.

### 2. *Superintendent Woods*

Plaintiff's claims against Superintendent Woods stand on slightly different footing. It is alleged that Superintendent Woods processed and affirmed the determination of the Upstate IGRC denying plaintiff's grievance regarding the relevant occurrences. His review of plaintiff's grievance arguably placed Superintendent Woods on notice of a constitutional violation, which was ongoing, at a time when he was potentially positioned to end the violation. On that

basis I conclude that plaintiff has sufficiently alleged Superintendent Woods' personal involvement in the violation alleged to withstand defendants' dismissal motion. *See Charles v. New York State Dept. of Corr. Services,* No. 9:07–CV–1274, 2009 WL 890548, at \*5–9 (N.D.N.Y. Mar. 21, 2009) (Hurd, J. and DiBianco, M.J .).

### 3. *Director Knapp–David*

Plaintiff's complaint alleges that in her position as the DOCS Director of Classification and Movement, defendant Knapp–David would have reviewed and approved his transfer from Auburn into Upstate. That allegation is buttressed by both her position with the DOCS and the fact that plaintiff's letter regarding the matter was referred to defendant Knapp–David for response explaining why the transfer was proper under DOCS regulations. On this basis, I conclude that plaintiff has stated a plausible claim against defendant Knapp–David and her personal involvement in the constitutional deprivations alleged.

### D. *Qualified Immunity*

In their motion, defendants also assert entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815 (2009).

  **\*8** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN9] *Kelsey,* 567 F.3d at 61, "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[FN10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently concluded in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[FN11] *Pearson,* 555 U.S. ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

  FN9. If no constitutional right would have been violated were the allegations established, no further inquiry regarding qualified immunity is necessary. *Kelsey,* 567 F.3d at 61 (quoting *Saucier* ).

  FN10. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is

part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433 n. 11 (citation omitted).

  FN11. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

  For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*9** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v.. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Applying the *Saucier* two-step inquiry here, I have already determined that plaintiff has failed to state a plausible constitutional violation. Moreover, even if plaintiff were able to distinguish the existing precedent in this district and allege a protected liberty interest that required that plaintiff be provided with additional due process before his transfer to Upstate, I conclude that any such right was far from a clearly established and that a reasonable person in the circumstances of defendant Woods and defendant Knapp–David would not have appreciated that the transfer of plaintiff into SHU confinement at Upstate represented a potential deprivation of plaintiff's procedural due process rights beyond those addressed by the hearing officer. Accordingly, as an additional basis for dismissal, I recommend that both defendants Woods and Knapp–David be granted qualified immunity from suit.

IV. *SUMMARY AND RECOMMENDATION*

At the heart of plaintiff's complaint in this action is his contention that his due process rights and DOCS regulations were violated when he was transferred from keeplock confinement at Auburn into an SHU cell at Upstate. Since such a claim, it is well established in this district, is not constitutionally cognizable, White has therefore failed to state a claim upon which relief may be granted. While plaintiff has failed to establish personal involvement on the part of Commissioner Fischer in an alleged deprivation and the claims against him should be dismissed on this additional basis, plaintiff has sufficiently alleged personal involvement on the part of defendant Knapp–David and R. Woods. Nonetheless, I find that those two defendants are entitled to qualified immunity from suit, providing an additional basis for dismissal of plaintiff's claims against them. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 10) be GRANTED, and that plaintiff's complaint in this action be DISMISSED, without leave to replead; and it is further

ORDERED that pending a final determination on defendants' dismissal motion, discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*10** It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

N.D.N.Y.,2010.
White v. Fischer
Not Reported in F.Supp.2d, 2010 WL 624081
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.